# TABLE OF CONTENTS

**Relevant Record Materials, Pursuant to FRAP 8(a)(2)(B)(iii) and Local Rule 8:**

Order (Apr. 4, 2025) (Dkt. 21)................................................ Add. 1

Complaint (Mar. 24, 2025) (Dkt. 1) ....................................... Add. 4

Goebertus Declaration (Mar. 19, 2025) (Dkt. 10-2)........... Add. 25

Bishop Declaration (Mar. 19, 2025) (Dkt. 10-3)................. Add. 31

IJ Bond Order (Apr. 29, 2019) (filed

Mar. 31 2025) (Dkt. 11-1)............................................. Add. 46

BIA Opinion (Dec. 19, 2019) (filed

Mar. 31, 2025) (Dkt. 11-2)........................................... Add. 49

Cerna Declaration (Mar. 31, 2025) (Dkt. 11-3) .................. Add. 51

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO
ABREGO GARCIA, *et al.*,                     *

     Plaintiffs,                                  *

           Civil Action No. 8:25-cv-00951-PX

  v.                                           *

KRISTI NOEM, Secretary,                      *
United States Department                     *
of Homeland Security, *et al.*,              *

     Defendants.

                *
             ***

_____ FILED          _____ ENTERED
_____ LOGGED  BU  _____ RECEIVED

APR 4 2025

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY                        DEPUTY

### <u>ORDER GRANTING PRELIMINARY INJUNCTION</u>

The Court has reviewed Plaintiffs' Motion for Injunctive Relief pursuant to Rule 65 of the Federal Rules of Civil Procedure, along with supporting memoranda, reply briefs, and the record in this case. ECF No. 6. The Defendants named in this suit are the United States Secretary of Homeland Security, the Attorney General of the United States, the United States Secretary of State, the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"), the Acting Executive Associate Director of ICE Enforcement and Removal Operations, and the Director of ICE's Baltimore Field Office (collectively, the "Defendants"). ECF No. 1.

Kilmar Armando Abrego Garcia ("Abrego Garcia"), a native of El Salvador, was granted withholding of removal in 2019, which prohibited his removal to El Salvador. The record reflects that Abrego Garcia was apprehended in Maryland without legal basis on March 12, 2025, and, without further process or legal justification, was removed to El Salvador by March 15, 2025. Abrego Garcia is detained in El Salvador's Terrorism Confinement Center (Centro de Confinamiento del Terrorismo or "CECOT"). Plaintiffs contend that his removal violated 8 U.S.C.

§ 1231(b)(3)(A) and its implementing regulations, as well as the Fifth Amendment to the United

States Constitution, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and other applicable

legal protections.

Based on the record before the Court, I find that this Court retains subject matter

jurisdiction. I further find that: (1) Plaintiffs are likely to succeed on the merits because Abrego

Garcia was removed to El Salvador in violation of the Immigration and Nationality Act,

specifically 8 U.S.C. § 1231(b)(3)(A), and without any legal process; (2) his continued presence

in El Salvador, for obvious reasons, constitutes irreparable harm; (3) the balance of equities and

the public interest weigh in favor of returning him to the United States; and (4) issuance of a

preliminary injunction without further delay is necessary to restore him to the status quo and to

avoid ongoing irreparable harm resulting from Abrego Garcia's unlawful removal. For the reasons

stated above, the Court hereby DIRECTS Defendants to return Abrego Garcia to the United States

no later than 11:59 PM on April 7th, 2025. A memorandum opinion further setting forth the basis

for this ruling will be issued in due course.

Accordingly, it is this 4th day of April, 2025, by the United States District Court for the

District of Maryland, hereby ORDERED that:

1. Plaintiffs' Motion (ECF No. 6), construed as one for preliminary injunctive relief, is

   GRANTED;

2. Defendants are hereby ORDERED to facilitate and effectuate the return of Plaintiff

   Kilmar Armando Abrego Garcia to the United States by no later than 11:59 PM on

   Monday, April 7, 2025;

3. This preliminary relief is issued to restore the status quo and to preserve Abrego Garcia's

   access to due process in accordance with the Constitution and governing immigration

statutes;

4. The Clerk is DIRECTED to TRANSMIT copies of this Order to the parties.

Paula Xinis
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

_____

Kilmar Armando Abrego Garcia,                    )
Jennifer Stefania Vasquez Sura,                  )
A.A.V., *a minor, by and through his next friend* )
         *and mother, Jennifer Vasquez Sura,*     )
                                                 )
         c/o Murray Osorio PLLC                  )
         8630 Fenton Street, Suite 918,          )
         Silver Spring, MD 20910                 )
                                                 )
         *Plaintiffs,*                           )
                                                 )          Civil Action No. _____
v.                                               )
                                                 )
Kristi Noem, *Secretary of Homeland Security,*   )
                                                 )
         Secretary of Homeland Security          )
         Washington, DC 20508                    )
                                                 )
Todd Lyons, *Acting Director, U.S. Immigration*  )
         *and Customs Enforcement,*              )
Kenneth Genalo, *Acting Executive Associate*    )
         *Director, ICE Enforcement and Removal* )
         *Operations,*                           )
Nikita Baker, *ICE Baltimore Field Office Director,* )
                                                 )
         500 12th St., SW                         )
         Washington, D.C. 20536                  )
                                                 )
Pamela Bondi, *Attorney General,*               )
                                                 )
         950 Pennsylvania Avenue, NW             )
         Washington, DC 20530-0001              )
                                                 )
Marco Rubio, *Secretary of State,*              )
                                                 )
         The Executive Office of the Legal Adviser )
         and Bureau of Legislative Affairs       )
         Suite 5.600                             )
         600 19th Street NW                      )
         Washington DC 20522                     )
                                                 )
         *Defendants.*                           )
_____          )

1

## COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

In 2019, Plaintiff Kilmar Armando Abrego Garcia won an order from an immigration judge granting him a form of relief called withholding of removal, which prohibits Defendants from removing him to El Salvador. Should Defendants wish to remove Plaintiff Abrego Garcia to El Salvador, the law sets forth specific procedures by which they can reopen the case and seek to set aside the grant of withholding of removal. Should Defendants wish to remove Plaintiff Abrego Garcia to any other country, they would have no legal impediment in doing so. But Defendants found those legal procedures bothersome, so they merely ignored them and deported Plaintiff Abrego Garcia to El Salvador anyway, ripping him away from his U.S.-citizen wife, Plaintiff Vasquez Sura, and his disabled U.S.-citizen child, Plaintiff A.A.V. Defendants sent Plaintiff Vasquez Sura to El Salvador knowing that he would be immediately incarcerated and tortured in that country's most notorious prison; indeed, Defendants have *paid the government of El Salvador millions of dollars to do exactly that*. Such conduct shocks the conscience and cries out for immediate judicial relief.

### JURISDICTION AND VENUE

1.    This Court has jurisdiction to hear this case under 28 U.S.C. § 2201, the Declaratory Judgment Act, and 28 U.S.C. § 1331, Federal Question Jurisdiction; and because the individual Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

2.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

3.    Venue lies in this District because Plaintiffs reside in Beltsville, Maryland and each Defendant is an agency or officer of the United States sued in his or her official capacity.  28

2

U.S.C. § 1391(e)(1). In addition, Defendant Baker's principal place of business is in Baltimore, Maryland, and the legal violations described herein took place at the direction and under the supervision of her predecessor in office.

## THE PARTIES

4.      Plaintiff Kilmar Armando Abrego Garcia is a citizen and native of El Salvador who resides in Beltsville, Maryland. Defendants have deported him to El Salvador without any legal process whatsoever, and in violation of an immigration judge order and a federal statute prohibiting them from doing so.

5.      Plaintiff Jennifer Vasquez Sura is a U.S. citizen, and the wife of Plaintiff Abrego Garcia.

6.      Plaintiff A.A.V., a U.S. citizen, is a minor child.  He is the child of Plaintiff Abrego Garcia and Plaintiff Vasquez Sura.

7.      Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). She is the cabinet-level secretary responsible for all immigration enforcement in the United States.

8.      Defendant Todd Lyons is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). He is the head of the federal agency responsible for all immigration enforcement in the United States.

9.      Defendant Kenneth Genalo is the Acting Executive Associate Director of ICE Enforcement and Removal Operations. He is the head of the ICE office that carries out arrests of noncitizens and removals from the United States.

3

10. Nikita Baker is the ICE Baltimore Field Office Director. She is the head of the ICE office that unlawfully arrested Plaintiff, and such arrest took place under the direction and supervision of her predecessor in office.

11. Pamela Bondi is the Attorney General of the United States. The Immigration Judges who decide removal cases and application for relief from removal do so as her designees.

12. Marco Rubio is the Secretary of State of the United States. He is the individual whom Plaintiffs request this Court order to request the return of Plaintiff Abrego Garcia to the United States from El Salvador.

13. All government defendants are sued in their official capacities.

## LEGAL BACKGROUND

14. Federal law prohibits the government from removing a noncitizen to a country where he is more likely than not to face persecution on account of a statutorily protected ground. 8 U.S.C. § 1231(b)(3)(A). This protection is usually referred to as "withholding of removal."

15. For an immigration judge (serving as the designee of Defendant Bondi) to grant withholding of removal to a noncitizen, the noncitizen must prove that he is more likely than not to suffer persecution. "The burden of proof is on the applicant for withholding of removal [] to establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b).

16. If a noncitizen is granted withholding of removal, "DHS may not remove the alien to the country designated in the removal order unless the order of withholding is terminated." *Johnson v. Guzman Chavez*, 594 U.S. 523, 531 (2021). No exceptions lie. However, withholding

of removal is a country-specific form of relief, and an individual granted withholding of removal can still be deported to any other country.

17.     Federal regulations provide a procedure by which a grant of withholding of removal issued by an immigration judge may be terminated: DHS must move to reopen the removal proceedings before the immigration judge, and then DHS will bear the burden of proof, by a preponderance of the evidence, that grounds for termination exist. 8 C.F.R. § 1208.24(e). After a grant of withholding of removal is terminated, there would be no impediment to removal.

## FACTS

18.     Plaintiff Kilmar Armando Abrego Garcia is a citizen of El Salvador and no other country.

19.     Plaintiff Abrego Garcia is not a member of or has no affiliation with Tren de Aragua, MS-13, or any other criminal or street gang. Although he has been accused of general "gang affiliation," the U.S. government has never produced an iota of evidence to support this unfounded accusation.

20.     Plaintiff Abrego Garcia has no criminal history. He has never been charged or convicted of any criminal charges, in the United States, El Salvador, or any other country.

### *Plaintiff Abrego Garcia's 2019 removal proceedings*

21.     Plaintiff Abrego Garcia left El Salvador when he was around sixteen years old, fleeing gang violence. Beginning around 2006, gang members had stalked, hit, and threatened to kidnap and kill him in order to coerce his parents to succumb to their increasing demands for extortion.

5

22.     Sometime around 2011, Plaintiff Abrego Garcia entered the United States without inspection. He then made his way to the state of Maryland, where his older brother, a U.S. citizen, resided. In the United States, Plaintiff Abrego Garcia has only ever resided in Maryland.

23.     Around 2016, Plaintiff Abrego Garcia met Plaintiff Jennifer Vasquez Sura, a U.S. citizen with two U.S.-citizen children from a prior relationship. Over time, they became close and eventually became romantically involved.

24.     Around December 2018, Plaintiff Abrego Garcia moved in with Plaintiff Vasquez Sura and her two children, after Plaintiff Vasquez Sura learned she was pregnant with their child. Plaintiff Abrego Garcia supported himself, Plaintiff Vasquez Sura, and her two children through work in the construction industry.

25.     On March 28, 2019, Plaintiff Abrego Garcia went to a Home Depot in Hyattsville, Maryland to solicit employment. When he arrived, he joined three other young men who were also at Home Depot soliciting employment, two of whom he recognized from prior occasions at the Home Depot, though he had never interacted with them in any other context. The young men proceeded to chat to pass the time.

26.     At 2:27 PM, while the four of them were chatting, a detective from the Hyattsville City Police approached the group. The detective did not speak to Plaintiff Abrego Garcia, but only one of the other men. Soon thereafter, officers from Prince George County Police Department ("PGPD") arrived on the scene and proceeded to handcuff all four young men, including Plaintiff Abrego Garcia. At no point did police explain why they were arresting Plaintiff Abrego Garcia, nor was Plaintiff Abrego Garcia ever charged with any crime. This was Plaintiff Abrego Garcia's first and only time in state custody.

6

27.     At the police station, the four young men were placed into different rooms and questioned. Plaintiff Abrego Garcia was asked if he was a gang member; when he told police he was not, they said that they did not believe him and repeatedly demanded that he provide information about other gang members. The police told Plaintiff Abrego Garcia that he would be released if he cooperated, but he repeatedly explained that he did not have any information to give because he did not know anything.

28.     Plaintiff Abrego Garcia was then transferred to another room and told that ICE officers would be coming to take him into federal immigration custody. Eventually, ICE officers arrived and took Plaintiff Abrego Garcia into detention.

29.     The following day, Plaintiff Abrego Garcia was served with a Notice to Appear, 8 U.S.C. § 1229, commencing removal proceedings against him pursuant to 8 U.S.C. § 1229a. He was charged as removable pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible"), and no other charges.

30.     On April 24, 2019, Plaintiff Abrego Garcia appeared for his first hearing in immigration court. Through counsel, he moved for release on bond pursuant to 8 U.S.C. § 1226(a), submitting over seventy pages of evidence in support thereof. ICE opposed a change in custody status, arguing that Plaintiff Abrego Garcia presented a danger to the community because local police had supposedly "verified" that he is an active gang member.

31.     In support thereof, ICE offered a Gang Field Interview Sheet ("GFIS") generated by PGPD. The GFIS explained that the only reason to believe Plaintiff Abrego Garcia was a gang member was that he was wearing a Chicago Bulls hat and a hoodie; and that a confidential informant advised that he was an active member of MS-13 with the Westerns clique. The GFIS

7

had been entered into PGPD's database at 6:47 PM, approximately four hours after police met Plaintiff Abrego Garcia for the first time.

32.     According to the Department of Justice and the Suffolk County District Attorney's Office, the "Westerns" clique operates in Brentwood, Long Island, in New York, a state that Plaintiff Abrego Garcia has never lived in.

33.     The attorney for Plaintiff Abrego Garcia subsequently made multiple attempts to obtain additional information from law enforcement concerning these allegations. PGPD indicated that it did not have any incident report related to the Home Deport episode at all, nor did the Department have any incident reports containing his name. The Hyattsville City Police Department ("HCPD"), on the other hand, confirmed it had an incident report for the Home Depot incident, but that only 3 people were named and Plaintiff Abrego Garcia was not one of them, nor did it have any other incident reports with his name in its database. His attorney also contacted the PGPD Inspector General requesting to speak to the detective who authored the GFIS sheet, but was informed that the detective had been suspended. A request to speak to other officers in the Gang Unit was declined.

34.     On June 25, 2019, Plaintiff Vasquez Sura and Plaintiff Abrego Garcia were married in the Howard Detention Center. Plaintiff Vasquez Sura was in her third trimester of pregnancy at the time. Due to a pre-existing condition, uterus didelphys, her pregnancy was categorized as high-risk. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

35.     Plaintiff Abrego Garcia then filed an I-589 application for asylum, withholding of removal, and protection under the Convention Against Torture with the Baltimore Immigration Court and was scheduled for an individual hearing. His individual hearing spanned over two days: August 9, 2019, and September 27, 2019.

8

36.    In advance of his hearing, Plaintiff Abrego Garcia, through counsel, filed a motion for a subpoena to require the appearance of two PGPD detectives, and any evidence substantiating his alleged gang membership.

37.    In addition, Plaintiff Abrego Garcia, through counsel, submitted a legal brief and a voluminous evidentiary filing establishing his eligibility for protection and contesting the unfounded allegation of gang membership levied against him.

38.    On August 9, 2019, the attorney for ICE indicated on the record that ICE had conferred with its law enforcement partners and that all the evidence and intelligence they had was what was contained in the GFIS. As a result, a subpoena was deemed unnecessary.

39.    On August 11, 2019, Plaintiff Vasquez Sura gave birth to the couple's son, Plaintiff A.A.V. Plaintiff Abrego Garcia was unable to witness the birth of his son as he remained detained, awaiting to continue the second part of his hearing.

40.    A.A.V. was born with Microtia, congenital malformation of the external ear, resulting in an underdeveloped ear. Testing later confirmed that A.A.V. was deaf in his right ear. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

41.    On October 10, 2019, Plaintiff Abrego Garcia was granted withholding of removal pursuant to 8 U.S.C. § 1232(b)(3)(A), after the immigration judge agreed that he had established it was more likely than not that he would be persecuted by gangs in El Salvador because of a protected ground. *See* Ex. A (Immigration Judge order). ICE did not appeal the grant of relief, *see* Ex. E (immigration court "Automated Case Information" page); and Plaintiff Abrego Garcia was then promptly released from custody.

42.    Plaintiff Abrego Garcia went home to his wife and children. They all have continuously resided in Prince George's County, Maryland.

43.     In addition to hearing problems, A.A.V., who is now five years old, is intellectually disabled and has a speech disorder. To this day, he is unable to verbally communicate and in October 2024 he was diagnosed with autism.

44.     Both Plaintiff Vasquez Sura and Plaintiff Abrego Garcia work to support their family of five. Plaintiff Abrego Garcia is a union member and is employed full-time as a first-year Sheetmetal Apprentice. In addition, he has been pursuing his own license at the University of Maryland.

45.     As a condition of his withholding of removal status, Plaintiff Abrego Garcia is required to check in with ICE once a year, and has been fully compliant. He appeared for his most recent check-in on January 2, 2025, without incident. *See* Ex. C (ICE check-in record).

46.     Aside from these check-ins, after being granted withholding protection and being released from custody, Plaintiff Abrego Garcia has had no contact with any law enforcement agency.

47.     Plaintiff Abrego Garcia has never been arrested or charged with any crime in the U.S. or in El Salvador. There is no known link or association between him and the MS-13 gang. Prince George's County law enforcement never again questioned him regarding MS-13 or accused him of membership in MS-13.

### *Plaintiff Abrego Garcia's 2025 arrest and removal*

48.     In the early afternoon of Wednesday, March 12, 2025, after completing a shift as a sheet metal worker apprentice at a new job site in Baltimore, Plaintiff Abrego Garcia picked up his five-year old son, A.A.V., from his grandmother's house.

10

49.    While driving with his son A.A.V. in the backseat, Plaintiff Abrego Garcia was pulled over by ICE officers acting at the direction and under the supervision of Defendant Baker's predecessor in office.

50.    One ICE officer, who identified himself as part of Homeland Security Investigations, told Plaintiff Abrego Garcia that his "status has changed." Within minutes, Plaintiff Abrego Garcia was handcuffed and detained in one of several ICE vehicles on the scene. Plaintiff Vasquez Sura was called and instructed to appear at their location within ten minutes to get her five-year old son, A.A.V.; otherwise, the ICE officers threatened that the child would be handed over to Child Protective Services. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

51.    After Plaintiff Vasquez Sura arrived at the scene, she was able to briefly talk with Plaintiff Abrego Garcia, who appeared confused, distraught, and crying. Moments later, Plaintiff Abrego Garcia was driven away. No explanation was provided to Jennifer as to why her husband was detained, where he was going, or what was happening. *Id.*

52.    Almost immediately after Plaintiff Vasquez Sura left with her son A.A.V., she began to try to locate Plaintiff Abrego Garcia through the online ICE Detainee Locator system and by calling various immigration detention centers and facilities. It appeared that between Wednesday, March 12, and Saturday, March 15, Plaintiff Abrego Garcia was moved to various different locations across the country. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

53.    The evening after his arrest, Plaintiff Vasquez Sura received a call from Plaintiff Abrego Garcia. At that time, it appeared that he was in Baltimore. During that conversation, Plaintiff Abrego Garcia informed Plaintiff Vasquez Sura that he was being questioned about gang affiliations. He repeatedly informed his interviewers that he was never a gang member and had no gang affiliations. He was shown several photos where he appeared in public, and asked about other

11

people in those photos, but was unable to provide any information on them, as he did not know them or anything about them. Plaintiff Abrego Garcia also told his wife that he had been told that he would go before an immigration judge and then be released. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

54.     Plaintiff Vasquez Sura received a call from Plaintiff Abrego Garcia on the evening of March 13. Plaintiff Abrego Garcia told his wife that he believed he was in Louisiana, but was not sure because he had been moved around so many times. Plaintiff Abrego Garcia indicated to his wife that he was very confused. However, he was still being assured that he would be brought before an immigration judge soon. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

55.     In an attempt to ascertain his actual location and find further information about his arrest and detention, Plaintiff Vasquez Sura called different detention centers, trying to speak to someone. She recalls one brief conversation where she was told that "El Salvador was asking for him." Her attempts to protest by saying that he had won protection from being removed to El Salvador fell on deaf ears. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

56.     Around 11:00 AM on Saturday, March 15, 2025, Plaintiff Vasquez Sura received her last call from Plaintiff Abrego Garcia. During that conversation, Plaintiff Abrego Garcia informed her that he was being held by ICE at the East Hidalgo Detention Center in La Villa, Texas. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

57.     Plaintiff Abrego Garcia then relayed that he was told that he was being deported to El Salvador. With a sense of urgency, he asked his wife to contact his mother so their family could get him from "CECOT," as that is where he was told they were sending him.[1]

---

[1] CECOT is the Terrorism Confinement Center in El Salvador, one of the largest prisons in the world.

58.     Since that conversation, Plaintiff Vasquez Sura has not had any further contact with Plaintiff Abrego Garcia. *See* Ex. B (Declaration of Plaintiff Vasquez Sura).

59.     The following day, on Sunday, March 16, Ms. Vasquez Sura was sent a photo from a news article discussing the deportation of alleged Venezuelan gang members that were deported without a hearing. The photo showed men kneeling on the ground, with their shaved heads bowed and their arms over their head. Their faces were not visible. Upon inspection, Jennifer identified one of these men as Plaintiff Abrego Garcia based on her husband's distinctive tattoos and two scars on his head. See Ex. D (CECOT photos).

60.     For the next few days, the ICE Detainee Locator continued to indicate that Plaintiff Abrego Garcia was located at the East Hidalgo Detention Center, even though staff at that detention center told Plaintiff Vasquez Sura that he had left on Saturday. *See* Ex. B (Declaration of Plaintiff Vasquez Sura). (Now, Plaintiff Abrego Garcia no longer appears in the ICE Detainee Locator.)

61.     Watching the news, Plaintiff Vasquez Sura was horrified to see more photos of CECOT prisoners that included her husband, and a video where Plaintiff Abrego Garcia was frog-walked through the CECOT prison.  Plaintiff Abrego Garcia's family subsequently hired a lawyer in El Salvador, who has confirmed that Plaintiff Abrego Garcia is, in fact, being held at CECOT. The lawyer has ascertained that to date, there are no known criminal charges levied against Plaintiff Abrego Garcia in El Salvador either.

62.     ICE and DHS took no steps to reopen the removal case of Plaintiff Abrego Garcia, nor to rescind his order of withholding of removal. *See* Ex. E (immigration court "Automated Case Information" page, showing no activity since October 10, 2019).

13

63.     Upon information and belief, ICE and DHS leadership, including Defendants Noem, Lyons, Genalo, and the predecessor in office of Defendant Baker, decided to deport Plaintiff Abrego Garcia without following the law. Upon information and belief, they did so knowing and intending that the Government of El Salvador would detain Plaintiff Abrego Garcia in CECOT immediately upon arrival.

*Conditions in CECOT*

64.     On March 15, 2025, Defendants deported 261 noncitizens, including 238 Venezuelan nationals and 23 Salvadoran nationals, to El Salvador without going through any legal processes whatsoever in front of an immigration judge. Upon information and belief, Plaintiff Abrego Garcia was one of those 23 Salvadoran nationals. Salvadoran President Nayib Bukele confirmed they have been sent to the country's mega-prison CECOT, the Terrorism Confinement Center. Upon information and belief, Defendants carried out this deportation through extrajudicial means because they believed that going through the immigration judge process took too long, and they feared that they might not win all of their cases before immigration judges.

65.     Upon information and belief, ICE and DHS has paid or continues to pay the Government of El Salvador six million dollars in order for the Government of El Salvador to detain these individuals, including Plaintiff Abrego Garcia.[2]

66.     Upon information and belief, all Defendants are aware that the government of El Salvador tortures individuals detained in CECOT. Indeed, U.S. President Donald Trump has made comments to the press expressing glee and delight at the torture that the Government of El Salvador inflicts upon detainees in CECOT.

---

[2] "US to pay El Salvador to jail 300 alleged gang members, AP reports" (Mar. 15, 2025), *available at* https://www.reuters.com/world/us/us-pay-el-salvador-jail-300-alleged-gang-members-ap-reports-2025-03-15/.

67.     CECOT conditions have garnered attention from human rights organizations. Each of the 256 cells is intended to hold approximately 80 inmates but often holds nearly double.[3] The cramped cells are equipped with tiered metal bunks without mattresses, two basins for washing, and two open toilets. There are no windows, fans, or air conditioning, despite the region's warm and humid climate.[4]

68.     Inmates in CECOT are confined to their cells for 23.5 hours daily and cannot go outdoors. They are denied access to reading materials, including even letters from friends or family. Inmates are prohibited from receiving visits from family and friends. Meals are provided through the bars, and the facility enforces strict regulations to maintain order.[5]

69.     In May 2023, Cristosal, a leading human rights organization in El Salvador, released a comprehensive report detailing severe human rights abuses within the country's prison system, especially CECOT.[6] The investigation documented the deaths of 153 inmates between March 27, 2022, and March 27, 2023, attributing many to torture, beatings, mechanical asphyxiation (strangulation), and lack of medical attention. *Id.* Autopsies revealed common patterns of lacerations, hematomas, sharp object wounds, and signs of choking or strangulation. *Id.* Survivors reported being forced to pick food off the floor with their mouths, subjected to

---

[3] Leire Ventas & Carlos García, "El Salvador's Secretive Mega-Jail," *BBC News* (July 14, 2023), *available at* https://www.bbc.com/news/resources/idt-81749d7c-d0a0-48d0-bb11-eaab6f1e6556.

[4] Maanvi Singh, "US Deportees Face Brutal Conditions in El Salvador Mega-Prison: 'Severe Overcrowding, Inadequate Food,'" *The Guardian* (Mar. 20, 2025), *available at* https://www.theguardian.com/us-news/2025/mar/20/trump-deportations-venezuela-prison

[5] "Inside El Salvador's prison holding Venezuelans deported from US," *CNN* (March 17. 2025), *available at* https://edition.cnn.com/2025/03/17/world/video/el-salvador-prison-holding-venezuelans-deported-us-trump-digvid.

[6] Noé López, "Inmates in El Salvador Tortured and Strangled: A Report Denounces Hellish Conditions in Bukele's Prisons," *El País* (May 29, 2023), *available at* https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html.

15

electric shocks, and exposed to untreated skin fungus epidemics. *Id.* Cristosal's director has emphasized that these systemic violations have become state policy. *Id.*

70.     Plaintiff Abrego Garcia is at imminent risk of irreparable harm with every additional day he spends detained in CECOT, included but not limited to torture and possible death.

71.     Plaintiff Abrego Garcia has exhausted all administrative remedies. No administrative remedies are available to Plaintiff Abrego Garcia, precisely because Defendants made the choice to unlawfully forego proceedings before the immigration judge, which would entail a right to administrative review before the Board of Immigration Appeals and then a petition for review to the U.S. Court of Appeals for the Fourth Circuit.

## FIRST CAUSE OF ACTION:
## VIOLATION OF THE WITHHOLDING OF REMOVAL STATUTE,
## 8 U.S.C. § 1231(b)(3)(A)
## (Plaintiff Abrego Garcia)

72.     Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

73.     The Withholding of Removal statute, 8 U.S.C. § 1231(b)(3)(A), prohibits Defendants from removing a noncitizen to any country from which he has been granted withholding of removal, unless such grant is formally terminated by lawful means.

74.     As set forth above, Defendants removed Plaintiff Abrego Garcia to El Salvador, the country from which he had been granted withholding of removal, without formally terminating his grant of withholding of removal, thus violating this law.

75.     Defendants' violation of law, as set forth herein, is causing Plaintiff Abrego Garcia irreparable harm with each day that he spends outside the United States and detained in CECOT.

76.     Even if Plaintiff Abrego Garcia were released from CECOT, he would still be suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

77.     Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States. This should begin with ordering that Defendants immediately halt all payments to the Government of El Salvador to hold individuals in CECOT, and an order that Defendants immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

**SECOND CAUSE OF ACTION:**
**PROCEDURAL DUE PROCESS**
**U.S. CONSTITUTION, AMENDMENT V**
**(Plaintiff Abrego Garcia)**

78.     Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

79.     Plaintiff Abrego Garcia has a procedural due process right not to be removed to El Salvador, the country from which he had been granted withholding of removal, without an immigration judge first carrying out the procedures set forth in statute and federal regulations.

80.     As set forth above, Defendants removed Plaintiff Abrego Garcia to El Salvador, the country from which he had been granted withholding of removal, without formally terminating his grant of withholding of removal, thus violating his procedural due process rights under the Fifth Amendment to the U.S. Constitution.

81.     Defendants' violation of law, as set forth herein, is causing Plaintiff Abrego Garcia irreparable harm with each day that he spends outside the United States and detained in CECOT.

82.    Even if Plaintiff Abrego Garcia were released from CECOT, he would still be suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

83.    Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States. This should begin with ordering that Defendants immediately halt all payments to the Government of El Salvador to hold individuals in CECOT, and an order that Defendants immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

**THIRD CAUSE OF ACTION:**
**SUBSTANTIVE DUE PROCESS**
**U.S. CONSTITUTION, AMENDMENT V**
**(All Plaintiffs)**

84.    Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

85.    Plaintiff Abrego Garcia has a substantive due process right under the Fifth Amendment to the U.S. Constitution not to be subjected to government conduct that shocks the conscience.  Defendants' conduct as set forth above violates that right.

86.    Plaintiffs Vasquez Sura and A.A.V., as the U.S.-citizen spouse and minor child of Plaintiff Abrego Garcia, also have a family unity interest in Plaintiff Abrego Garcia not being removed from the United States in a manner that shocks the conscience. Defendants' conduct as set forth above violates that right.

87.    Defendants' conscience-shocking actions, as set forth herein, is causing Plaintiff Abrego Garcia irreparable harm with each day that he spends outside the United States and detained in CECOT.

88.     Even if Plaintiff Abrego Garcia were released from CECOT, he would still be suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

89.     Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States. This should begin with ordering that Defendants immediately halt all payments to the Government of El Salvador to hold individuals in CECOT, and an order that Defendants immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

### FOURTH CAUSE OF ACTION:
### ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 706(2)(A)
### (Plaintiff Abrego Garcia)

90.     Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

91.     The Administrative Procedure Act provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion."  5 U.S.C. § 706(2)(A).

92.     Defendants' actions as set forth herein were arbitrary, capricious, and an abuse of discretion.

93.     Defendants' arbitrary and capricious actions, as set forth herein, are causing Plaintiff Abrego Garcia irreparable harm with each day that he spends outside the United States and detained in CECOT.

94.     Even if Plaintiff Abrego Garcia were released from CECOT, he would still be suffering irreparable harm in the form of separation from his U.S. citizen wife, Plaintiffs Vasquez Sura, and his severely disabled U.S. citizen child, Plaintiff A.A.V.

19

95.     Plaintiffs ask the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States. This should begin with ordering that Defendants immediately halt all payments to the Government of El Salvador to hold individuals in CECOT, and an order that Defendants immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

### FIFTH CAUSE OF ACTION:
### HABEAS CORPUS
### 28 U.S.C. § 2241
### (Plaintiff Abrego Garcia)

96.     Plaintiffs incorporate the foregoing paragraphs 1-71 by reference.

97.     The writ of habeas corpus is available to any individual who is held in custody of the federal government in violation of the Constitution or laws or treaties of the United States.

98.     As set forth herein, Plaintiff Abrego Garcia is being held in custody by the Government of El Salvador, but the Government of El Salvador is detaining Plaintiff Abrego Garcia at the direct request of Defendants, and at the financial compensation of Defendants.  Such detention is in violation of the Constitution or laws or treaties of the United States.

99.     Plaintiffs ask the Court to immediately order Defendants to immediately cease compensating the Government of El Salvador for its detention of Plaintiff Abrego Garcia, and to immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador.

### REQUEST FOR RELIEF

Plaintiffs pray for judgment against Defendants and respectfully request that the Court enters an order:

a)  Declaring that Defendants' actions, as set forth herein, violated the laws of the United States and the Fifth Amendment to the U.S. Constitution;

b)  Immediately ordering Defendants to immediately cease compensating the Government of El Salvador for its detention of Plaintiff Abrego Garcia;

c)  Immediately ordering Defendants to immediately request that the Government of El Salvador release Plaintiff Abrego Garcia from CECOT and deliver him to the U.S. Embassy in El Salvador;

d)  Should the Government of El Salvador decline such request, ordering Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States;

e)  Granting Plaintiffs costs and fees under the Equal Access to Justice Act; and

f)  Granting such other relief at law and in equity as justice may require.


Respectfully submitted,

*//s// Simon Sandoval-Moshenberg*                              Date: March 24, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com

21

Docusign Envelope ID: DB17694C-7A56-4BD0-8B9C-082DA7493DB6

Case 1:25-cv-00766-JEB    Document 44-3    Filed 03/19/25    Page 2 of 7
Case 8:25-cv-00951-PX    Document 10-2    Filed 03/28/25    Page 2 of 7

## DECLARATION OF JUANITA GOEBERTUS,
## DIRECTOR, AMERICAS DIVISION, HUMAN RIGHTS WATCH

I, Juanita Goebertus, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am the Director of the Americas Division of Human Rights Watch and have worked with the organization since 2022. I hold BAs in Law and Political Science from the Universidad de los Andes (Colombia) and an LLM from Harvard Law School. I oversee Human Rights Watch's work on El Salvador and have traveled to the country several times, most recently in 2024. I provide this declaration based on my personal knowledge and experience.

2. Individuals deported pursuant to the 1789 Alien Enemies Act have been sent to the Center for Terrorism Confinement, the Centro de Confinamiento del Terrorismo (CECOT) in Tecoluca, El Salvador. The prison was first announced for a capacity of 20,000 detainees. The Salvadoran government later doubled its reported capacity, to 40,000.  As Human Rights Watch explained to the UN Human Rights Committee in July 2024, the population size raises concerns that prison authorities will not be able to provide individualized treatment to detainees, thereby contravening the UN Standard Minimum Rules for the Treatment of Prisoners.

3. People held in CECOT, as well as in other prisons in El Salvador, are denied communication with their relatives and lawyers, and only appear before courts in online hearings, often in groups of several hundred detainees at the same time. The Salvadoran government has described people held in CECOT as "terrorists," and has said that they "will never leave." Human Rights Watch is not aware of any detainees who have been released from that prison. The government of El Salvador denies human rights groups

Docusign Envelope ID: DB17694C-7A56-4BD0-8B9C-082DA7493DB6

Case 1:25-cv-00766-JEB    Document 44-3    Filed 03/19/25    Page 3 of 7
Case 8:25-cv-00951-PX    Document 10-2    Filed 03/28/25    Page 3 of 7

access to its prisons and has only allowed journalists and social media influencers to visit
CECOT under highly controlled circumstances. In videos produced during these visits,
Salvadoran authorities are seen saying that prisoners only "leave the cell for 30 minutes a
day" and that some are held in solitary confinement cells, which are completely dark.

4.  While CECOT is likely to have more modern technology and infrastructure than other
prisons in El Salvador, I understand the mistreatment of detainees there to be in large part
similar to what Human Rights Watch has documented in other prisons in El Salvador,
including Izalco, La Esperanza (Mariona) and Santa Ana prisons. This includes cases of
torture, ill-treatment, incommunicado detention, severe violations of due process and
inhumane conditions, such as lack of access to adequate healthcare and food.

5.  Prison conditions in El Salvador should be understood within the context of the country's
three-year-long state of emergency, which has suspended constitutional due process
rights. Since the state of emergency was instituted in March 2022, security forces report
detaining 85,000 people (the equivalent of 1.4% of the country's population). Although
the government has denied Human Rights Watch information on the number of detainees
it holds and its prison capacity, Human Rights Watch estimates based on official data that
there are 109,000 people held in prisons with an official capacity for 70,000. Since the
state of emergency was instituted, over 350 people have died in El Salvador's prisons
according to Salvadoran human rights groups, including the organization Cristosal, which
jointly authored our December 7, 2022 report on El Salvador's prisons titled, "We Can
Arrest Anyone We Want" (hereinafter "We Can Arrest Anyone").[1]

---

[1] Human Rights Watch, *"We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency"*, WWW.HRW.ORG, Dec. 7, 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el#3683 (last visited Mar. 19, 2025).

Docusign Envelope ID: D917694C-7A56-4BD8-8B9C-982DA7493DB6

Case 1:25-cv-00766-JEB    Document 44-3    Filed 03/19/25    Page 4 of 7
Case 8:25-cv-00951-PX    Document 10-2    Filed 03/28/25    Page 4 of 7

6.  In July 2024, Human Rights Watch published a report on abuses committed against children during the state of emergency, titled "Your Child Does Not Exist Here." Over 3,300 children have been detained, many without any ties to gang activity or criminal organizations. Human Rights Watch documented 66 cases of children subjected to torture, ill-treatment and appalling conditions, including at times extreme overcrowding, unhygienic conditions, and inadequate access to food and medical care while in custody. In February, the Legislative Assembly approved a law ordering the transfer of children detained for organized crime offenses to the country's adult prison system, exposing them to a heightened risk of abuse and violating international juvenile justice standards.

7.  For "We Can Arrest Anyone," and in "Your Child Does Not Exist Here," Human Rights Watch has interviewed more than 30 people released from El Salvador's prisons, including children, and dozens of people who have relatives in jail.[2] These interviews were conducted in person in several states in El Salvador or by telephone and corroborated by additional research and media reports.

8.  One of the people we spoke with was an 18-year-old construction worker who said that police beat prison newcomers with batons for an hour. He said that when he denied being a gang member, they sent him to a dark basement cell with 320 detainees, where prison guards and other detainees beat him every day. On one occasion, one guard beat him so severely that it broke a rib.

---

[2] Human Rights Watch, "*Your Child Does Not Exist Here": Human Rights Abuses Against Children Under El Salvador's "State of Emergency"* , WWW.HRW.ORG, Jul. 16, 2024, https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here/human-rights-abuses-against-children-under-el (last visited Mar. 19, 2025).

Docusign Envelope ID: DB17694C-7A56-ABD8-8B9C-082DA7493DB6

Case 1:25-cv-00766-JEB     Document 44-3     Filed 03/19/25     Page 5 of 7
Case 8:25-cv-00951-PX     Document 10-2     Filed 03/28/25     Page 5 of 7

9.  The construction worker said the cell he was imprisoned in was so crowded that detainees
    had to sleep on the floor or standing, a description often repeated by people who have
    been imprisoned in El Salvador.

10. Another detainee we interviewed was held for two days in a police lock-up with capacity
    for 25 people, but he said that when he arrived, there were over 75 prisoners. He slept on
    the floor next to "the bathroom," a hole in the ground that smelled "terrible." He was sent
    in a group of other prisoners to Izalco prison on the third day, where they were ordered
    the group to take off their clothes. They were forced to kneel on the ground naked
    looking downwards for four hours in front of the prison's gate. Guards took the group to
    a room with five barrels full of water with ice, he said. Fifteen guards forced him and
    others to go into the barrels for around two hours in total, as they questioned them. The
    detainee was forced into a barrel "around 30 times," and was kept there for about a
    minute each time. Guards forced his head under water so he could not breathe. "I felt I
    was drowning," he said. Guards repeatedly insulted them, calling them "dogs" and
    "scum" and saying they would "pay for what [they] had done."

11. A third detainee held in prison in June 2022 described being sent to what he described as
    a "punishment cell." He said officers moved him and others there to "make room for
    other detainees." The new cell was constantly dark, detainees had to sleep standing due to
    overcrowding, and there was no regular access to drinking water.

12. For "We Can Arrest Anyone," Human Rights Watch and Cristosal gathered evidence of
    over 240 cases of people detained in prisons in El Salvador with underlying health
    conditions, including diabetes, recent history of stroke, and meningitis. Former detainees
    often describe filthy and disease-ridden prisons. Doctors who visited detention sites told

Docusign Envelope ID: DB17694C-7A56-4BD0-8B96-082DA7493DB6

Case 1:25-cv-00766-JEB    Document 44-3    Filed 03/19/25    Page 6 of 7
Case 8:25-cv-00951-PX    Document 10-2    Filed 03/28/25    Page 6 of 7

us that tuberculosis, fungal infections, scabies, severe malnutrition and chronic digestive issues were common.

13. Out of the estimated 350 detainees who have died in El Salvador's prisons, we documented 11 of these cases in detail in "We Can Arrest Anyone", based on interviews with victims' relatives, medical records, analysis by forensic experts, and other evidence.

14. In one case, a person who died in custody was buried in a mass grave, without the family's knowledge. This practice could amount to an enforced disappearance if authorities intentionally concealed the fate or whereabouts of the detainee.

15. In at least two other cases, officials appear to have failed to provide detainees the daily medication they required to manage underlying health conditions such as diabetes.

16. In at least four of the eleven cases, photographs of the bodies show bruises. Members of the Independent Forensic Expert Group (IFEG) of the International Rehabilitation Council for Torture Victims (IRCT), who reviewed the photos and other evidence in two of the cases, told Human Rights Watch and Cristosal that the deaths were "suspicious" given that the bodies "present multiple lesions that show trauma that could have been caused by torture or ill-treatment that might have contributed to their deaths while in custody."

17. In a separate Human Rights Watch report from February 2020, titled "Deported to Danger," Human Rights Watch investigated and reported on the conditions in Salvadoran prisons experienced by Salvadoran nationals deported by the United States.[3] In interviews with deportees and their relatives or friends, we collected accounts of three

---

[3] Human Rights Watch, *Deported to Danger: United States Deportation Policies Expose Salvadorans to Death and Abuse*, WWW.HRW.ORG, Feb. 5, 2020, https://www.hrw.org/report/2020/02/05/deported-danger-united-states-deportation-policies-expose-salvadorans-death-and (last visited Mar. 19, 2025).

Docusign Envelope ID: DB17694C-7A56-4BD0-8B9C-982DA7493DB6

Case 1:25-cv-00766-JEB    Document 44-3    Filed 03/19/25    Page 7 of 7
Case 8:25-cv-00951-PX    Document 10-2    Filed 03/28/25    Page 7 of 7

male deportees from the United States who said they were beaten by police or soldiers during arrest, followed by beatings during their time in custody, which lasted between three days to over a year. During their time in prison, two of these individuals reported being kicked in the face and testicles. A third man described being kicked by guards in his neck and abdomen, after which he sustained injuries requiring an operation for a ruptured pancreas and spleen, month-long hospitalization, and 60 days of post-release treatment.

Executed on this 19th day of March, 2025 in Villa de Leyva, Colombia.

Signed by:

*Juanita Goebertus*

F2D78A8897CF4A6...

JUANITA GOEBERTUS

**Declaration of Dr. Sarah C. Bishop**
**Risks for Non-Salvadoran Actors Facing Third Country Removal to El Salvador**

## Introduction

1.  I am writing this expert witness report to address human rights abuses in Salvadoran prisons. I am a full professor with tenure at Baruch College, the City University of New York. I was the 2020-2021 Fulbright Scholar to El Salvador during which time I lived and conducted fieldwork in the country; I have since returned to El Salvador each year for fieldwork related to both published and in-process projects about the State of Exception, human rights abuses by state actors, gang activity, and prison conditions.

2.  Deportees who are imprisoned in El Salvador are highly likely to face immediate and intentional life-threatening harm at the hands of state actors and a secondary threat of violence from incarcerated gang members.

## Expert Qualifications

3.  I was the 2020/2021 Fulbright scholar to El Salvador, during which time I lived and worked in the Department of La Libertad consulting with local academics and non-profit personnel to develop a project that chronicles the experiences of individuals affected by gang-, government-, and domestic-based violence, as well as the professional and psychological outcomes for deportees. I have interviewed multiple people who have been deported back to El Salvador after failed asylum claims and have also interviewed personnel from non-profit organizations working to support individuals who had been deported by the United States or by another government.

4.  I have published three books on the experiences of refugees and undocumented immigrants in the United States. In 2022, Columbia University Press published my book *A Story to Save Your Life: Communication and Culture in Migrants' Search for Asylum*. The book won the Abraham Brilloff Prize in Ethics and the Oral History Association's Best Book Award in 2023. My book *Undocumented Storytellers: Narrating the Immigrant Rights Movement* was published by Oxford University Press in 2019 and was the winner of the Best Book Award from the American Studies Division of the National Communication Association. *U.S. Media and Migration: Refugee Oral Histories* was published by Routledge in 2016 and won the Sue DeWine Distinguished Scholarly Book Award.

5.  I am a migration scholar with a Ph.D. in Intercultural Communication from the University of Pittsburgh (2014). My dissertation was an oral history project analyzing the push factors and migration experiences of 74 refugees living in the United States. I received an M.A. from New York University in 2009 in Media, Culture, and Communication during which I took classes such as "Refugees and IDPs: Protection and Practice." I received a B.A. from the University of Akron in 2008.

6.  I have published numerous articles in peer-reviewed academic journals on the experiences of forced migrants from Central America, including most recently "Hidden in Plain Sight: The In/Visibility of Human Rights in El Salvador's Prisons Under the State of Exception" coauthored with Salvadoran expert Dr. Mneesha Gellmen and forthcoming in *Latin American Research*

*Review* in 2025; "Beyond the Glowing Headlines: Social Science Analysis of the State of Exception in El Salvador," *Columbia Regional Expert Series,* coauthored with Salvadoran experts Dr. Tom Boerman and Dr. Tommie Sue Montgomery in 2023; "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence," published in *Journalism and Media* in 2023;  "'What Does a Torture Survivor Look Like?': Nonverbal Communication in Asylum Interviews and Hearings," published in the  *Journal of International & Intercultural Communication* in 2021; "Intercultural Communication, the Influence of Trauma, and the Pursuit of Asylum in the United States,"  published in the *Journal of Ethnic and Cultural Studies* in 2021; "An International Analysis of Governmental Media Campaigns to Deter Asylum Seekers," published in the *International Journal of Communication* in 2020. All of my books and the articles I have published in academic journals have been subject to peer review by other experts.

7.    I regularly give talks about country conditions in El Salvador and the root causes of forced migration, including "Violence for Peace: Authoritarian Justifications of Human Rights Abuses in Central America," to be presented at the Anthropology of Peace, Conflict, and Security Conference in June 2025;  "Intergovernmental Criminal History Information Sharing: Justice on Paper, Violence in Practice for Forced Migrants," presented at the Marxe School for International Affairs in March 2025; "Populism, Rhetorical Strategy, and the Regression of Democracy in Central America," presented at Cristosal in San Salvador in February 2023; "Addressing Misinformation and Distortion of Statistics in Country Conditions Research," presented at the International Studies Association in November 2024; "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence," presented at the annual meeting of the American Sociological Association in August 2022; "Health and Safety in El Salvador," presented at the Fulbright Pre-departure Orientations in June 2022, June 2023, and June 2024; and "The Returned: Communication and Culture in the Post-Deportation Lives of Former Asylum Seekers from El Salvador," presented at the annual meeting of the International Association for the Study of Forced Migration in July 2021.

8.    I have received several competitive grants for my research on El Salvador, including a 2025 grant from the American Council of Learned Societies (ACLS) and a 2024 grant from the Waterhouse Family Institute to study post-deportation experiences in El Salvador through a family communication approach; a 2022-2023 PSC CUNY Grant for research that documents post-deportation harm in El Salvador; a 2022 grant from the Robert Bosch Stiftung Foundation to travel to El Salvador and meet with investigative journalists and human rights activists for a project about President Nayib Bukele's recent actions against independent media; and a 2018 fellowship from the Institute for the Study of Human Rights at Columbia University to study obstacles to human rights and efforts to promote peace in post-conflict societies including El Salvador.

9.    I remain current on events in El Salvador through regularly reading local, national, and international sources including academic and government studies and investigative journalism studies, through frequent conversations with colleagues in the U.S. and El Salvador, and by presenting my research on El Salvador at national and international academic conferences.

10.    At Baruch College, I teach classes on migration to the United States and global communication in the Department of Communication Studies, the Macaulay Honors College, and the Masters in International Affairs. I am affiliate faculty in the Department of Black and Latino Studies.

11.    My migration research has been recognized for being ethical and applied to real-world contexts: I won the Abraham J. Briloff Prize in Ethics in 2017 and 2023, and the Stanley L. Saxton Applied Research Award in 2018. Moreover, in keeping with the New York State Ethics Commission Reform Act of 2022, I undergo annual ethics training at CUNY.

12.    Methodologically, I rely on oral history, ethnography, critical-cultural analysis of governmental communication, and qualitative comparative analysis to conduct my research about country conditions in El Salvador. These are standard and widely used social science methodologies. At Baruch, I am responsible for teaching a graduate level required course on qualitative methods in which I train master's level students in these methods.

13.    In 2025 I received $75,000 from the Russell Sage Foundation to continue the project "Recovering the Visibility of Post-Deportation Experiences in El Salvador: A Family Communication Approach" for the years 2025-2027 to involve additional participants who have family members who have been deported under the State of Exception.

### Democratic Erosion and Governmental Corruption in El Salvador

14.    El Salvador is experiencing a severe democratic decline that threatens the human rights and general safety of the whole population. The 2023 U.S. State Department's Human Rights Reports on El Salvador cites "credible reports of: unlawful or arbitrary killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; extensive gender-based violence, including domestic and sexual violence, and femicide; substantial barriers to sexual and reproductive health services access; trafficking in persons, including forced labor; and crimes involving violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons."[1]

15.    President Bukele was discovered through meticulously documented reporting by investigative journalists working for *El Faro* in 2020 to have been negotiating with imprisoned gang leaders who reportedly agreed to a reduction in homicides and electoral support in exchange for additional prison privileges and other benefits for incarcerated gang members.[2] During the weekend of March 25, 2022 there was a record-setting string of around eighty-seven gang-committed homicides across El Salvador that resulted from the unraveling of that secret pact between Bukele and the gangs in what MS-13 called a "betrayal" of Bukele's loyalty. The Monday following the homicides, Bukele successfully called on the Salvadoran Legislative Assembly to pass a State of Exception, which suspends many constitutional protections including due process, drastically increases police and military powers to arrest and imprison suspected gang members, and curtails the right to legal defense.

---

[1] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 1.
[2] Carlos Martínez, Óscar Martínez, Sergio Arauz, and Efren Lemus. "Bukele has been negotiating with MS-13 for a reduction in homicides and electoral support." *El Faro*. 6 September 2020. https://elfaro.net/en/202009/el_salvador/24785/Bukele-Has-Been-Negotiating-with-MS-13-for-a-Reduction-in-Homicides-and-Electoral-Support.htm

16.   As a result of the government's actions under the current State of Exception, El Salvador currently has the highest incarceration rate in the world.[3]

17.   Salvadoran Vice President Félix Ullóa revealed plainly to the *New York Times*, "To these people who say democracy is being dismantled, my answer is yes — we are not dismantling it, we are eliminating it, we are replacing it with something new."[4] The politicized use of all three branches of government to enact and extend the power of the State of Exception disallows any guarantee of justice for Salvadorans against whom the State has acted.

18.   The government of El Salvador claims that it has been effective at establishing peace in the country. Americas director at Amnesty International Ana Piquer explained in December 2024, "What the government calls 'peace' is actually an illusion intended to hide a repressive system, a structure of control and oppression that abuses its power and disregards the rights of those who were already invisible—people living in poverty, under state stigma, and marginalization—all in the name of a supposed security defined in a very narrow way."[5]

19.   Bukele's director of prisons, Osiris Luna Meza, was indicted by the United States Federal Government for arranging meetings in prison for negotiations with MS-13.[6] As the U.S. Treasury Department reveals, "Osiris Luna Meza (Luna) and Carlos Amilcar Marroquin Chica (Marroquin) [chairman of Bukele's Social Fabric Reconstruction Unit] led, facilitated, and organized a number of secret meetings involving incarcerated gang leaders, in which known gang members were allowed to enter the prison facilities and meet with senior gang leadership. These meetings were part of the Government of El Salvador's efforts to negotiate a secret truce with gang leadership."[7] Luna has also been deemed corrupt by the U.S. Department of Treasury for developing a scheme with another senior Bukele official to embezzle millions of dollars from the prison commissary system.[8]

---

[3] "El Salvador Opens 40,000-Person Prison as Arrests Soar in Gang Crackdown." *Reuters*. 1 February 2023. https://www.reuters.com/world/americas/el-salvador-opens-40000-person-prison-arrests-soar-gang-crackdown-2023-02-01/#:~:text=SAN%20SALVADOR%2C%20Feb%201%20(Reuters,the%20prison%20population%20to%20soar.
[4] Natalie Kitroeff. "He Cracked Down on Gangs and Rights. Now He's Set to Win a Landslide." New York Times. 2 February 2024. https://www.nytimes.com/2024/02/02/world/americas/el-salvador-bukele-election.html
[5] "El Salvador: A thousand days into the state of emergency. 'Security' at the expense of human rights." Amnesty International. 20 December 2024. https://www.amnesty.org/en/latest/news/2024/12/el-salvador-mil-dias-regimen-excepcion-modelo-seguridad-a-costa-derechos-humanos/
[6] United States District Court. Eastern District of New York. Paragraph 35. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.justice.gov/usao-edny/press-release/file/1569726/download
[7] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Treasury Department. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519
[8] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Department of the Treasury. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519

20.   In multiple recent documented cases, the Salvadoran government has falsified records, ignored international human rights laws, and detained and prosecuted individuals without evidence to support the ongoing expansion of the State of Exception and indiscriminately punish those who resist or oppose it. As described by Human Rights Watch, "In many cases, detentions appear to be based on the appearance and social background of the detainees, or on questionable evidence, such as anonymous calls and uncorroborated allegations on social media. In these cases, police and soldiers did not show people a search or arrest warrant, and rarely informed them or their families of the reasons for their arrest. A mother who witnessed the detention of her son said that police officers told her, 'We can arrest anyone we want.'"[9]

### General Living Conditions in Prison

21.   The 2023 U.S. State Department Human Rights Report on El Salvador emphasizes that "Prison conditions *before* the state of exception were harsh and life threatening …The addition of 72,000 detainees under the state of exception exacerbated the problem."[10] Rather than merely being a result of overcrowding, the same U.S. State Department report cites testimonies from released prisoners that show that the life threatening nature of the prison is a result of "systemic abuse in the prison system, including beatings by guards and the use of electric shocks."[11]

22.   Salvadoran government officials have directly stated that the dangerous and unsanitary conditions for prisoners taken into custody during the State of Exception are being created intentionally: for example, the U.S. State Department notes that "From the start of the state of exception, the government frequently advertised on social media the overcrowded conditions and lack of adequate food in the prisons as appropriate treatment for gang members."[12] The Directorate General of Penal Centers advertised: "All the suffering these bastards have inflicted on the population, we will make happen to them in the prisons, and we will be very forceful with this. They live without the light of the sun, the food is rationed… they sleep on the floor because that is what they deserve."[13] Paradoxically, this was the same director who was indicted by the United States Federal Government for arranging meetings in prison for negotiations with MS-13,[14] and who has been deemed corrupt by the U.S. Department of Treasury for developing a scheme with another senior Bukele official to embezzle millions of dollars from the prison commissary system, emphasizing the scope of corruption common in prison leadership.[15]

23.   In response to international human rights organizations that have raised the alarm about current conditions in El Salvador, President Bukele tweeted "Let all the 'human rights' NGOs know that we are going to destroy these damn murderers and their collaborators, we will throw them in

---

[9] Human Rights Watch and Cristosal. "We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency." 7 December 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el

[10] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 7, emphasis added

[11] Ibid., p 5.

[12] "El Salvador 2022 Human Rights Report." https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 6.

[13] Cited in Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 34.

[14] United States District Court. Eastern District of New York. Paragraph 35. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.justice.gov/usao-edny/press-release/file/1569726/download

[15] "Treasury Targets Corruption Networks Linked to Transnational Organized Crime." U.S. Department of the Treasury. 8 December 2021. https://home.treasury.gov/news/press-releases/jy0519

prison and they will never get out. We don't care about their pitying reports, their prepaid journalists, their puppet politicians, nor their famous 'international community' that never cared about our people."[16]

24.   El Salvador's Public Security Minister has confirmed the plan not to release prisoners and claimed that there are 40,000 serial killers in El Salvador. He stated in an interview with CNN in 2024: "Someone who every day killed people, every day raped our girls, how can you change their minds? We are not stupid…In the US, imagine a serial killer in your state, in your community being released by a judge … how would you feel as a citizen? We don't have facts that someone can change a mind from a serial killer … and we have more than 40,000 serial killers in El Salvador."[17]

25.   In October 2021 the Salvadoran government declared that information relating to all detained persons would be considered confidential; over 325 complains to the Interamerican Commission on Human Rights show that when family members have requested information about their detained loved ones, "authorities either refused or provided false information about their whereabouts."[18] In a sample of 131 cases, Cristosal found that 115 family members of detainees have not received any information about the whereabouts or wellbeing of their detained family members since the day of their capture.[19]

26.   During my January 2024 visit to El Salvador, I visited Mariona prison where many informal vendors were set up outside the prison gates selling packets of food, medicine, soap, and clothing to individuals with detained family members. Family members can seek to protect their detained relatives from illness or starvation in prison if their family is able to purchase these expensive packets, which cost $100-$300 per month although the national minimum monthly wage is only $365.[20] However, even families who can afford these packets have no assurance that the resources they try to send will ever reach their loved ones inside the prison; there are reports of prison officials deliberately withholding medicine and food even when it is available,[21] and reports of guards forcing women to do sexual acts in exchange for food and medicine.[22]

[16] Nayib Bukele. 16 May 2023. https://x.com/nayibbukele/status/1658608915683201030?s=20

[17] David Culver, Abel Alvarado, and Evelio Contreras. "Exclusive: Locking eyes with mass murderers in El Salvador." 13 November 2024 https://www.cnn.com/2024/11/06/americas/el-salvador-inside-cecot-prison/index.html

[18] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 29.

[19] Noah Bullock. "The State of Exception in El Salvador: Taking Stock." Testimony before the United States Congress, Tom Lantos Human Rights Commission. 10 December 2024. https://www.youtube.com/watch?v=ChTW-gm-5SI

[20] Mneesha Gellman. "El Salvador voters set to trade democracy for promise of security in presidential election." *The Conversation.* 29 January 2024. https://theconversation.com/el-salvador-voters-set-to-trade-democracy-for-promise-of-security-in-presidential-election-221092

[21] "Testimonios: Sobrevivientes de las Cárceles del Régimen." A weekly series from *El Faro.* https://especiales.elfaro.net/es/testimonios/

[22] "El Silencio no es opción: Investigación sobre las practices de tortura, muerte, y justicia fallida el el regimen de excepción." 10 July 2024. Cristosal Foundation. https://cristosal.org/ES/presentacion-informe-el-silencio-no-es-opcion/

27.   A 2024 Report on the Violation of the Right to Health in the Country's Penal Centers from the
      Human and Community Rights Defense Unit (UNIDEHC) found that upon arrival in prison,
      detainees under the State of Exception "were received by guards, where many of them were beaten
      to pressure them to declare which 'gang they belonged to,' and if they refused to say so, they were
      beaten and tortured more, some convulsed from the beatings they received and others died in these
      practices, on the first day of transfer."[23] In February 2025, the spokesperson for the organization
      who produced this report was arbitrarily detained during a raid on the organization's headquarters;
      Amnesty International concluded his detention was "particularly concerning, as he has been both a
      witness to and a denouncer of torture in penitentiary centers."[24]

28.   The Human and Community Rights Defense Unit (UNIDEHC) also reported in 2024 after a round
      of interviews with a health professional who worked in a clinic that served some inmates from
      Mariona prison that inmates were "not provided with medication to treat their diseases that they
      already suffered from; for example: people with hypertension, diabetes, kidney failure, respiratory
      problems, among others. They did not receive medication, which caused decompensation and
      death in some cases. Guards were repeatedly asked for help when someone convulsed or felt ill,
      but they did not arrive until the following day, or the person's health became more complicated or
      they died, waiting for help from the prison authorities."[25]

29.   Both the 2022 and 2023 U.S. State Department's Human Rights Report on El Salvador state that
      prison officials repeatedly denied access to the Salvadoran Human Rights Ombudsman's Office,
      the entity responsible for investigating accusations of human rights abuses in prison.[26]

30.   In 2023, Bukele announced the opening of the new "mega-prison" called the *Centro de
      Confinamiento del Terrorismo* or CECOT. An analysis of the CECOT's design using satellite
      footage found that if the prison were to reach full supposed capacity of forty thousand, each
      prisoner would have less than two feet of space in shared cells—an amount the authors point out is
      less than half the space required for transporting midsized cattle under EU law.[27]

31.   The U.S. State Department confirms that prisoners have been held in grossly overcrowded prisons
      with as many as 80 prisoners held in cells designed for just 12 so that they must sleep standing
      up.[28]

### Systemic Torture as State Policy in Salvadoran Prisons

32.   Although El Salvador is a signatory to both the Convention Against Torture and the International
      Covenant on Civil and Political Rights, Amnesty International has concluded that there is a

---

[23] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers.
2024. https://heyzine.com/flip-book/9849749093.html#page/1 p 17.
[24] "El Salvador: Repression against human rights defenders and community leaders." Amnesty International 5 March 2025.
https://www.amnesty.org/en/documents/amr29/9100/2025/en/
[25] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers.
2024. https://heyzine.com/flip-book/9849749093.html#page/1
[26] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-
human-rights-practices/el-salvador/ p 4.
[27] Christine Murray, and Alan Smith.. "Inside El Salvador's mega-prison: the jail giving inmates less space than livestock."
Financial Times, 6 March 2023. https://www.ft.com/content/d05a1b0a-f444-4337-99d2-84d9f0b59f95.
[28] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-
human-rights-practices/el-salvador/ p 6.

*Expert Declaration of Sarah C. Bishop, Ph.D.*                                        *Page 7 of 15*

"systemic use of torture in Salvadoran prisons."[29] The organization notes with concern the three primary characteristics of the crisis: "1) the massive number of human rights violations being committed; 2) the high degree of state coordination in the design and implementation of this measure; and 3) a state response that tends to conceal and minimize these actions, refusing to recognize and diligently investigate the abuses."[30] They confirm that "torture and cruel, inhuman, and degrading treatment have become habitual practice rather than isolated incidents in the prisons."[31]

33.    The range of violence occurring inside prisons in El Salvador at the hands of gangs and prison guards is acknowledged in the 2022 and 2023 U.S. State Department's Human Rights Reports on El Salvador; detainees are subject to beatings, waterboarding, and use implements of torture on detainees' fingers to try to force confessions of gang affiliation.[32] Likewise, family members of the detained have been threatened with arrest by security forces to "stop asking questions."[33]

34.    A July 2024 report from Cristosal—compiled from 3,643 reports of abuses or rights violations, 110 interviews, case-by-case analyses of 7,742 detainees' experiences—concluded that "Torture has become a state policy, with cruel and inhuman treatment regularly practices in prisons and places of detention."[34]

35.    Human Rights Watch conducted 90 interviews about human rights abuses under the State of Exception and published in July 2023 evidence of torture including suffocation, burning, and mock executions against children.[35] The report also found that authorities use abusive language and death threats when making arrests of children who are subjected to human rights violations before, during, and even after their release, and that "In many cases, authorities coerced children into making false confessions to crimes through a combination of abusive plea deals and sometimes mistreatment or torture."[36]

36.    An extensive December 2022 investigative report by Human Rights Watch and Cristosal about the State of Exception found that "human rights violations were not isolated incidents by rogue agents. Rather, similar violations were carried out repeatedly and across the country, throughout a period of several months, by both the military and the police."[37]

---

[29] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/
[30] Ibid.
[31] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 33.
[32] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 5; "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 2, 15.
[33] Ibid.
[34] "El Silencio no es opción: Investigación sobre las practices de tortura, muerte, y justicia fallida el el regimen de excepción." 10 July 2024. Cristosal Foundation. https://cristosal.org/ES/presentacion-informe-el-silencio-no-es-opcion/
[35] Human Rights Watch. "Your Child Does Not Exist Here: Human Rights Abuses Against Children Under El Salvador's 'State of Emergency.'" 16 July 2024. https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here-human-rights-abuses-against-children-under-el
[36] Ibid. p 2.
[37] Human Rights Watch and Cristosal. "We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador's "State of Emergency." 7 December 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el; The Minister of Security is determined to see the number of arrests rise. See: Mario Gonzalez. "Security Minister wants to imprison 80,000 gang members." *El Diario de Hoy.* 17 June 2022. https://www.elsalvador.com/noticias/nacional/regimen-de-excepcion-ministro-gustavo-villatoro/968181/2022/

37.    In some cases, many inmates are punished if one does not obey the guards' orders. UNIDEHC found in an interview with a health professional who had worked at Mariona prison, "In some cells, when an order of the guards or person was not obeyed, they were punished, some examples are: wetting all the people in the cell including their belongings with high-pressure hoses with ice cold water, invading the cell with tear gas; electric shocks, beatings with objects, confinement in the 'punishment cell,' where there were insects and animals (cockroaches, scorpions and mice)…[and] to deprive the right to food, use of the bathroom, and going out in the sunlight, for many days."[38]

38.    Amnesty International confirms that "the grave human rights violations being committed under the state of emergency are systematic in nature due to the widespread and sustained manner in which they are occurring; the level of state organization and planning involving the convergence of the three branches of the state; the impunity and lack of accountability; the lack of transparency and access to information; and the widespread criminalization of poverty, as an aspect of discrimination."[39] This is not a matter of isolated acts of violence and torture but rather a coordinated dismantling of the rule of law and widespread practice of grave violations of human rights as the current norm.

39.    A team of investigative journalists working to produce a report of human rights abuses under the State of Exception for an *Al Jazeera* documentary shared with me during my visit to El Salvador in early 2023 their preliminary findings, including an interview with an adolescent who had been released from Izalco prison who reported that there were daily beatings in prison, that "the guards would ignore people's requests for medical attention," that "guards would beat someone [un]til they were dead and then bring the body back into the cells and leave it there until the body started stinking," that food rations were so meager that they sometimes had to split one hard-boiled egg between two people for a meal, and that "usually the gang members in the cells would bully weaker people for their food." Former inmates revealed that tear gassing in the overcrowded prisons were so frequent that detainees would reserve one of the three small cups of water they usually received each day to flush their eyes after being gassed.[40]

40.    Because the Salvadoran government has been actively attempting to conceal the human rights abuses occurring in prison, a team of investigative journalists at *El Faro* has been recording and publish weekly testimonies of individuals who survived incarceration under the State of Exception. These testimonies corroborate the reports cited above by confirming widespread torture including public beatings to death in front of other inmates, the deliberate withholding of medicine from sick inmates that has resulted in the need for appendages to be amputated, officials throwing prisoners' food on the ground so that inmates must lick the floor to survive, and guards knowing about but failing to take action to prevent some inmates from raping other inmates.[41]

41.    Further testimonies gathered and published by the newspaper *El Pais* reveal practices such as prison officials in Izalco prison hosing down the floor of an overcrowded cell with water then

---

[38] Human and Community Rights Defense Unit (UNIDEHC). Violation of the Right to Health in the Country's Penal Centers. 2024. https://heyzine.com/flip-book/9849749093.html#page/1 p 18.

[39] "El Salvador: One year into state of emergency, authorities are systematically committing human rights violations." Amnesty International. 3 April 2023. https://www.amnesty.org/en/latest/news/2023/04/el-salvador-state-emergency-systematic-human-rights-violations/

[40] Mark Scialla, Salvadoran-based investigative journalist and director of documentary on human rights abuses under the State of Exception for *Al Jazeera* "Fault Lines." 28 February 2023, via message to Sarah Bishop

[41] "Testimonios: Sobrevivientes de las Cárceles del Régimen." A weekly series from *El Faro*. https://especiales.elfaro.net/es/testimonios/

*Expert Declaration of Sarah C. Bishop, Ph.D.*                                    *Page 9 of 15*

sending an electric current through the water to shock everyone inside, guards responding to inmates' pleas for medicine or food with beatings (sometimes to the point of death), and state officials' explicit threats to murder inmates and fabricate justifications, such as "I can shoot you right now and say you wanted to escape."[42]

42.    El Salvador's government has repeatedly been accused of committing crimes against humanity. Zaria Navas, former Inspector General for the Salvadoran National Police and now head of Cristosal's Law and Security program, declared in June 2023 that due to the systemic and widespread human rights abuses committed during the State of Exception: "There is enough evidence for El Salvador to be tried for crimes against humanity."[43]  Likewise, in July 2023, former Salvadoran Human Rights Ombudsman David Morales equated the abuses occurring in the prisons under the State of Exception with the 1932 genocide against the country's indigenous population and the atrocities committed during El Salvador's 1980-1992 civil war; like Navas, he described the government's actions as crimes against humanity.[44] More recently, in December 2024, Leonor Arteaga from the Due Process of Law Foundation concluded, "it is also likely that some of the torture enforced disappearances and extrajudicial executions that have been documented may constitute crimes against humanity which implies the existence of a plan or a policy to commit them involving a chain of command of government actors in El Salvador."[45]

### Deaths in Prison

43.    The deaths of around 375 incarcerated individuals since the start of the State of Exception have been recorded so far, but the human rights nongovernmental organization (NGO) Socorro Jurídico Humanitario that the actual number of deaths may exceed 1000 because of an estimated minimum of fifteen deaths per month that are not reported.[46]

44.    In a sample of 100 cases of prison deaths that occurred during the first year of the State of Exception and for which a cause of death could be determined, Cristosal found through photographic, forensic, and testimonial evidence that 75% of the deaths were violent, probably violent, or with suspicions of criminality on account of a common pattern of hematomas caused by beatings, sharp object wounds, and signs of strangulation on the cadavers examined.[47] Others have died due to being denied medical care.[48]

---

[42] David Marcial Pérez. "The rampant abuse in El Salvador's prisons: 'They beat him to death in the cell and dragged him out like an animal'." *El Pais.* 26 March 2023. https://english.elpais.com/international/2023-03-26/the-rampant-abuse-in-el-salvadors-prisons-they-beat-him-to-death-in-the-cell-and-dragged-him-out-like-an-animal.html

[43] Julia Gavarrete. "There is Enough Evidence for El Salvador to be Tried for Crimes Against Humanity." *El Faro.* 7 June 2023. https://elfaro.net/en/202306/el_salvador/26881/there-is-enough-evidence-for-el-salvador-to-be-tried-for-crimes-against-humanity#

[44] Lissette Lemus. "David Morales: Los Crímenes que está Cometiendo el Gobierno Actual son de Lesa Humanidad." *El Salvador.com.* 16 July 2023.  https://www.elsalvador.com/noticias/nacional/capturados-cristosal-regimen-de-excepcion-breaking-news/1076092/2023/

[45] Leonor Arteaga. "The State of Exception in El Salvador: Taking Stock." Testimony before the United States Congress, Tom Lantos Human Rights Commission. 10 December 2024. https://www.youtube.com/watch?v=ChTW-gm-5SI

[46] Socorro Jurídico Humanitario (Humanitarian Legal Aid). 16 March 2025. https://x.com/SJHumanitario/status/1901454047162372257

[47] Cristosal (2023). One Year Under State of Exception: A Permanent Measure of Repression and Human Rights Violations. https://cristosal.org/EN/wp-content/uploads/2023/08/One-year-under-the-state-of-exception-1.pdf. Page 29.

[48] David Bernal. "Socorro Jurídico ya contabiliza 235 reos muertos bajo régimen de excepción en El Salvador." 24 February 2024. *La Prensa Grafica.* https://www.laprensagrafica.com/elsalvador/Socorro-Juridico-ya-contabiliza-235-reos-muertos-en-regimen-20240223-0089.html

45.    The actual number of deaths is impossible to confirm because of the government's opacity on the matter.[49] Noah Bullock, the director of Cristosal, explains, "Our investigations demonstrate a clear pattern of torture within the prisons and so we don't discount that the number of people who have died in the State of Emergency could be much higher."[50] The Salvadoran state maintains that all prison deaths have been the result of natural causes despite forensic evidence to the contrary.[51]

46.    The known death rate in Salvadoran prisons is around 70 times greater than the international violent death according to the United Nations' 2024 Global Prison Population report.[52]

47.    The organization MOVIR (Movimiento de Victimas del Régimen de Excepción, or Movement of Victims of the Regimen of Exception) has corroborated that a considerable number of the deaths evaluated so far have been a result of physical attacks of various kinds carried out by state agents, in addition to "beatings inflicted by other prisoners with acquiescence of the prison authorities."[53]

48.    The testimony of Professor Mario Alberto Martínez, who was arrested and detained after making a public statement denouncing the arbitrary detention of his daughter, includes the account of his being in a highly overcrowded cell where inmates were not allowed to speak or even to pray. When three boys were caught talking, the guards removed them from the cell and beat them until they appeared to be dead. Martinez reports that "people died every day" while he was in prison.[54]

49.    Even the deaths described by medical legal obituaries as nonviolent have in some cases involved cadavers that show forensic evidence of torture. One 45-year-old man with an intellectual disability died in prison and was buried by the state in a mass grave with a legal obituary that showed he died from a "pulmonary edema." However, photographic evidence of the cadaver showed edemas of his face, and interviews with individuals detained in the same prison reveal that he was beaten so severely that he lost mobility including the ability to eat.[55] Others have been released from prison in such severe physical states that they have died within days of release because of injuries they sustained in prison; they are not counted among the numbers of deaths in prison.[56]

---

[49] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/. p 33.

[50] "El Salvador's Prison State." *Fault Lines, Al Jazeera English*. May 24, 2023. https://www.aljazeera.com/program/fault-lines/2023/5/24/el-salvadors-prison-state

[51] Bryan Avelar. "Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons." *El Pais*. 29 May 2023. https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html

[52] United Nations Office on Drugs and Crime (UNODC). "Global prison population and trends. A focus on rehabilitation." 15 August 2024. https://www.cdeunodc.inegi.org.mx/index.php/2024/08/15/global-prison-population-and-trends-a-focus-on-rehabilitation/; The figure of 366 deaths among an inmate population of 83,000 translates to a ratio of 404.82 deaths per 100,000, a rate 69.8 times greater than the international violent death rate of 5.8 per 100,000.

[53] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December 2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/. P 33.

[54] Williams Sandoval. ""Vi cuando llevaban gente tiesa; todos los días moría gente": así narra un profesor su paso por las cárceles del régimen de excepción." *La Prensa Grafica*. 14 June 2024. https://www.laprensagrafica.com/elsalvador/Vi-cuando-llevaban-gente-tiesa-todos-los-dias-moria-gente-asi-narra-un-profesor-su-paso-por-las-carceles-del-regimen-de-excepcion-20240614-0056.html

[55] Bryan Avelar. "Inmates in El Salvador tortured and strangled: A report denounces hellish conditions in Bukele's prisons." *El Pais*. 29 May 2023. https://english.elpais.com/international/2023-05-29/inmates-in-el-salvador-tortured-and-strangled-a-report-denounces-hellish-conditions-in-bukeles-prisons.html

[56] Cristosal. "One Year Under the State of Exception." May 2023. https://cristosal.org/EN/2023/08/17/report-one-year-under-the-state-of-exception/ p 53.

50.    It sometimes takes several months for family members to learn of the death of a loved one in
       prison, as was the case for a 76-year-old woman who was arrested in April 2022, died while in
       custody the following November, and was buried in a mass grave. Her children were not advised
       of her death and continued to send care packages to the prison until February 2023 when a lawyer
       told them their mother would be released on bail if they paid $3,000. When they arrived at the
       prison to deliver one last care package before their mother's release, guards told them she had
       been dead for months.[57]

### Governmental Attempts to Obscure the Visibility of Human Rights Violations

51.    Public access to national data is a central tenet of democracy that has been severely curtailed under
       Bukele as a means of maintaining popularity while allowing widespread human rights abuses to be
       committed out of public view. The government of El Salvador is intentionally restricting access to
       previously publicly available information especially as related to the police and military, prisoners,
       and the judiciary. As a result, it is becoming increasingly difficult for academics, NGOs, and other
       governments to access the information and statistics that would reveal the full scope of the
       disregard for human rights taking place in El Salvador. To produce evidence that is statistically
       significant instead of just anecdotal in this repressive context requires a coordinated approach to
       identify patterns and fidelity among pockets of available data in the rapidly unfolding human
       rights crisis.

52.    As I and my coauthors in a 2023 report in Columbia University's *Regional Expert Series* explain,
       President Bukele's government has attempted to prevent public knowledge of continuing and
       widespread human rights abuses through strategies that include (1) denying outsiders access to the
       prisons, including the Salvadoran Human Rights Ombudsman's Office; (2) criminalizing the
       media and threatening journalists; (3) subjecting family members of the detained to threats of
       arrest if they speak publicly of their loved ones' experiences; and (4) routinely charging that
       individuals and groups who expose the abuses associated with the State of Exception are
       supporters of gang members and terrorists, in some cases leading to their imprisonment.[58]

53.    Though international NGOs have been working for all three years of the State of Exception to
       document and corroborate widespread claims of human rights abuses taking place in El Salvador,
       this work is made highly difficult and sometimes impossible by the government's resistance. As
       described by Amnesty International in December 2023, "It is not possible to obtain official
       statistics such as the number of prisoners, overcrowding rate at detention centres, deaths of
       prisoners, number of crimes, [and] whether abuses of force by public security agents are being
       recorded and disciplined, among other citizen security variables used to monitor and assess the
       security situation and state of emergency."[59] Likewise, clandestine graves discovered in El
       Salvador are deemed by Bukele's government as matters of national security and the identities of
       their contents classified.

---

[57] "Relato: Las mentiras de un abogado y el deterioro en el penal le costaron la vida a Rosa." La Prensa Grafica. 11 February
2023. https://www.laprensagrafica.com/elsalvador/Relato-Las-mentiras-de-un-abogado-y-el-deterioro-en-el-penal-le-costaron-la-
vida-a-rosa-20230210-0095.html
[58] Sarah Bishop, Tommie Sue Montgomery, and Tom Boermann. "Behind the Glowing Headlines: Social Science Analysis of
the State of Exception in El Salvador" CeMeCA's Regional Expert Series No. 9, 2023.
[59] Amnesty International. "Behind the veil of popularity: Repression and regression of human rights in El Salvador." 5 December
2023. https://www.amnesty.org/en/latest/news/2023/12/el-salvador-policies-practices-legislation-violate-human-rights/ p 64.

54.    The State Department's 2023 Human Rights Report on El Salvador explicitly remarks on the invisibility of and lack of access to national data: "Human rights groups observed that the government increasingly declined to make public data for monitoring and analysis purposes. *Gato Encerrado,* an investigative newspaper, noted the government continued to expand the types of information it classified as confidential and not subject to public disclosure requirements."[60] Without reliable access to national data, neither the State Department nor any other concerned party can provide a more exhaustive view of country conditions that would be possible in more democratic contexts.

55.    There are increasing instances of the government blatantly obscuring evidence of state violence. For example, the Attorney General of El Salvador claims to have investigated 143 deaths in prison during the State of Exception and found that every one of the 143 was due to pre-existing conditions or natural causes. However, the U.S. State Department Human Rights report released in 2024 offers evidence from sources including Socorro Jurídico Humanitario, Cristosal, and *El Pais* determining through forensic evidence dozens of violent deaths in prison including those where prison guards beat inmates to death.[61] What the U.S. State Department calls "systemic abuse in the prison system" is effectively denied by the Salvadoran State.

56.    The government's clampdown on information related to human rights appears to be devolving. Whereas the 2022 U.S. State Department Human Rights report on El Salvador revealed that "The government reported varying numbers of disappearances and sporadically declined to provide media with numbers and additional data on disappearances, often claiming the statistics were classified,"[62] the report from the following year explains that the Minister of Justice and Public Security had announced the total suspension of investigations into disappearances.[63] These kinds of data would be more readily available in more democratic contexts and offer evidence of El Salvador's sharp democratic decline.

57.    To create an illusion of improving country conditions with respect to gang violence, Bukele relies on rhetorical strategies that include selectively revealing and concealing national data.[64] The Inter-American Commission on Human Rights (IACHR) has criticized the Salvadoran State for "a lack of access to statistical data and official records on violence and crime from the Attorney General's Office and the Institute of Forensic Medicine, as well as other data from the PNC [National Civil Police], making it difficult to verify, contrast, and analyze information on citizen security."[65] IACHR notes the "absence of updated official data on incidents of injured or dead persons related to police or Armed Force officers that could be construed as human rights violations."[66] In other

---

[60] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 27.
[61] Ibid, p 2.
[62] "El Salvador 2022 Human Rights Report." US Department of State https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 3.
[63] "El Salvador 2023 Human Rights Report." US Department of State. https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/ p 4.
[64] Parker Assmann. "El Salvador to Omit Key Data from Official Homicide Tally." *Insight Crime.* 18 July 2019. https://insightcrime.org/news/brief/el-salvador-omit-key-data-homicides/; Sarah C. Bishop. "An Illusion of Control: How El Salvador's President Rhetorically Inflates His Ability to Quell Violence." *Journalism and Media, 4,* no. 1 (2023): 16-29.
[65]Inter-American Commission on Human Rights. "Follow-up of Recommendations Issued by the IACHR in its Country or Thematic Reports: El Salvador." 2022. https://www.oas.org/en/iachr/docs/annual/2022/Chapters/12-IA2022_Cap_5_El_Salvador_EN.pdf. p 874.
[66] Ibid., p 876.

*Expert Declaration of Sarah C. Bishop, Ph.D.*                    *Page 13 of 15*

words, the state has repeatedly refused to provide the information that would be necessary to know the full scope of and prosecute instances of police and military violence.

58.    Americas Director for Amnesty International Ana Piquer reported in March 2024 that "the denial, minimization and concealment of reported serious human rights violations reflect the government's unwillingness to fulfil its duty to respect and promote human rights in the country."[67] By strategically concealing both the nature and scope of human rights abuses taking place, the government of El Salvador has managed to mitigate international awareness.

## Gang Activity During the State of Exception

59.    Publicly visible gang activity outside the prisons has quieted during the State of Exception, though gang violence inside the prisons subsists.[68] Since 2004, a practice had been in place to hold members of the two most powerful gangs in El Salvador, MS-13 and Barrio 18, in separate prisons in a measure designed to prevent both rival inter-gang violence and violence between gang members and civilians. Former Salvadoran Security Minister Bertrand Galindo explained, "The point was that if we left them in the same facilities, with the level of violence that was occurring and the weakness of the infrastructure, the state was not going to be able to prevent them from killing each other."[69] Bukele changed this policy in 2020 and reaffirmed on Twitter during the opening of his new 2023 mega-prison that gang members would be mixed together and held for decades[70]—a change certain to result in violence between the gangs and indicative of the Salvadoran state's determination not to protect its detained citizens from harm at the hands of the gangs.

60.    The high probability of violent gang activity in prisons during the State of Exception in El Salvador since the policy changed has been confirmed by a range of instances such as a January 2025 riot in Izalco prison in which active gang members mixed together in a cell with retired gang members reportedly attacked each other using iron bars they had removed from their beds, resulting in at least three deaths.[71] Two weeks after the riot, three inmates from Izalco prison died in hospitals; the families of the deceased were informed that the cause of their deaths was "illness." [72]

[67] Amnesty International. "El Salvador: The institutionalization of human rights violations after two years of emergency rule." 27 March 2024. https://www.amnesty.org/en/latest/news/2024/03/el-salvador-two-years-emergency-rule/
[68] "El Salvador 2022 Human Rights Report." U.S. Department of State. https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/el-salvador/ p 5.
[69] Roberto Valencia. "How El Salvador Handed its Prisons to the Mara Street Gangs." *InsightCrime*  3 September 2014. https://insightcrime.org/news/analysis/how-el-salvador-handed-its-prisons-to-the-gangs/#:~:text=On%20September%202%2C%202004%20the,active%20gang%20members%20call%20pesetas.
[70] Bukele, Nayib (@NayibBukele). 2023. Twitter, February 24, 2023. Translated from Spanish by Sarah C. Bishop. https://twitter.com/nayibbukele/status/1629165213600849920.
[71] David Bernal, Cindy Castillo y Claudia Espinoza. "Pedirán una investigación por motín en penal de Izalco." *La Presna Grafica.* 10 January 2025. https://www.laprensagrafica.com/elsalvador/Pediran-una-investigacion-por-motin-en-penal-de-Izalco-20250110-0063.html
[72] Oscar Reyes. "Reos de penal de Izalco mueren en hospitals." 28 January 2025. *La Prensa Grafica.* https://www.laprensagrafica.com/elsalvador/Reos-de-penal-de-Izalco-mueren-en-hospitales-20250128-0083.html

61. Bukele's failure to protect detainees from gang violence has been widely criticized by human rights organizations. Director for the Americas at Human Rights Watch José Miguel Vivanco stated that not separating gang-affiliated detainees from each other or from other detainees showed the government's "wickedness and cruelty;"[73] the Human Rights Commission of El Salvador stated that the practice "carries a total risk of mutinies or selective or collective murders."[74] Still, much of the news reporting on Bukele's change in procedure referenced the country's general prison overcrowding, as though the move was an inevitable reality in a national context where the prison population was already double its stated capacity. The fact that Bukele reiterated his intention to mix gang members together in the announcement of the opening of the new mega-prison that was promised to solve the issue of overcrowding reveals this practice as a deliberate strategy in knowing acquiescence to the violence likely to result rather than an unfortunate necessity.

62. In practice, this means that Salvadoran citizens, many of whom have been arrested arbitrarily, continue to be victim to gang control and authority even while detained. In some prisons, MS-13 and Barrio 18 are designating leaders of crowded cells to set cell rules and determine who receives food and water. Breaking the gang's rules may result in physical beatings.[75]

### Conclusion

63. Deportees who are imprisoned in El Salvador are highly likely to face immediate and intentional life-threatening harm at the hands of state actors and a secondary threat of violence from incarcerated gang members.

---

### Signature

I declare under penalty of perjury that the foregoing is true and correct to best of my knowledge.

_____                    March 19, 2025_____

Signature                                           Date

---

[74] Marcos González Díaz. "Bukele contra las maras: las impactantes imágenes con las que El Salvador anunció que juntó a presos de diferentes pandillas en las celdas para combatir la violencia." *BBC News Mundo.* 28 April 2020. https://www.bbc.com/mundo/noticias-america-latina-52450557

[75] Stephen Dudley et al. "El Salvador's (Perpetual) State of Emergency: How Bukele's Government Overpowered Gangs." December 2023. https://insightcrime.org/investigations/el-salvador-perpetual-state-emergency-how-bukele-government-overpowered-gangs/#:~:text=In%20March%202022%2C%20the%20government,suspected%20gang%20members%20and%20collaborators p 6.

**United States Department of Justice**
**Executive Office for Immigration Review**
**Immigration Court**
**Baltimore, Maryland**

|  |  |  |
|---|---|---|
| **In the Matter of** | : | **In Bond Proceedings** |
|  | : |  |
| **ABREGO-GARCIA, Kilmer Armado** | : | **Case #A** ▮▮▮▮▮ |
|  | : |  |
| **Respondent** | : |  |
|  | : |  |

| | |
|---|---|
| **Charges:** | Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i) |
| **Application:** | Change in Custody Status |
| **Hearing Date:** | April 29, 2019 |
| **Appearances:** | Himedes Chicas, Esq., on behalf of the Respondent; Jennifer Hastings, Esq., on behalf of the Department of Homeland Security |

### BOND MEMORANDUM

The Respondent is a native and citizen of El Salvador. On March 29, 2019, the Department of Homeland Security (DHS) served the Respondent with a Notice to Appear (NTA), which sets forth the following factual allegations: (1) the Respondent is not a citizen or national of the United States; (2) he is a native and citizen of El Salvador; (3) he arrived in the United States at an unknown place, on an unknown date; and (4) he was not then admitted or paroled after an inspection by an immigration officer. Accordingly, the Respondent was charged with removability pursuant to INA § 212(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. Exh. 1. The Respondent was held in custody by the DHS.

The Respondent requested a bond redetermination hearing, which the Court conducted on April 24, 2019. At his bond hearing, the Respondent, through counsel, requested a $5,000 bond. He argued that he is not a flight risk. He asserted that he has lived in the United States for eight years. He has two brothers who are legal permanent residents. His fiancé is a United States citizen, and the Respondent is helping to raise and support her two children. His fiancé is also five months' pregnant with a child by the Respondent; her pregnancy is high-risk. He stated that he failed to appear for hearings on some traffic violations because he was not aware of those hearings, and he intends to hire an attorney to resolve his traffic proceedings. In addition, the

1

Respondent stated that he intends to apply for relief in the form of asylum and adjustment of status based on his relationship to his fiancé, whom he intends to marry. The Respondent also argued that he is not a danger to the community. He has no criminal convictions. He denied being a gang member and objected to the admissibility of the Form I-213 and the Prince George's County Police Department Gang Field Interview Sheet because he lacked the opportunity to cross-examine the detective who determined that he is a gang member.

The DHS opposed the Respondent's request for bond. The DHS asserted that the Respondent is a verified gang member. The Respondent was arrested in the company of other ranking gang members and was confirmed to be a ranking member of the MS-13 gang by a proven and reliable source. The DHS argued that the Form I-213 is admissible as a legally reliable document in immigration court.

An alien seeking a custody redetermination under section 236(a) of the Act bears the burden of demonstrating that he merits release on bond. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). The respondent may satisfy this burden by demonstrating that his release does not pose a danger to persons or property, a threat to national security, or a risk of flight, and that he is likely to appear for any future proceedings. *Matter of Siniauskas*, 27 I&N Dec. 207, 207 (BIA 2018); *Matter of Adeniji*, 22 I&N Dec. 1102, 1111–13 (BIA 1999).

An immigration judge has broad discretion to consider any matter deemed relevant to determining whether an alien's release on bond is permissible or advisable. *Matter of Guerra*, 24 I&N Dec. at 40 (noting that an immigration judge "may choose to give greater weight to one factor over others, as long as the decision is reasonable"). Relevant factors include: (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recent nature of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States. *Id.*; *see also Matter of Saelee*, 22 I&N Dec. 1258 (BIA 2000).

After considering the information provided by both parties, the Court concluded that no bond was appropriate in this matter. The Court first reasoned that the Respondent failed to meet his burden of demonstrating that his release from custody would not pose a danger to others, as the evidence shows that he is a verified member of MS-13. *Matter of Siniauskas*, 27 I&N Dec. at 210; *Matter of Adeniji*, 22 I&N Dec. at 1111–13; 8 C.F.R. § 1003.19(h)(3). The BIA has held that, absent any indication that the information therein is incorrect or was the result of coercion or duress, Form I-213 is "inherently trustworthy and admissible." *Matter of Barcenas*, 19 I&N Dec. 609, 611 (BIA 1988). The Respondent contends that the Form I-213 in his case erroneously states that he was detained in connection to a murder investigation. He also claims that the I-213 is internally contradicts itself as to whether the Respondent fears returning to El Salvador. The reason for the Respondent's arrest given on his Form I-213 does appear at odds with the Gang Field Interview Sheet, which states that the Respondent was approached because he and others were loitering outside of a Home Depot. Regardless, the determination that the Respondent is a

2

gang member appears to be trustworthy and is supported by other evidence in the record, namely, information contained in the Gang Field Interview Sheet. Although the Court is reluctant to give evidentiary weight to the Respondent's clothing as an indication of gang affiliation, the fact that a "past, proven, and reliable source of information" verified the Respondent's gang membership, rank, and gang name is sufficient to support that the Respondent is a gang member, and the Respondent has failed to present evidence to rebut that assertion.

The Court further held that no bond was appropriate in order to ensure the Respondent's appearance at future hearings, as he had not met his burden of showing that he would not be a flight risk. *See* 8 C.F.R. § 1003.19(h)(3). The Respondent's case presents limited eligibility for relief, thereby significantly diminishing his incentive to appear for future immigration proceedings. He is not married to his fiancé, and any immigration relief that he can be expected to gain from a marital relationship with her in the future is speculative. Although the Respondent stated that he intends to file for asylum, his eligibility appears limited to withholding of removal and protection under the Convention Against Torture due to his failure to file an application within one year of his arrival in the United States. Those forms of relief are limited and contain standards that are difficult to meet. In addition, the record evidence shows that the Respondent has a history of failing to appear for proceedings pertaining to his traffic violations. *See* Bond Exh. 2, Tab I at 28–29. He asserted that he did not receive notice of these proceedings, but in his written statement, he admitted that he remembers receiving citations that he chose not to follow up on. *See* Bond Exh. 2, Tab B at 5. The Respondent's lack of diligence in following up on his traffic court cases indicates that he cannot be trusted to appear in immigration court.

In light of these findings, the Court concluded that no bond was appropriate in this matter. That order was issued on April 24, 2019. The Respondent reserved the right to appeal.

5.22.2019

Date

Elizabeth A. Kessler
Immigration Judge

3

**U.S. Department of Justice**                                        Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia 22041

File:  ████████ – Baltimore, MD                      Date:

                                                                          **DEC 1 9 2019**
In re: Kilmer Armado ABREGO-GARCIA

IN BOND PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Lucia Curiel, Esquire

ON BEHALF OF DHS:   Jennifer L. Hastings
                    Assistant Chief Counsel

APPLICATION:  Redetermination of custody status


    The respondent, a native and citizen of El Salvador, appeals from an Immigration Judge's
April 24, 2019, decision denying his request for release on bond from the custody of the
Department of Homeland Security pursuant to section 236(a) of the Immigration and Nationality
Act, 8 U.S.C. § 1226(a).  On May 22, 2019, the Immigration Judge issued a memorandum setting
forth the reasons underlying her conclusion that the respondent did not show that he is not a danger
to the community or that he presents a flight risk capable of being mitigated by bond.  The appeal
will be dismissed.

    This Board reviews the Immigration Judge's factual findings for clear error.  8 C.F.R.
§ 1003.1(d)(3)(i); *see also Matter of Fatahi*, 26 I&N Dec. 791, 793 n.2 (BIA 2016).  We review
all other issues de novo.  8 C.F.R. § 1003.1(d)(3)(ii).

    An alien "must demonstrate to the satisfaction of [the Immigration Judge] that [his or her]
release would not pose a danger to property or persons . . . ."  8 C.F.R. § 1236.1(c)(8); *see also
Matter of Adeniji*, 22 I&N Dec. 1102, 1111-12 (BIA 1999).  Thus, only if an alien has established
that he or she would not pose a danger to persons or property should an Immigration Judge decide
the amount of bond necessary to ensure the alien's presence at proceedings to remove him or her
from the United States. *Matter of Urena*, 25 I&N Dec. 140, 141 (BIA 2009).

    The respondent argues that the Immigration Judge clearly erred in determining that he is a
verified member of MS-13 because there is no reliable evidence in the record to support such a
finding (Respondent's Br. at 6-9).  In this regard, the respondent asserts that a Prince George's
County Police Department Gang Field Interview Sheet ("GFIS") is based on hearsay relayed by a
confidential source (Exh. 4).  The respondent also claims that he presented sufficient evidence to
rebut the allegation that he is affiliated with MS-13, including character references and criminal
records showing that he has only been charged with traffic offenses.  Therefore, the respondent
contends that the Immigration Judge erroneously ruled that he did not show that he is not a danger
to the community (Respondent's Br. at 9-10).

We adopt and affirm the Immigration Judge's danger ruling (IJ at 2-3). *See Matter of Burbano*, 20 I&N Dec. 872, 874 (BIA 1994). Notwithstanding the respondent's challenges to the reliability of the GFIS, the Immigration Judge appropriately considered allegations of gang affiliation against the respondent in determining that he has not demonstrated that he is not a danger to property or persons. *See Matter of Fatahi*, 26 I&N Dec. at 795 (in determining whether an alien presents a danger to the community and thus should not be released on bond pending removal proceedings, an Immigration Judge should consider both direct and circumstantial evidence of dangerousness); *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (stating that Immigration Judges may look to a number of factors in determining whether an alien merits release on bond, including "the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses").

Consequently, we need not address the Immigration Judge's flight risk determination (Respondent's Br. at 10-11).

Accordingly, the following order is entered.

ORDER: The appeal is dismissed.

FOR THE BOARD

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

Kilmar Armando Abrego Garcia*, et al*.,

Plaintiffs,

v.

Kristi Noem, Secretary of Homeland Security, *et al.*,

Defendants.

No. 8:25-cv-00951-PX

<u>Declaration Of Acting Field Office Director Robert L. Cerna</u>

## DECLARATION OF ROBERT L. CERNA

I, Robert L. Cerna, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an Acting Field Office Director Enforcement and Removal Operations ("ERO") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.      As the (A)FOD of the Harlingen Field Office, I am responsible for, among other things, the detention and enforcement operations of more than 350 employees, assigned to six ERO Harlingen offices. ERO Harlingen encompasses fifteen South Texas counties and is responsible for six detention facilities with a combined total of 3,790 detention beds.

3.      I am aware that the instant lawsuit has been filed regarding the removal of Kilmer Armado Abrego-Garcia (Abrego-Garcia) to El Salvador.

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      On March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua.*

6.      On March 15, 2025, two planes carrying aliens being removed under the Alien Enemies Act ("AEA") and one carrying aliens with Title 8 removal orders departed the United States for El Salvador. Abrego-Garcia, a native and citizen of El Salvador, was on the third flight and thus had his removal order to El Salvador executed. This removal was an error.

7.      On March 29, 2019, the Department of Homeland Security (DHS) served Abrego-Garcia with a Notice to Appear, charging him as inadmissible pursuant to Section 1182(a)(6)(A)(i) of Title 8 of the United States Code, "as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."

8.      During the course of his proceedings, Abrego-Garcia remained in ICE custody because the Immigration Judge (IJ) with the Executive Office for Immigration Review denied Abrego-Garcia bond at a hearing on April 24, 2019, citing danger to the community because "the evidence show[ed] that he is a verified member of [Mara Salvatrucha] ('MS-13')]" and therefore posed a danger to the community. The IJ also determined that he was a flight risk. Abrego-Garcia appealed, and the Board of Immigration Appeals upheld this bond decision in an opinion issued on December 19, 2019, citing the danger Abrego-Garcia posed to the community.

9.      On October 10, 2019, an IJ ordered Abrego-Garcia's removal from the United States but granted withholding of removal to El Salvador pursuant to 8 U.S.C. § 1231(b)(3)(A). This grant of protection prohibited his removal to El Salvador.

10.      Following this grant of withholding of removal, Abrego-Garcia was released from ICE custody.

11.      On March 12, 2025, ICE Homeland Security Investigations arrested Abrego-Garcia due to his prominent role in MS-13. Over the next two days, Abrego-Garcia was transferred to the staging area for the removal flights discussed in Paragraph 6.

12.      The operation that led to Abrego-Garcia's removal to El Salvador was designed to only include individuals with no impediments to removal. Generally, individuals were not placed on the manifest until they were cleared for removal.

13.      ICE was aware of this grant of withholding of removal at the time Abrego-Garcia's removal from the United States. Reference was made to this status on internal forms.

14.      Abrego-Garcia was not on the initial manifest of the Title 8 flight to be removed to El Salvador. Rather, he was an alternate. As others were removed from the flight for various reasons, he moved up the list and was assigned to the flight. The manifest did not indicate that Abrego-Garcia should not be removed.

15.      Through administrative error, Abrego-Garcia was removed from the United States to El Salvador. This was an oversight, and the removal was carried out in good faith based on the existence of a final order of removal and Abrego-Garcia's purported membership in MS-13.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of March 2025.

_____

Robert L. Cerna
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security