Case No. 25-1345

---

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

KILMAR ARMANDO ABREGO GARCIA, ET AL.,
*Plaintiffs-Appellees,*

v.

KRISTI NOEM, ET AL.,
*Defendants-Appellants.*

---

On Appeal from the U.S. District Court
for the District of Maryland
Case No. 8:25-CV-00951-PX

---

## PLAINTIFFS' SUPPLEMENTAL RECORD MATERIALS

---

# TABLE OF CONTENTS

**Page**

Memorandum and Order Granting Withholding
of Removal (Oct. 10, 2019) (ECF 1-1).......................................................SA1

Jennifer Stefania Vasquez Sura
Affidavit (Mar. 23, 2025) (ECF 1-2) .......................................................SA15

Plaintiffs' Supplemental Memorandum In Support
of Injunctive Relief (Mar 28, 2025) (ECF 10) .......................................SA24

"Photos Show Kristi Noem's Visit Through Notorious El Salvador Prison,"
*Newsweek* (Mar. 26, 2025) (ECF 10-5) .................................................SA36

Defendants' Corrected Memorandum In Opposition To
Plaintiffs' Emergency Motion for Temporary
Restraining Order (Apr. 1, 2025) (ECF 12-1) .........................................SA42

Plaintiffs' Reply Memorandum In
Support Of Motion For
Preliminary Injunction (Apr. 2, 2025) (ECF 15) .....................................SA64

Transcript of Preliminary Injunction
Hearing (Apr. 4, 2025)............................................................................SA80

Defendants' Notice  of Appeal
(Apr. 4, 2025) (ECF 22)........................................................................SA143

Memorandum Opinion
(Apr. 6, 2025) (ECF 31)........................................................................SA144

Paperless Order Denying Defendants'
Motion to Stay (Apr. 6, 2025) (ECF 32) ...............................................SA166

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
BALTIMORE, MARYLAND

| | | |
|---|---|---|
| **IN THE MATTER OF:** | ) | **IN REMOVAL PROCEEDINGS** |
| | ) | |
| | ) | |
| **Kilmar Armando ABREGO-GARCIA** | ) | **File #A 201-577-119** |
| | ) | |
| | ) | |
| **RESPONDENT** | ) | |

| | |
|---|---|
| **INDIVIDUAL HEARING DATE:** | August 9 and September 27, 2019 |
| **CHARGE:** | Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA" or the "Act"), as amended, in that the Respondent is an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. |
| **APPLICATIONS:** | INA § 208, Asylum; INA § 241(b)(3), Withholding of Removal; Protection Under Article 3 of the Convention Against Torture. |

### APPEARANCES

**ON BEHALF OF RESPONDENT**
Lucia Curiel
Khatia Mikadze

**ON BEHALF OF THE DHS**
Amy Donze-Sanchez

### MEMORANDUM OF DECISION AND ORDER

**I.    Procedural History**

The Respondent is a native and citizen of El Salvador. The Department of Homeland Security ("DHS") issued the Respondent a Notice to Appear ("NTA") on March 29, 2019 which alleged that the Respondent: (1) is not a citizen or national of the United States; (2) is a native and citizen of El Salvador; (3) entered the United States at or near an unknown place on or about an

unknown date; and (4) was not then admitted or paroled after inspection by an immigration officer.

At a Master Calendar Hearing the Respondent, through counsel, admitted the factual allegations contained in the NTA and conceded removability as charged. Based on the Respondent's admissions and concessions, the Court found his removability to be established by clear and convincing evidence as required by INA § 240(c)(3). *See also Woodby v. INS*, 385 U.S. 276 (1966). As relief from removal, the Respondent filed a Form I-589, Application for Asylum, Withholding of Removal, and Relief under Article 3 of the Convention Against Torture ("CAT"). The Respondent and his wife both <sup>testifi</sup>ed in support of the applications. The Court reserved the matter for the issuance of a written decision.

The Court has considered the arguments of both parties and the entire record carefully. The following documentary evidence was considered by the Court and admitted into the record: Exhibit 1, the Notice to Appear; Exhibit 2, the I-213; Exhibit 3, the Respondent's application with all supporting documents; and Exhibit 5, Part A, explanation of the wife's pregnant condition while testifying.[1] All evidence and testimony admitted has been considered, even if not specifically addressed in the decision. Having reviewed the evidence of record and the applicable law, the Court's written decision and order now follow.

## II.    **Testimonial Evidence Presented**

### A. Respondent

The Respondent is a 24-year old native of El Salvador. He was born in 1995 in Los Nogales neighborhood, San Salvador, El Salvador. The Respondent testified that he fears returning to his country because the Barrio 18 gang was targeting him and threatening him with death because of his family's pupusa[2] business. The Respondent's mother, Cecilia, ran the business out of her home. Although the business had no formal storefront, everyone in the town knew to get their pupusas from "Pupuseria Cecilia." The Respondent's father, brother and two sisters all helped run the family business. The Respondent's job was to go to the grocery store to buy the supplies needed for the pupusas, and then he and his brother would do deliveries four days a week to the people in

---

[1] Exhibit 4 is a Prince George's County Police Department Gang Field Interview Sheet. It was admitted for the limited purpose of showing that the Respondent was labeled a gang member by law enforcement.

[2] El Salvadorian stuffed tortillas.

the town that ordered pupusas from Cecilia.

At some point, Barrio 18 realized the family was making money from their family business and they began extorting the Respondent's mother, Cecilia. They demanded a regular stipend of "rent" money from the business, beginning with a monthly payment and then requiring weekly payments. The gang threatened to harm the Respondent, his older brother Cesar, and the family in general if their demands were not met. Alternatively, they told Cecelia that if she could not pay the extortion money, she could turn Cesar over to them to become part of their gang. The Abrego family paid the money on a regular basis, whenever they could, and hid Cesar from the gang. On one occasion, the gang came to the family's home and threatened to kill Cesar if the family did not pay the rent. The family responded by sending Cesar to the U.S.

After Cesar left, the gang started recruiting the Respondent. They told Cecilia that she would not have to pay rent any more if she let him join the gang. The mother refused to let this happen. The gang then threatened to kill the Respondent. When the Respondent was around 12-years old, the gang came to the home again, telling Cecilia that they would take him because she wasn't paying money from the family's pupusa business. The Respondent's father prevented the gang from taking the Respondent that day by paying the gang all of the money that they wanted. During the days, the gang would watch the Respondent when he went back and forth to school. The members of the gangs all had many tattoos and always carried weapons.

Eventually, the family had enough and moved from Los Nogales to the 10th of October neighborhood. This town was about 10 minutes away, by car, from Los Nogales. Shortly after the family moved, members of Barrio 18 from Nogales went to the 10th of October and let their fellow gang members know that the family had moved to that neighborhood· Barrio 18 members visited the house demanding the rent money from the pupusa business again. They went to the house twice threatening to rape and kill the Respondent's two sisters and threatening the Respondent. The Respondent's parents were so fearful that they kept the Respondent inside the home as much as possible. Finally, the family decided they had to close the pupusa business and move to another area, Los Andes, about a 15 minute drive from their last residence. Even at this new location, the family kept the Respondent indoors most of the time because of the threats on his life. After four months of living in fear, the Respondent's parents sent the Respondent to the U.S.

Even though the Respondent's father was a former policeman, they family never reported anything to the police regarding the gang extorting the family business. The gang members had

3

threatened Cecilia, telling her that if she ever reported anything to the police that they would kill the entire family. The family believed them, because they were well aware of the rampant corruption of the police in El Salvador and they believed that if they reported it to the police, the police would do nothing.

At present, even though the family has now shut down the pupusa business, Barrio 18 continues to harass and threaten the Respondent's two sisters and parents in Guatemala. Additionally, they have targeted a brother-in-law who now lives with the family.

**B. The Respondent's Wife**

The Respondent's wife also testified, but her testimony related to two other particular social groups not reached in this decision.[3]

## III.    Eligibility for Asylum, Withholding and CAT Relief

**A.    Asylum**

An applicant for asylum bears the burden of establishing that he meets the definition of a refugee under INA § 101(a)(42)(A), which defines a refugee in part as an alien who is unable or unwilling to return to her home country because of persecution, or a well-founded fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. *Matter of S-P-*, 21 I&N Dec. 486, 489 (BIA 1996); 8 C.F.R. § 1208.13(a); INA § 208(b)(1)(B). The alien's fear of persecution must be country-wide. *Matter of Acosta*, 19 I&N Dec. 211, 235 (BIA 1985). Additionally, the alien must establish that he is unable or unwilling to avail himself of the protection of his country of nationality or last habitual residence. INA § 101(a)(42)(A); *see also Matter of A-B-*, 27 I&N Dec. 316, 325–26 (A.G. 2018). An applicant who establishes statutory eligibility for asylum still bears the burden of demonstrating that he merits a grant of asylum as a matter of discretion. INA § 208(b)(1); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987).

**i.    Credibility and Corroboration**

An alien bears the evidentiary burden of proof and persuasion in connection with any

---

[3] The other two particular social groups are: 1) Salvadoran male deportees labeled as MS-13 gang members by U.S. law enforcement; and 2) Immediate family of Jennifer Vasquez (the Respondent's wife.) The Court will not address the alternative claims for relief, as it is not necessary to do so at this time.

4

asylum application pursuant to section 208 of the Act. 8 C.F.R. § 1208.13(a); *see also Matter of S-M-J-*, 21 I&N Dec. 722, 723 (BIA 1997); *Matter of Acosta*, 19 I&N Dec. 211, 215 (BIA 1985); *Matter of Mogharrabi*, 19 I&N Dec. 439, 446 (BIA 1987). The Board of Immigration Appeals (BIA) has recognized the difficulties an asylum applicant may face in obtaining documentary or other corroborative evidence to support his claim of persecution. *Matter of Dass*, 20 I&N Dec. 120, 124 (BIA 1989). As a result, uncorroborated testimony that is credible, persuasive, and specific may be sufficient to sustain the burden of proof to establish a claim for asylum. *See* INA § 208(b)(1)(B)(ii); 8 C.F.R. § 1208.13(a); *Matter of Mogharrabi*, at 445. However, where it is reasonable to expect corroborating evidence for certain alleged facts, such evidence must be provided as long as the applicant has the evidence or can reasonably obtain it. *Matter of S-M-J-*, 21 I&N Dec. at 725. The absence of such corroboration may lead to a finding that an applicant has failed to meet his burden of proof. *Id.* at 725–26. The immigration judge must provide the applicant an opportunity to explain the lack of corroborating evidence and ensure that the applicant's explanation is included in the record. *See id.; Lin-Jian v. Gonzales*, 489 F.3d 182, 192 (4th Cir. 2007). The Board has made clear that an asylum applicant cannot meet his burden of proof by "general and vague" testimony, and "the weaker an alien's testimony, the greater the need for corroborative evidence." *Matter of Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998).

In the instant matter, the Respondent provided credible responses to the questions asked. His testimony was internally consistent, externally consistent with his asylum application and other documents, and appeared free of embellishment. Further, he provided substantial documentation buttressing his claims. Included in this evidence were several affidavits from family members that described the family's pupusa business, and the threats by Barrio 18 to the various family members—in particular the Respondent—over the years. The court finds the Respondent credible. This finding is applicable to his other two claims as well (withholding under the Act and CAT protection).

## ii.    One-Year Filing Deadline

Under INA § 208(a)(2)(B), an applicant for asylum must demonstrate by clear and convincing evidence that the application has been filed within one year after the date of the alien's arrival in the United States. Following the *Mendez Rojas v. Johnson* case (305 F. Supp. 3d 1176 (W.D. Wash., Mar. 29, 2018)), in a joint stay agreement, the Government agreed to treat pending

5

asylum applications by four classes of applicants as though filed within one year of arrival.[4] *See* 305 F. Supp. 3d at 1179. Members of Class A.II are individuals in removal proceedings who have been released from DHS custody after having been found to possess a credible fear of persecution, did not receive notice from the DHS of the one-year deadline, and filed an untimely asylum application. *See id.* Members of Class B.II are individuals in removal proceedings who express a fear of return to their country of origin, were released from DHS custody without a credible fear determination, did not receive notice from the DHS of the one-year deadline, and filed an untimely asylum application. *See id.*

Here, the Respondent's asylum application is time-barred without exception. INA § 208(a)(2)(B); 8 C.F.R. § 1208.4(a)(2). The Respondent testified that he entered the U.S. in 2012. However, he did not file his application for asylum until after he was detained in August 2019, seven years after his entry into the U.S. and well-beyond the one-year filing deadline. *See* Exh. 3. He has shown no changed or extraordinary circumstances that would entitle him to relief from the one-year bar. *See* 8 C.F.R. § 1208.4(a)(4) and (5). Based on the foregoing, the Respondent's application for asylum is time-barred and must be denied. We turn next to withholding of removal under the Act.

**B.    Withholding of Removal Pursuant to INA § 241(b)(3)**

Withholding of removal, in contrast to asylum, confers only the right not to be deported to a particular country rather than the right to remain in the U.S. *INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999). To establish eligibility for withholding of removal, a respondent must show that there is a clear probability of persecution in the country designated for removal on account of race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic*, 467 U.S. 407 (1984). Such a showing requires that the respondent establish that it is more likely than not (i.e., a clear probability) that the alien would be subject to persecution if returned to the country from which the alien seeks withholding of removal. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987). The standard for withholding of removal is thus more stringent than the standard for asylum. *Stevic*, 467 U.S. at 429-430. Under the withholding of removal regulations at 8 C.F.R. § 1208.16(b)(1), however, if an applicant has suffered past persecution, then there is a presumption that the applicant's life or freedom would be threatened in the future in the country of removal.

---

[4] Classes A.I and B.I apply only to individuals who are not in removal proceedings. *See Mendez Rojas*, 305 F. Supp. 3d at 1179.

### i.    Past Persecution

Persecution has been interpreted to include serious threats to an individual's life or freedom, or the infliction of significant harm on the applicant. *See Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985); *Li v. Gonzales*, 405 F.3d 171 (4ᵗʰ Cir. 2005). Persecution is generallʸ assessed cumulatively, and relevant incidents are not to be evaluated in isolation. *See Baharon v. Holder*, 588 F.3d 228 (4ᵗʰ Cir. 2009). A death threat qualifies as persecution. *See Crespin-Valladares v. Holder*, 632 F.3d 117 (4ᵗʰ Cir. 2011). Extortion may constitute persecution, even if physical harm will be inflicted only upon failure to pay. *Oliva v. Lynch*, 807 F.3d 53 (4ᵗʰ Cir. 2015).

The Respondent suffered past persecution as he was threatened with death on more than one occasion. Therefore, DHS bears the burden of establishing "a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds" or that "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." *See* 8 C.F.R. § 1208.16(b)(1).

The "one central reason" standard that applies to asylum applications pursuant to section 208(b)(1)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(1)(B)(i) (2006), also applies to applications for withholding of removal under section 241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A) (2006). *Matter of C-T-L-*, 25 I&N Dec. 341 (BIA 2010). An applicant must demonstrate that a statutorily protected ground would be "at least one central reason" for the feared persecution. *See* INA § 208(b)(1)(B)(i); *Matter of J-B-N- & S-M-*, 24 I&N Dec. 208 (BIA 2007) (holding that in a mixed motive asylum case, an applicant must prove that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for the claimed persecution). An alien need not show that a statutorily protected ground would be the central reason or even a dominant central reason, but rather must show that such a ground was more than an "incidental, tangential, superficial or subordinate" reason for the past persecution or feared future persecution. *Matter of J-B-N- & S-M-*, 24 I&N Dec. at 214; *see also Crespin-Valladares v. Holder*, 632 F.3d 117 (4ᵗʰ Cir. 2011); *Quinteros-Mendoza v. Holder*, 556 F.3d 159, 164 (4ᵗʰ Cir. 2009). Persecution may be on account of multiple central reasons or intertwined reasons, and the full factual context must be taken into account when analyzing nexus. *Oliva v. Lynch*, 807 F.3d 53 (4ᵗʰ Cir. 2015).

### ii.    Well-Founded Fear of Future Persecution and Internal Relocation

Based on the above, the Respondent has demonstrated the he was subject to past persecution on account of a statutorily protected ground. He is entitled to the presumption under the regulations that he would have a clear probability of future persecution on account of a protected ground. Given his testimony and other evidence concerning official corruption and other abuses, he has demonstrated that authorities were and would be unable or unwilling to protect him from past or feared future persecution. Given country conditions and the Respondent's inability to avoid the threat through internal relocation, the Respondent could not necessarily avoid the threat through internal relocation, nor would it be reasonable to expect him to do so. DHS has failed to carry their burden to show that there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable. The facts here show that the Barrio 18 gang continues to threaten and harass the Abrego family over these several years, and does so even though the family has moved three times.[5]

### iii.    Nexus to a Protected Ground

To be cognizable under the statute, members of a "particular social group" must share a "common immutable characteristic," which may be an innate characteristic or a shared past experience. *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018). In either case, it must be a characteristic that members of the group either cannot change or should not be required to change. To constitute a "particular social group" under the statute, the group must be (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question. *See Matter of A-B-*, 27 I&N Dec. 316 (married women in Guatemala who are unable to leave their relationships do not constitute a particular social group); *Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014) (former members of Mara 18 gang in El Salvador who renounced gang membership do not constitute a particular social group); *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014); *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006) (former noncriminal drug informants do not present a cognizable social group); *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985).

Under well-established Fourth Circuit precedent, family ties may provide the basis for a

---

[5] The court understands that the family's moves have been only 15 minutes away each time. However, DHS has failed to show that internal relocation is not only possible, but reasonable to expect the Respondent to so relocate.

cognizable particular social group under the INA. *See, e.g., Crespin-Valladares v. Holder*, 632 F.3d 117, 124-126 (4th Cir. 2011) ("we can conceive of few groups more readily identifiable than the family"); *Hernandez-Avalos v. Lynch,* 784 F.3d 944, 949 (4th Cir. 2015) ("membership in a nuclear family qualifies as a protected ground for asylum purposes"); *Cruz v. Sessions*, 853 F.3d 122, 127 (4th Cir. 2017) ("by virtue of her domestic partnership with Martinez, Cantillano Cruz was a member of a cognizable particular social group, namely, 'the nuclear family of Johnny Martinez'"), *Salgado-Sosa v. Sessions*, 882 F.3d 451, 457 (4th Cir. 2018) ("Salgado-Sosa's family qualifies as a 'particular social group,' protected for purposes of his asylum and withholding of removal claims"). Neither those who resist recruitment efforts by gangs nor their family members generally constitute a particular social group under the INA, nor do such bases amount to political opinion. *See Matter of S-E-G-,* 24 I&N Dec. 579 (BIA 2008); *see also INS v. Elias-Zacarias*, 502 U.S. 478 (1992) (forced recruitment or attempts to forcibly recruit into a guerrilla organization does not necessarily constitute persecution on account of political opinion). Membership or perceived membership in a criminal gang also does not constitute membership in a particular social group under the INA. *See Matter of E-A-G-,* 24 I&N Dec. 591 (BIA 2008); *see also Lizama v. Holder,* 629 F.3d 440 (4th Cir. 2011) (claimed particular social group of "young, Americanized, well-off Salvadoran male deportees with criminal histories who oppose gangs" not cognizable under the INA). At the same time, the BIA has noted that social group determinations are made on a case by case basis. *Matter of M-E-V-G-,* 26 I&N Dec. 227.

Ascertaining whether membership in a family-based social group is at least one central reason for any past or feared future persecution may present challenges, and the Fourth Circuit has encouraged an expansive view of nexus in these cases. *See Hernandez-Avalos v. Lynch,* 784 F.3d 944 (4th Cir. 2015) (mother who refused to allow her son to join a gang was persecuted on account of her membership in the particular social group of his family); *Cruz v. Sessions*, 853 F.3d 122 (4th Cir. 2017) (nexus to family relationship established because wife of murdered man was more likely than others to search for her husband, confront the suspect, and express an intent to go to the police); *Salgado-Sosa v. Sessions*, 882 F.3d 451 (4th Cir. 2018) (nexus found where man fought back when he was in his family's home during attack targeted at stepfather because membership in the family was why the man and not some other person became involved); *but see Velasquez v. Sessions*, 866 F.3d 188 (4th Cir. 2017) (personal dispute among family members may not equate to persecution on account of family group membership); *Matter of A-B-,* 27 I&N Dec. at 338-339;

*Cortez-Mendez v. Whitaker*, 912 F.3d 205 (4th Cir. 2019) (circumstantial evidence presented did not establish as a factual matter that the respondent's relationship to his father was at least one central reason for his mistreatment by gang members who sought to forcibly recruit him).

The evidence in this case indicates quite clearly that at least one central reason the Respondent was subject to past persecution was due to him being his mothers' son, essentially as a member of his nuclear family. That the Respondent is his mothers' son is the reason why he, and not another person, was threatened with death. He was threatened with death because he was Cecilia's son and the Barrio 18 gang targeted the Respondent to get at the mother and her earnings from the pupusa business. Pursuant to unambiguous and repeated guidance from the Fourth Circuit, the nexus requirement is satisfied in this case. *See generally Hernandez-Avalos v. Lynch*, 784 F.3d at 944; *Cruz v. Sessions*, 853 F.3d at 122; *Salgado-Sosa v. Sessions*, 882 F.3d at 451.

The Court finds that the Respondent's proposed social group, "Immediate Family Members of the Abrego Family," essentially his nuclear family, is cognizable. Membership in this family group is immutable. It is also sufficiently particular, as it is clearly delineated and easy to determine who is and is not in the group, and it is socially distinct.

With respect to social distinction, the immediate family lived in the same home, and his mother ran a pupusa business. Neighbors and others in the community recognized the family as a distinct group that was related, and ran a family business. Everyone knew that Cecilia Abrego was where you purchased your pupusas and that if you could not make it to the family's home, then the Respondent would deliver the pupusas to your house four days a week. As with many other precedential cases involving immediate family members, the proposed social group in this case too satisfies all of the legal requirements for recognition as a cognizable social group. *Cf. Crespin-Valladares v. Holder*, 632 F.3d at 124-126; *Hernandez-Avalos v. Lynch*, 784 F.3d at 949; *Cruz v. Sessions*, 853 F.3d at 127; and *Salgado-Sosa v. Sessions*, 882 F.3d at 457.

This finding—that the Abrego family was socially distinct—does not run afoul of the Attorney General's (AG) recent case, *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019). In that case, the AG did not bar all family-based social groups from qualifying from relief. *Id.* at 595. Rather, the AG required that "[a]n applicant must establish that his specific family group is defined with sufficient particularity and is socially distinct in his society." *Id.* at 586. This case is a close call. But, the Court finds that the Respondent has established that Cecilia's family pupusa business was well-known in the community and therefore the family was socially distinct in society.

10

EOIR - 10 of 14

### C.    Relief from Removal Under CAT

The applicant for withholding of removal under the CAT bears the burden of proving that it is "more likely than not" that he or she would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). An applicant who establishes that he or she is entitled to CAT protection shall be granted withholding of removal unless he is subject to mandatory denial of that relief, in which case he shall be granted deferral of removal. 8 C.F.R. §§ 1208.16(c)(4), 1208.1[7](a). An applicant is subject to mandatory denial of withholding of removal under the CAT if that individual has participated in the persecution of others, has been convicted of a particularly serious crime, has committed a serious nonpolitical crime outside of the U.S., or is a danger to U.S. national security. Under applicable provisions of law at 8 C.F.R. § 1208.16(d) and INA § 241(b)(3)(B), an alien who has been convicted of an aggravated felony for which the alien was sentenced to an aggregate term of imprisonment of at least five years is considered to have been convicted of a particularly serious crime. That does not preclude other crimes from being considered particularly serious crimes.

"Torture" [1S] defined in the treaty and at 8 C.F.R. § 1208.18(a)([1]). It is defined in part as the intentional infliction of severe physical or mental pain or suffering by, or at the instigation of, or with the consent or acquiescence of a public official. Acquiescence of a public official requires that the official have awareness of or remain willfully blind to the activity constituting torture prior to its commission, and thereafter breach his or her legal responsibility to intervene to prevent such activity. *See* 8 C.F.R. § 1208.18(a)(7).

To qualify for protection under the CAT, "specific grounds must exist that indicate the individual would be personally at risk." *Matter of S-V-*, 22 I&N Dec. 1306, 1313 (BIA 2000). The mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would be more likely than not to be tortured. *Id.*

In assessing the likelihood of future torture, the Court must consider all evidence relevant to the possibility of future torture, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured; evidence of gross, flagrant or mass violations of human rights within the country of removal; or other relevant information of conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3). In order for an alien to meet the burden of proof for relief under the CAT, he or she

must demonstrate that each step in the necessary chain of events is more likely than not to happen. *Matter of J-F-F-*, 23 I&N Dec. 912 (A.G. 2006). Under Fourth Circuit precedent, the risks of torture from all sources must be aggregated when determining whether an individual is more likely than not to be tortured in a particular country. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019).

Instances of police brutality do not necessarily rise to the level of torture, nor does the indefinite detention of criminal deportees in substandard conditions. *Matter of J-E-*, 23 I&N Dec. 291, 301-02 (BIA 2002) (indefinite detention of criminal deportees in substandard conditions in Haiti does not constitute torture where there is no evidence that government officials intentionally and deliberately detain deportees under such conditions in order to inflict torture). Abusive or squalid conditions in pretrial detention facilities, prisons, or mental health institutions will not constitute torture when those conditions occur due to neglect, a lack of resources, or insufficient training and education, rather than a specific intent to cause severe pain and suffering. *Matter of J-R-G-P-*, 27 I&N Dec. 482 (BIA 2018).

Torture must come at the hands of the government. *Matter of S-V-*, 22 I&N Dec. at 1311-12. This can include acquiescence of officials provided it meets the conditions set out in the regulations at 8 C.F.R. § 1208.18(a)(7) ("Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity"). Awareness can include actual knowledge and willful blindness. *See* Senate Exec. Rep. 101-30 at 9 (1990); *see also Matter of S-V-*, 22 I&N Dec. at 1312. In *Matter of S-V-*, the BIA elaborated that a respondent needs to show more than that government officials are aware of the activity and powerless to stop it and needs to show that government officials are willfully accepting of the activity. *Matter of S-V-*, 22 I&N Dec. at 1311-1312. Following *Matter of S-V-*, the Attorney General, in *Matter of Y-L-, A-G-, & R-S-R-*, 23 I&N Dec. 270 (A.G. 2002), elaborated on the definition of acquiescence and indicated that the relevant inquiry is "whether governmental authorities would approve or 'willfully accept' atrocities committed." *Id.* at 283.[6]

The Fourth Circuit has clarified that "willful blindness can satisfy the acquiescence

---

[6] That decision noted in part that it would not suffice for a respondent to show that isolated, rogue government agents were involved in atrocities despite a government's best efforts to root out misconduct.

EOIR - 12 of 14

component of 8 C.F.R. § 1208.18(a)(1)." *See Suarez-Valenzuela v. Holder,* 714 F.3d 241, 246 (4th Cir. 2013). Pursuant to the willful blindness standard, government officials acquiesce to torture when they have actual knowledge of or turn a blind eye to torture. *Id.* at 245-246.

Decisions regarding an alien's likely future mistreatment are factual determinations subject to review only for clear error; the determination as to whether any such mistreatment constitutes torture as a legal matter is subject to de novo review. *Turkson v. Holder,* 667 F.3d 523 (4th Cir. 2012); *see also Kaplun v. Attorney General,* 602 F.3d 260 (3d Cir. 2010). Whether the government would acquiesce in any future torture is likewise a mixed question of law and fact. *Cruz-Quintanilla v. Whitaker,* 914 F.3d 884 (4th Cir. 2019).

Here, the Respondent has not shown that it is "more likely than not" that he would be tortured if he were to be removed to El Salvador.

## IV.    Conclusion

The Respondent's application for asylum is time-barred without exception. However he has established past persecution based on a protected ground, and the presumption of a well-founded fear of future persecution. DHS has not shown there are changed circumstances in Guatemala that would result in the Respondent's life not being threatened, or that internal relocation is possible and reasonable under the circumstances. Therefore, the Respondent's application for withholding under the Act is granted. Finally, his CAT claim fails because he has not shown that he would suffer torture.

## ORDER

It is hereby ordered that:

    I.    the Respondent's application for asylum pursuant to INA § 208 is **DENIED**;

    II.    the Respondent's application for withholding of removal pursuant to INA § 241(b)(3) is **GRANTED**; and

    III.    the Respondent's application for withholding of removal under the Convention Against Torture is **DENIED**;

_10/10/19_
Date

_____
David M. Jones
United States Immigration Judge
Baltimore, Maryland

**Appeal Rights**
Each party has the right to appeal this Court's decision to the Board of Immigration Appeals. Any appeal must be filed within 30 calendar days of the mailing of this decision. Under the regulations, a notice of appeal must be received by the Board by that deadline. The notice of appeal must also state the reasons for the appeal. *See* 8 C.F.R. § 1240.15.

# AFFIDAVIT OF JENNIFER STEFANIA VASQUEZ SURA

1. My name is Jennifer Stefania Vasquez Sura. I was born on December 20, 1995, in Fairfax, VA. I am a U.S. citizen. I currently reside at 4502 Beltsville, MD, 20705. I am married to Kilmar Armando Abrego Garcia, who was born on July 26, 1995, in El Salvador. Kilmar was granted humanitarian protection by an immigration judge in October 2019.

2. Kilmar and I have three children together. I had two children from a prior relationship, D.T.V. and X.T.V., and Kilmar and I have one biological child together, A.A.V.. All three of our children have special needs.

3. D.T.V., was born on July 23, 2014, in La Plata, Maryland. She suffers from epilepsy and started having seizures in July 2024.

4. X.T.V, was born on October 26, 2015, in La Plata, Maryland. He was diagnosed with autism.

5. A.A.V., was born on August 11, 2019, in Silver Spring, Maryland. He was also diagnosed with autism.

6. Although having three small children with special needs can be challenging, Kilmar and I love our children and are grateful to be their parents. Having Kilmar as my partner in life and in raising and caring for them has been the greatest blessing to our family.

7. Both Kilmar and I work to support our family and care for our children.

8. I work in the dental field, and Kilmar is a sheet metal worker.

**Kilmar's Arrest and Immigration Custody**

9. On March 27, 2019, we had an appointment with a perinatal specialist. My pregnancy was considered high-risk because I was born with two uteruses. My condition is called Uterus didelphys. We were excited to learn we were expecting a boy.

1

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

10. The following morning, Kilmar was worried about my pregnancy risks and so he drove me and the kids. We dropped off X.T.V at the babysitter and D.T.V at school. He then drove me to work. The plan was for him to look for work during the day and then pick me up when I was done with work.

11. After Kilmar dropped me off, he went to Hyattsville, seeking work in construction. Someone suggested that he go to Home Depot for day labor opportunities.

12. Kilmar would often bring me lunch while I was at work. However, that day, I texted him telling him that I had food. He told me he would have lunch at a nearby buffet restaurant.

13. At the end of my work shift, I texted him asking him to pick me up. I remember seeing that the message was marked as "read," but Kilmar did not respond, which was not like him. I called him, but he did not answer. Shortly after, his phone was turned off.

14. That evening, Kilmar never arrived to pick me up. I had to ask a co-worker for a ride and to pick up my son from daycare. We had to take an Uber home.

15. By 7 p.m., I was frustrated and worried. At 9 p.m., I contacted his friends, and they informed me he had been at Home Depot but was arrested. I called various jails, but no one had information on his whereabouts. The next morning, around 10 a.m., Kilmar called me from ICE custody.

16. I hired a lawyer to get him out on bond. I attended his bond hearing and was shocked when the government said he should stay detained because Kilmar is an MS-13 gang member. Kilmar is not and has never been a gang member. I'm certain of that. Because of these false accusations, he was denied bond. This left me alone to care and provide for our family, while I was very far along in my pregnancy, under extreme stress. I was terrified that he could be deported to El Salvador and our son would not have a father.

**Our Marriage in Detention and Our Family's Struggles**

17. From the moment Kilmar was detained, my children and I were sad and worried. Kilmar has always been a loving, reliable partner and father. We struggled without him emotionally and economically. By then, we both knew we wanted to build a life together

2

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

as husband, but we did not know if he would be deported. Facing that possibility, Kilmar and I both felt getting married in detention might be our only chance to get married, even though it was far from how we ever imagined it.

18. We got married on June 25, 2019, while he was detained. I coordinated with the detention center and a local pastor to officiate our wedding. We were separated by glass and were not allowed physical contact. The officer had to pass our rings to each other. It was heartbreaking not to be able to hug him.

19. Next came his final hearing on August 9, 2019, where it would be decided if he would be granted humanitarian protection or if he would be deported. The hearing lasted over five hours and focused on two things: the false accusations against Kilmar and the risk to Kilmar's life if he was deported to El Salvador. The hearing was continued until September because they could not get through everything.

20. During the first hearing, I began having contractions. Our son, A.A.V., was born two days later on August 11, 2019. It was a complicated C-section. However, A.A.V. was born and I instantly fell in love with him. A.A.V. was born with microtia, a congenital ear deformity. Testing later showed that he is deaf in one ear. Kilmar missed A.A.V.'s birth because he was detained.

21. Throughout his hearings, I testified and so did Kilmar. I testified a lot about Kilmar's character. It was so emotional and unfair. It was so clear that they had absolutely no evidence that Kilmar was ever a gang member, yet they made us prove he was not one. It should be the other way around. Kilmar also testified about difficult things he went through in El Salvador before I met him. He testified about how he was a victim of gang violence in El Salvador when he was a teenager and he came to the U.S. to escape all of that.

22. The judge did not make a decision on his case until October 19, 2019. That day, Kilmar's attorney called and told me the news: Kilmar won his case. She explained that the judge granted him a special status that allows him to stay in the U.S. and makes it illegal to deport him to El Salvador. She told me that he cannot leave the country or he would lose his status.

3

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

**Kilmar's Release and Family Life**

23. When I got the news that he was being released, I rushed to pick him up. It was the first time he held his son. He was emotional, as were our children when they saw him after school.

24. Although our family separation was hard, the love we have for each other and our kids has sustained us. Kilmar appeared to be a little more reserved and he now had a sadness about him that I didn't see before he went into immigration custody.

25. Kilmar resumed working as a sheet metal worker and did everything he could to secure a better future for himself and our family. In September 2024, he secured a job with W.E. Bowers and he began a five-year apprenticeship program to become a licensed journeyman. He was enrolled at the University of Maryland and had classes every other Thursday. The license would allow him to earn better wages.

26. By 18 months old, our son, A.A.V., showed signs of autism. We were placed on a waiting list to be evaluated for autism under our child's health insurance plan, but due to extremely long wait times, Kilmar and I decided to pay for it out of pocket. Even then, there was still a significant wait, but we were able to get A.A.V a much earlier appointment this way and he was formally diagnosed with autism by a pediatric specialist on October 21, 2024.

27. Both of our older children attend school and both have Individualized Education Plans. Both Kilmar and I are active participants in our children's education and development.

28. In August 2024, A.A.V. started to attend a regular school but due to his condition in late October 2024 he was transferred to a special school. Now he is in a special program for children with special needs. When he finishes school, he will receive a completion certificate rather than a high school degree.

29. Kilmar continued to be the supportive, loving, reliable, and law-abiding man I know and love. He was never arrested or accused of a crime. And to my knowledge, he never again was stopped by the police officers that accused him of being a gang member in 2019. We

4

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

really believed that the false accusations had been cleared up and that they were behind us.

**The Second Arrest and Deportation**

30. On Wednesday March 12, 2025, Kilmar was sent to a new job site in Baltimore. After work, he picked up A.A.V. from his mother's house to bring him home. Shortly after he picked up our son, Kilmar called me, saying he was being pulled over. We each share our location with each other and I could see that he was close to home. I told him to put me on speaker when he was talking with the police because he does not feel confident speaking English. He did.

31.  Kilmar thought it was a routine traffic stop. He pulled over in an Ikea parking lot and rolled down the window. The person at his window told him to turn off the car and get out. In English, Kilmar told the officer that his son was in the backseat of the car and had special needs. At that point, I heard the officer take Kilmar's phone and hang up.

32. A few minutes later, someone identifying themselves as with the Department of Homeland Security called me back and said that I needed to get there in 10 minutes to pick up my son or they would call child protective services.

33. I arrived within minutes and they flagged me down as if they knew my car. When I arrived, Kilmar was on the curb in handcuffs. They had taken his work boots and his belt off. There were two male officers and a female officer with my child. They claimed his "immigration status had changed" and were taking him away.

34. I put A.A.V  in my car seat, who was crying. They asked me if I wanted to say goodbye to Kilmar. Kilmar was crying and I told him he would come back home because he hadn't done anything wrong.

35. A.A.V.  has been very distressed since Kilmar has been gone. He is very close to Kilmar and one of the few people A.A.V. trusts. Although he cannot speak, he shows me how much he missed Kilmar. He has been finding Kilmar's work shirts and smelling them, to smell Kilmar's familiar scent. He has been crying and acting out more than usual since

5

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

Kilmar was arrested. As an autistic child, he needs stability and patterns. The sudden disappearance of his father is a big change for A.A.V. that makes him very distressed, and makes him act out physically.

36. Kilmar has called me a total of five times since his arrest on March 12, 2025. He called me twice from an immigration facility in Baltimore, twice from Louisiana, and once from Texas.

37. At approximately 9:00 PM the night he was arrested, Kilmar called me from Baltimore. He told me that he was questioned about a past traffic stop and that out of nowhere, they were bringing up the old, false accusations of MS-13 gang membership that we thought were behind us. He said that when they interrogated him about his connections to MS-13 that they asked him about his visits to Don Ramon, a restaurant we frequented as a family, and asked him about a photo they had of him playing basketball with others at a local public court. Kilmar did not understand what was happening or why. He was reassured he would see a judge.

38. Kilmar called me once more from Baltimore, basically saying the same thing. He was being asked the same questions and he would repeat the truth again and again - that he was not in a gang and didn't know anything about any gang members.

39. After that, I started to regularly check the ICE detainee locator. Whenever I would see his name somewhere, I would call that detention center, and I would tell them to give Kilmar the free call he was entitled to and I would ask them why he was there. I was desperate. None of this made any sense. No one would tell me why he was detained.

40. Kilmar called me two more times from Louisiana. Those calls were sad and confusing to us both. Kilmar still had hope that this nightmare would end soon because he was still being told that he would speak with a judge.

41. The final call I received from Kilmar was Saturday morning, March 15, 2025, at approximately 11:00 AM. That call was short and Kilmar's tone was different. He was scared. He was told he was being deported to El Salvador. He was told he was being deported to El Salvador to a super-max prison called "CECOT." He asked me to contact

6

his mom with all his U.S. immigration paperwork so they can give that to a lawyer in El Salvador.

42. After that, I never heard from Kilmar again.

**Aftermath**

43. On Sunday, my brother in law, Cesar, texted me a photo of deportees sent to the Salvadoran super-max, CECOT. The photo was part of an article discussing the deportation of alleged Venezuelan gang members without court hearings. It was a group of men bent over on the ground, with their heads down and their arms on their heads. None of their faces were visible. There was one man who had two scars on his head like Kilmar does, and tattoos that looked similar to Kilmar's. I zoomed into get a closer look at the tattoos. My heart sank. It was Kilmar.

44. The ICE detainee locator continued to indicate that Kilmar was at the East Hidalgo Detention Center, but when I called, they told me he was no longer there and could not tell me where he was. They told me to call the number for the Baltimore ICE office provided by the detainee locator website. When I called, the number was disconnected. Now, Kilmar no longer appears in the ICE detainee locator.

45. I keep seeing news footage from El Salvador. These reports are talking about horrible gang members from Venezuela. No one is talking about my husband and the fact that he is not a gang member, has no criminal history, is married to a U.S. citizen and has three special needs U.S. citizen children, and won legal protection in the United States. These reports and articles had some more pictures of CECOT prisoners where Kilmar is photographed. I know its him from his tattoos and his head scars. I also saw a video of him where he is being dragged by prison guards.

46. Nonetheless, Kilmar was with this group in the news. I recognized Kilmar by his hand tattoos and scars on his head. His family also confirmed his detention in El Saldavor, who hired an attorney in El Salvador. Still, we have received no answers from either the U.S. or El Salvador government.

7

47. This has been a nightmare for my family. My faith in God carries me, but I am exhausted and heartbroken. My children need their father. A.A.V, especially, requires constant care and stability. I need to know when my husband is coming home.


I, **JENNIFER STEFANIA VASQUEZ SURA**, hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowlege.

*Jennifer Vasquez*

03 / 23 / 2025

_____
Signature

_____
Date

8

Doc ID: 5e3a65259dd107b58750c203adf756f9cf147a1e

**Dropbox Sign**

Audit trail

| | |
|---|---|
| **Title** | 2 - AFFIDAVIT OF JENNIFER STEFANIA VASQUEZ SURA.docx (1).pdf |
| **File name** | 2%20-%20AFFIDAVIT...ocx%20%281%29.pdf |
| **Document ID** | 5e3a65259dd107b58750c203adf756f9cf147a1e |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

This document was requested from app.clio.com

## Document History

| | | |
|---|---|---|
| SENT | **03 / 23 / 2025**<br>21:34:09 UTC | Sent for signature to Jennifer Vasquez<br>(jvasquez2326@yahoo.com) from lucia@kinzlerimmigration.com<br>IP: 136.49.107.44 |
| VIEWED | **03 / 23 / 2025**<br>21:42:54 UTC | Viewed by Jennifer Vasquez (jvasquez2326@yahoo.com)<br>IP: 174.192.192.238 |
| SIGNED | **03 / 23 / 2025**<br>21:43:24 UTC | Signed by Jennifer Vasquez (jvasquez2326@yahoo.com)<br>IP: 174.192.192.238 |
| COMPLETED | **03 / 23 / 2025**<br>21:43:24 UTC | The document has been completed. |

Powered by **Dropbox Sign**

SA023

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | |
|---|---|
| _____ ) | |
| Kilmar Armando Abrego Garcia, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) Civil Action No. <u>8:25-cv-00951-PX</u> | |
| v. ) | |
| ) | |
| Kristi Noem, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM**
**IN SUPPORT OF INJUNCTIVE RELIEF**

Plaintiff Kilmar Armando Abrego Garcia, by counsel, pursuant to Fed. R. Civ. P. 65(a) and

this Court's order of March 25, 2025 (Dkt. No. 8), hereby files this supplemental memorandum in

support of his request for injunctive relief (Dkt. No. 6), seeking an order from this Court restraining

Defendants from continuing to financially support Plaintiff's further detention in El Salvador and

ordering Defendants to request that the Government of El Salvador return Plaintiff to their custody.

In support of this motion, Plaintiffs respectfully represent as follows:

**<u>Introduction</u>**

Plaintiff Kilmar Armando Abrego Garcia ("Mr. Abrego Garcia") won an order from an

immigration judge ("IJ") prohibiting his removal to El Salvador, after he established it was more

likely than not that he would be persecuted in that country on account of a statutorily protected

ground. The government could have chosen to appeal that order, but did not. The government

could have chosen to remove Mr. Abrego Garcia to any *other* country on earth, but did not. The

government could later have filed a motion to reopen proceedings against Mr. Abrego Garcia and

seek to set aside the order of protection, but did not. Instead, the government put Mr. Abrego

1

Garcia on a plane to El Salvador, seemingly without any pretense of a legal basis whatsoever. Once in El Salvador, that country's government immediately placed Mr. Abrego Garcia into a torture center—one that the U.S. government is reportedly paying the government of El Salvador to operate. This grotesque display of power without law is abhorrent to our entire system of justice, and must not be allowed to stand.

This memorandum is perhaps short, but that is because the legal argument for a judgment in favor of Plaintiff is clear and inescapable. This case may end up raising difficult questions of redressability in a subsequent phase, but a preliminary injunction should issue promptly, ordering Defendants to do the two most basic things that are clearly in their power: request that the government of El Salvador return Plaintiff to Defendants' custody; and cease paying the government of El Salvador to continue to detain Plaintiff in the notorious CECOT torture prison.

## **Background**

On October 10, 2019, at the conclusion of hotly contested removal proceedings before an IJ in Baltimore, Mr. Abrego Garcia won an order granting him withholding of removal, pursuant to Section 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3), as to El Salvador. Dkt. No. 1-1 at 14. The government did not appeal. Dkt. No. 1-5 at 2. From October 2020 through January 2, 2024, Mr. Abrego Garcia attended his annual ICE reporting check-in without fail and without incident. Dkt. No. 1-3.

On March 12, 2025, Mr. Abrego Garcia was pulled over by ICE officers while driving his disabled U.S.-citizen son, Plaintiff A.A.V., home from school. Dkt. 1-2 at ¶ 30-34. His U.S.-citizen wife, Plaintiff Vasquez, was called to pick up the child and saw Mr. Abrego Garcia being taken into ICE custody. *Id.* Mr. Abrego Garcia was able to call his wife from ICE custody on five occasions thereafter, *id.* at ¶¶ 36-41. The last call was on March 15, 2015, at 11:00am, in which

Mr. Abrego Garcia told his wife that he was being deported to El Salvador, to a supermax prison called CECOT. *Id.* at ¶ 41. Mr. Abrego Garcia's wife later saw news photographs of her husband in the CECOT prison. *Id.* at ¶ 43-46; Dkt. No. 1-4 (photographs of Mr. Abrego Garcia in the CECOT prison, with Mr. Abrego Garcia circled in red). Since then, Mr. Abrego Garcia has not been able to contact his wife or legal counsel, and his wife and legal counsel have received no factual explanation or legal justification for his removal to El Salvador.

The CECOT prison is a notorious torture chamber. As Judge Boasberg wrote earlier this week in *JGG v. Trump*, declining to vacate a Temporary Restraining Order on behalf of a group of Venezuelan nationals removed to El Salvador on the same airplane as Mr. Abrego Garcia:

> In Salvadoran prisons, deportees are reportedly "highly likely to face immediate and intentional life-threatening harm at the hands of state actors." ECF No. 44-4 (Sarah Bishop Decl.), ¶ 63.
>
> The country's government has boasted that inmates in CECOT "never leave"; indeed, one expert declarant alleges that she does not know of any CECOT inmate who has been released. See ECF No. 44-3 (Juanita Goebertus Decl.), ¶ 3; see also Bishop Decl., ¶ 23 ("[W]e will throw them in prison and they will never get out.") (quoting Nayib Bukele (@nayibbukele), X (May 16, 2023, 7:02 p.m.), https://x.com/nayibbukele/status/1658608915683201030?s=20). Once inmates enter the prisons, moreover, their families are often left in the dark. See Bishop Decl., ¶ 25 ("In a sample of 131 cases, [it was] found that 115 family members of detainees have not received any information about the whereabouts or wellbeing of their detained family members since the day of their capture.").
>
> Plaintiffs offer declarations that inmates are rarely allowed to leave their cells, have no regular access to drinking water or adequate food, sleep standing up because of overcrowding, and are held in cells where they do not see sunlight for days. See Goebertus Decl., ¶¶ 3, 11; Bishop Decl., ¶ 31.
>
> At CECOT specifically, one declarant states that "if the prison were to reach full supposed capacity ..., each prisoner would have less than two feet of space in shared cells ... [which] is less than half the space required for transporting midsized cattle under EU law." Bishop Decl., ¶ 30. Given poor sanitary conditions, Goebertus points out, "tuberculosis, fungal infections, scabies, severe malnutrition[,] and chronic digestive issues [a]re common." Goebertus Decl., ¶ 12.

Beyond poor living conditions, Salvadoran inmates are, according to evidence presented, often disciplined through beatings and humiliation. One inmate claimed that "police beat prison newcomers with batons …. [W]hen he denied being a gang member, they sent him to a dark basement cell with 320 detainees, where prison guards and other detainees beat him every day. On one occasion, one guard beat him so severely that [he] broke a rib." Id., ¶ 8. Three prior deportees from the United States reported being kicked in the face, neck, abdomen, and testicles, with one requiring "an operation for a ruptured pancreas and spleen." Id., ¶ 17. One inmate reported being forced to "kneel on the ground naked looking downwards for four hours in front of the prison's gate." Id., ¶ 10. That same prisoner also said that he was made to sit in a barrel of ice water as guards questioned him and then forced his head under water so he could not breathe. Id.

One scholar avers that, since March 2022, an estimated 375 detainees have died in Salvadoran prisons. See Bishop Decl., ¶¶ 15, 43. Although the Salvadoran government maintains that all deaths have been natural, others respond that 75% of them "were violent, probably violent, or with suspicions of criminality on account of a common pattern of hematomas caused by beatings, sharp object wounds, and signs of strangulation on the cadavers examined." Id., ¶¶ 44–45. When an inmate is killed, there are also reports that guards "bring the body back into the cells and leave it there until the body start[s] stinking." Id., ¶ 39.

*J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 890401, at *16 (D.D.C. Mar. 24, 2025).[1] The few available photographs of Mr. Abrego Garcia's treatment are consistent with this narrative. Dkt. No. 1-4.

Defendants not only knew that Mr. Abrego Garcia would be detained in CECOT upon his arrival in El Salvador, they even told him so. Dkt. 1-2 at ¶ 41. Defendants have celebrated the CECOT detention of Mr. Abrego Garcia and the planeload of Venezuelan nationals whom he accompanied to El Salvador. *See* Ex. A hereto (tweet by Salvadoran president Nayib Bukele noting that "23 MS-13 members wanted by Salvadoran justice" were transferred to CECOT, along with 238 Venezuelan nationals, and stating that "[t]he United States will pay a very low fee for them[.]"; Ex. D hereto (tweet by Defendant Rubio thanking President Bukele for his assistance). On March 26, 2025, one day after the first telephonic hearing in this case, Defendant Noem visited CECOT.

---

[1] The two declarations cited by Judge Boasberg are attached hereto as Exs. B and C, and their contents are incorporated herein by reference.

4

Mary Beth Sheridan and Maria Sacchetti, "Noem visits El Salvador prison where deportees are in 'legal limbo,'" *The Washington Post* (March 26, 2025), *available at* https://www.washingtonpost.com/world/2025/03/26/el-salvador-noem-cecot-venezuelans/ (noting that the U.S. government has paid six million dollars to El Salvador to hold 238 Venezuelan nationals, along with 23 Salvadoran nationals accused of being MS-13 members, in CECOT). Defendant Noem was granted a special tour inside the CECOT prison, separated from the prisoners by mere metal bars. *See* "Photos Show Kristi Noem's Visit Through Notorious El Salvador Prison," *Newsweek* (March 26, 2025), Ex. E hereto.

Unfortunately, Secretary Noem did not return to the United States with Mr. Abrego Garcia. He remains in CECOT.

## Legal Standard

A preliminary injunction is an "extraordinary remedy" and "shall be granted only if the moving party clearly establishes entitlement to the relief sought." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citations omitted). The Fourth Circuit differentiates between a prohibitory injunction which seeks to maintain the status quo, and a mandatory injunction which seeks to alter the status quo, *see League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014); the latter is disfavored. "We have defined the status quo for this purpose to be the last uncontested status between the parties which preceded the controversy. To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but such an injunction restores, rather than disturbs, the status quo ante." *Id.* at 236 (internal citations omitted). Since the controversy in this matter arose when Defendants removed Mr. Abrego Garcia from the United States, the "last uncontested status between the parties" was one in which Mr. Abrego Garcia was present in the United States.

A court may issue a preliminary injunction upon notice to the adverse party. Fed. R. Civ. P. 65(a). It is well settled law that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A movant seeking a preliminary injunction must establish each of the four *Winter* elements: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Id.* at 20. Demonstrating a likelihood of success does not require a plaintiff to "establish a certainty of success"; instead, the plaintiff "must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

<u>**Argument**</u>

**I.      Plaintiff is likely to succeed on the merits of this case.**

Plaintiff is likely to succeed on the merits of this case, since the government removed him to a country to which the law clearly and indisputably prohibited them from doing so, without observing proper (or indeed any) legal procedures. As the Supreme Court has explained, a noncitizen "may seek statutory withholding under [8 U.S.C.] § 1231(b)(3)(A), which provides that 'the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" *Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021). Plaintiff Abrego Garcia won just such an order in 2019. Dkt. No. 1-1. "If an alien is granted withholding-only relief, DHS may not remove the alien to the country designated in the removal order unless the order of withholding is terminated. [8 C.F.R.] §§ 208.22, 1208.22. But because withholding of removal is a form of country specific relief, nothing prevents DHS from removing [the] alien to a third country other than the country to which

6

removal has been withheld or deferred, [8 C.F.R.] §§ 208.16(f), 1208.16(f); *see also* §§ 208.17(b)(2), 1208.17(b)(2)." *Guzman Chavez*, 594 U.S. at 531-32 (some internal citations omitted). It is clear, therefore, that the Immigration and Nationality Act ("INA") prevented the government from removing Mr. Abrego Garcia to El Salvador.

Nor is it an excuse for the government to protest that Mr. Abrego Garcia is a member of the MS-13 gang (he is not) and therefore a terrorist (he is not) subject to removal outside of removal proceedings pursuant to 8 U.S.C. § 1229a: no proceedings were ever brought against him in the Alien Terrorist Removal Court, 8 U.S.C. § 1532; nor were federal criminal or extradition proceedings ever brought against him.

Finally, this Court need not wade into tricky issues about the centuries-old Alien Enemies Act, 50 U.S.C. § 21 *et seq.*: as a national of El Salvador, Plaintiff is simply not subject to the proclamation against the Venezuelan gang Tren de Aragua, *see* Proclamation, "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua" (March 15, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/, at § 1 ("I proclaim that all **Venezuelan citizens** 14 years of age or older who are members of [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies.") (Emphasis added.)

Plaintiff has brought several viable claims for relief, *inter alia* under the Administrative Procedure Act, 5 U.S.C. § 702. Plaintiff is a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," and is therefore "entitled to judicial review" under the APA. *Id.* His removal represented "final agency action" that is "subject to

judicial review." 5 U.S.C. § 704. Likewise, Plaintiff's procedural due process claim is a viable one. Having been granted withholding of removal Mr. Abrego Garcia—a "person" within the meaning of the Due Process Clause of the Fifth Amendment—had a property and liberty interest in not being removed to El Salvador without observance of legal procedures. *Rusu v. INS*, 296 F.3d 316, 320 (4th Cir. 2002) (deportation proceedings are subject to procedural due process requirements).

For the foregoing reasons, Plaintiff is likely to succeed on the merits of this litigation.

**II.    Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief.**

Although "the burden of removal alone cannot constitute the requisite irreparable injury," *Nken v. Holder*, 556 U.S. 418, 435 (2009), this case presents far more immediate injury than the garden-variety removal case in which "[a]liens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal," *id.*

Mr. Abrego Garcia is suffering irreparable harm with each day that he remains detained in the CECOT torture prison.  As Judge Boasberg recently held in *JGG*, "the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm." 2025 WL 890401, at *16, citing *United States v. Iowa*, 126 F.4th 1334, 1352 (8th Cir. 2025) (torture); *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (physical abuse).

In addition, all plaintiffs are suffering irreparable harm by virtue of the unlawful family separation without notice. *See* Dkt. No. 1-2 at ¶¶ 35 (noting the distress of Plaintiff A.A.V., Mr. Abrego Garcia's autistic U.S.-citizen child); 47. "Even absent First Amendment injury, family separation alone causes irreparable harm." *Int'l Refugee Assistance Project v. Trump*, 883 F.3d

233, 308 (4th Cir. 2018) (Gregory, C.J., concurring), *vacated on other grounds*, 585 U.S. 1028 (2018).

For these reasons, Plaintiff has made an adequate showing of irreparable harm to justify preliminary injunctive relief under the second *Winter* factor.

### III.   The balance of equities tips in Plaintiff's favor, and an injunction is in the public interest.

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party. *Nken*, 556 U.S. at 435.

Here, the balance of equities and the public interest tilt sharply in favor of the issuance of a preliminary injunction. Again, Judge Boasberg: "There is, moreover, a strong public interest in preventing the mistaken deportation of people based on categories they have no right to challenge. *See* [*Nken*, 556 U.S. at 436] ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). The public also has a significant stake in the Government's compliance with the law. *See, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.")" *JGG*, 2025 WL 890401, at *17.

To the extent Defendants argue danger to the community based on Plaintiff Abrego Garcia's supposed ties to MS-13, again, he has neither been convicted nor charged with any crime. If the government wishes to reinstitute removal proceedings against him, and an immigration judge grants its motion to reopen his order of withholding of removal, he will indeed be subject to detention pursuant to 8 U.S.C. §1226(a), but he will be eligible to seek a bond hearing from an

9

immigration judge and request release on bond.  No evidence weighs against Plaintiff in the balancing of the equities and the public interest.

**IV.    No jurisdictional bar applies in this case.**

Several jurisdictional bars often apply in cases challenging removal under Title 8 of U.S. Code, but none applies in this case. As 8 U.S.C. § 1252(f)(2) provides, "[n]otwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." To the extent that this section of law applies since Plaintiff is seeking to be restored to the *ex ante* position he held prior to his removal to El Salvador, the "clear and convincing evidence" standard is easily met here, for the reasons set forth above. Nor does 8 U.S.C. § 1252(g) apply here, since the facts described herein do not represent the Attorney General's "decision or action" to "execute removal orders" against Mr. Abrego Garcia: there was no removal order to execute, and if it was executed, it certainly was not done "under this chapter" (Chapter 12 of Title 8, U.S. Code) as that chapter prohibited such removal. The discretionary bars at 8 U.S.C. § 1252(a)(2)(B) do not apply, as the withholding of removal statute is mandatory and admits of no discretion; the criminal-alien bar, 8 U.S.C. § 1252(a)(2)(C) does not apply where Plaintiff has no criminal conviction. Finally, the zipper clause, 8 U.S.C. § 1252(b)(9), does not apply, because, again, Mr. Abrego Garcia was not removed "under this subchapter." Accordingly, no provision of law strips this Court of jurisdiction to hear and decide this action.

<u>Conclusion</u>

Where the government casts aside laws and the orders of courts, including administrative courts, state power consists solely of the capacity to commit violence. This Court can reassert the

primacy of due process by ordering Defendants to take reasonable steps within their power to (1) request that the government of El Salvador remove Mr. Abrego Garcia from the CECOT torture prison in which Defendants caused him to be placed, and return him to the custody of the United States; and (2) stop compensating the operators of the CECOT torture prison for their continued detention of Mr. Abrego Garcia. A preliminary injunction should issue.

Respectfully submitted,

*//s// Simon Sandoval-Moshenberg*                              Date: March 28, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com

**Certificate of Service**

I, the undersigned, hereby certify that on this date, I uploaded the foregoing, along with all attachments thereto, to this Court's CM/ECF case management system, which will send a Notice of Electronic Filing (NEF) to all case participants.

Respectfully submitted,

*//s// Simon Sandoval-Moshenberg*                                    Date: March 28, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com



SUBSCRIBE FOR $1    **Login**

U.S.  |  El Salvador    Venezuela    Kristi Noem    Department Of Homeland Security    ICE    Tren De Aragua

# Photos Show Kristi Noem's Visit Through Notorious El Salvador Prison

**Published** Mar 26, 2025 at 7:21 PM EDT

**Updated** Mar 26, 2025 at 7:54 PM EDT



*Today is a historic day here at Port Everglades.*

By **Gabe Whisnant**
Breaking News Editor

 Newsweek Is A Trust Project Member

SA036

**Newsweek**   SUBSCRIBE FOR $1

News Article | 20

**H**omeland Security Secretary [Kristi Noem](#) visited El Salvador's high-security Terrorism Confinement Center in Tecoluca on Wednesday, where recently deported Venezuelan migrants accused by the Trump administration of gang affiliations are being held.

Photos of her visit showed Noem touring crowded cell blocks, the prison armory, and isolation units within the facility, which has drawn international attention for its harsh conditions. Inmates are shown packed into small cells and are reportedly denied outdoor time and stripped of any form of visitation or rehabilitation programs.



Prisoners stand looking out from their cell as US Secretary of Homeland Security Kristi Noem speaks while touring the Terrorist Confinement Center, in Tecoluca, El Salvador, Wednesday, March 26, 2025.   **ASSOCIATED PRESS**

## Why It Matters

[Noem's visit is part of a broader push by the Trump administration](#) to showcase its crackdown on immigration, particularly against individuals it refers to as the "worst of the worst."

SA037

Case 8:25-cv-00951-PX    Document 10-5    Filed 03/28/25    Page 3 of 6

**Newsweek**    SUBSCRIBE FOR $1

In February, El Salvador President Nayib Bukele agreed to accept deportees from the U.S. of any nationality — even American citizens — offering to hold them in the country's sprawling maximum-security facility known as CECOT, or the Terrorism Confinement Center.

## What to Know

The trip comes amid ongoing legal challenges to the administration's use of the Alien Enemies Act of 1798, which President Trump invoked to justify the deportation of Venezuelans he claims are members of the Tren de Aragua gang.



Homeland Security Secretary Kristi Noem tours the Terrorist Confinement Center in Tecoluca, El Salvador, Wednesday, March 26, 2025.    **ASSOCIATED PRESS**

On Wednesday, a federal appeals court upheld a block on further deportations under the act, calling into question the legality of the removals. While the Trump administration insists the migrants are threats to national security, it has yet

SA038

Case 8:25-cv-00951-PX    Document 10-5    Filed 03/28/25    Page 4 of 6

**Newsweek**   SUBSCRIBE FOR $1

strongly deny any gang ties. Venezuelan human rights advocates and attorneys representing some of the 30 deportees argue they've been imprisoned without due process, and with no clear path to release.

At the prison, Noem recorded a video statement warning, "If an immigrant commits a crime, this is one of the consequences you could face... You will be removed and you will be prosecuted."

| READ MORE | **El Salvador** |
| --- | --- |

 **Yunseo Chung Speaks Out After Judge Blocks ICE Deporting Columbia Student**

**Man Selling Fake Social Security Cards Arrested by ICE**

**Deported Venezuelans Told to Sign Papers Admitting Gang Membership: Filing**

**How Judge James Boasberg Might Handle Trump Admin Lawyers**

SA039

Case 8:25-cv-00951-PX      Document 10-5      Filed 03/28/25      Page 5 of 6

**Newsweek**    SUBSCRIBE FOR $1



A prisoner stands shackled against a wall as Homeland Security Secretary Kristi Noem tours the Terrorist Confinement Center in Tecoluca, El Salvador, Wednesday, March 26, 2025.    **ASSOCIATED PRESS**

She emphasized the administration's intent to expand deportation efforts in partnership with El Salvador, with Homeland Security stating she would discuss increasing deportation flights with Salvadoran President Nayib Bukele. The prison, opened in 2023 as part of Bukele's crackdown on gangs, can house up to 40,000 inmates and is notorious for its lack of legal protections. The deportees, who no longer appear in ICE's online system and have not seen a judge in El Salvador, are effectively in legal limbo.

El Salvador has had no diplomatic relations with Venezuela since 2019, leaving the prisoners without consular support. A video released by Salvadoran authorities showed the men shackled, shaved and dressed in white prison uniforms before being confined.

> I toured the CECOT, El Salvador's Terrorism Confinement Center.
>
> President Trump and I have a clear message to criminal illegal aliens: LEAVE NOW.
>
> If you do not leave, we will hunt you down, arrest you, and you could end up in this El Salvadorian prison.
> pic.twitter.com/OItDqNsFxM

SA040

**Newsweek**    SUBSCRIBE FOR $1

## What People Are Saying

**Noem posted Wednesday on X, formerly Twitter:** "I toured the CECOT, El Salvador's Terrorism Confinement Center.President Trump and I have a clear message to criminal illegal aliens: LEAVE NOW. If you do not leave, we will hunt you down, arrest you, and you could end up in this El Salvadorian prison."

**U.S. Secretary of State Marco Rubio at a recent press conference in San Salvador:** "Any unlawful immigrant, illegal immigrant in the United States who's a dangerous criminal – MS-13, Tren de Aragua, whatever it may be – he [El Salvador President Nayib Bukelehas] offered his jails so we can send them here and he will put them in his jails".

**Bukele in a post on X (formerly Twitter):** "We are willing to take in only convicted criminals (including convicted U.S. citizens) into our mega-prison (CECOT) in exchange for a fee. The fee would be relatively low for the U.S. but significant for us, making our entire prison system sustainable."

**Manuel Flores, secretary general of El Salvador leftist opposition party Farabundo Martí National Liberation Front, has criticized the plan:** "We also have many violent criminals in our country, however, that did not necessarily come here illegally but have been arrested 30 times, 35 times, 41, 42 times ... for murder [and] other heinous charges. I don't want these violent repeat offenders in our country any more than I want illegal aliens from other countries in."



Shackled prisoners stand against a wall as US Homeland Security Secretary Kristi Noem tours the Terrorist Confinement Center (CECOT) in Tecoluca, El Salvador, March 26, 2025.    **AFP/GETTY IMAGES**

## What Happens Next

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA et al.,<br><br>                *Plaintiffs,*<br><br>     v.<br><br>KRISTI NOEM, Secretary of Homeland Security, et al.,<br><br>                *Defendants.* | Civil No.: 8:25-cv-00951-PX<br><br><br>**DEFENDANTS' CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER** |

# Table of Contents

INTRODUCTION ................................................................................................ 2

STATEMENT OF FACTS .................................................................................. 3

LEGAL STANDARD........................................................................................... 4

ARGUMENT ........................................................................................................ 6

    I.    Plaintiffs have not made a clear showing that they will likely prevail on the merits. ................................................................. 6

        A.    This Court lacks jurisdiction because Abrego Garcia is not in United States custody. ............................................. 6

        B.    Plaintiffs cannot show redressability. ......................................... 9

        C.    8 U.S.C. § 1252(g) deprives this Court of jurisdiction............... 11

    II.    Plaintiffs have not clearly shown that irreparable harm is likely without the preliminary relief they seek............................................... 14

    III.    Plaintiffs have not shown that the balance of the equities and public interest clearly weigh in their favor. ......................................... 16

CONCLUSION..................................................................................................... 21

**<u>INTRODUCTION</u>**

Plaintiffs are a Salvadoran national removed to El Salvador and his two U.S. citizen family members who live in the United States. Compl., ECF No. 1, ¶¶ 4–6. They have sued Defendants, federal officials in their official capacities, seeking declaratory and injunctive relief. *Id.* ¶¶ 7–13; *id.* Request for Relief. The core allegation is that the lead Plaintiff, Abrego Garcia, was removed to El Salvador despite a grant of withholding of removal to that country.

Plaintiffs have moved for a temporary restraining order ("TRO") asking for a prohibitory injunction—an order that Defendants "immediately stop paying compensation to the Government of El Salvador for the detention of Plaintiff Abrego Garcia"—and a mandatory injunction—an order that the federal government "request that the Government of El Salvador return Plaintiff Abrego Garcia to [Defendants'] custody." TRO Mot., ECF No. 6, at 2–3.

This Court should deny the motion because Plaintiffs have not made the requisite showings for a TRO. First, Plaintiffs have not shown they are likely to succeed on the merits of the case. Indeed, they have not shown how this Court has jurisdiction even to issue a TRO in this case. Second, Plaintiffs have not shown a likelihood they will suffer an irreparable injury absent their requested TRO. Finally, Plaintiffs have not shown that the balance of the equities and the public interest weigh in their favor.

## STATEMENT OF FACTS[1]

Plaintiff Abrego Garcia is a citizen and native of El Salvador, and his coplaintiffs are his U.S. citizen wife and five-year-old child, who reside in Maryland. Compl. ¶¶ 4–6, 42. Both Abrego Garcia and his wife work full-time to support their family. *Id.* ¶ 44.

In March 2019, Abrego Garcia was served a notice to appear in removal proceedings, charging him as inadmissible as an "alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General." *Id.* ¶¶ 25–29 (quoting 8 U.S.C. § 1182(a)(6)(A)(i)). During a bond hearing, Immigration and Customs Enforcement ("ICE") stated that a confidential informant had advised that Abrego Garcia was an active member of the criminal gang MS-13. *Id.* ¶ 31. Bond was denied. *See id.* ¶¶ 34, 39; *see also* IJ Order, *infra* Ex. A, at 2–3 (finding that Abrego Garcia was a danger to the community); BIA Opinion, *infra* Ex. B, at 1–2 (adopting and affirming IJ Order, specifically finding no clear error in its dangerousness finding).

Abrego Garcia then filed an I-589 application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. Compl. ¶ 35. Although Abrego Garcia was found removable, the immigration judge granted him withholding of removal to El Salvador in an order dated October 10, 2019. *Id.* ¶ 41.

---

[1] As alleged in the complaint, except as to the exhibits attached to this memorandum.

Plaintiffs allege that, on March 12, 2025, Abrego Garcia was stopped by ICE officers, who informed him that his immigration status had changed. *Id.* ¶¶ 48–50; *see also* Cerna Decl., *infra* Ex. C, ¶ 11. After being detained, he was questioned about gang affiliations and transferred ultimately to a detention center in Texas. Compl. ¶¶ 53, 56; Cerna Decl. ¶¶ 2, 11. Plaintiffs allege Abrego Garcia was told he would be removed to El Salvador and detained at the CECOT prison there. Compl. ¶¶ 56–57 & n.1.

On March 15, although ICE was aware of his protection from removal to El Salvador, Abrego Garcia was removed to El Salvador because of an administrative error. Cerna Decl. ¶¶ 12–15. On March 16, a news article contained a photograph of individuals entering intake at CECOT. *Id.* ¶ 59. Abrego Garcia's wife identified one of the detainees depicted as her husband based on his tattoos and head scars. *Id.*

Plaintiffs allege, based on a news article, that the federal government "has paid or continues to pay the Government of El Salvador six million dollars in order for the Government of El Salvador to detain" individuals removed there from the United States, "including Plaintiff Abrego Garcia." *Id.* ¶ 65 & n.2.

## LEGAL STANDARD

Emergency injunctive relief is an extraordinary remedy requiring "a clear showing that the plaintiff is entitled to relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, (2008)); *Seth v. McDonough*, 461 F. Supp. 3d 242, 257 (D. Md. 2020) ("[T]he standards for a temporary restraining order and a preliminary injunction are the

same." (citing *Int'l Longshoremen's Ass'n, Local 333 v. Int'l Longshoremen's Ass'n, AFL-CIO*, Civil No. 15-813, 2015 WL 1402342, at *1 (D. Md. Mar. 25, 2015))). Plaintiffs' motion asks this Court, "on an incomplete record, [to] order a party to act, or refrain from acting, in a certain way." *Seth*, 461 F. Supp. 3d at 257. Thus, "[t]he danger of a mistake in this setting is substantial." *Id.* (alteration in original) (quoting *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994)). This Court must therefore exercise its discretion with caution. *See id.* This concern is even greater when, as here, the "requested immediate injunctive relief deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978); *see also Sampson v. Murray*, 415 U.S. 61, 83–84 (1974) (A court is "quite wrong in routinely applying . . . the traditional standards governing more orthodox 'stays'" in an area to which "the Government has traditionally been granted the widest latitude.").

Additionally, the mandatory preliminary injunctive relief Plaintiffs request "is disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). The standard for obtaining a mandatory injunction is thus "even more searching" than the already "exacting standard of review" for a prohibitory injunction. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013).

The factors this Court considers, as prescribed by *Winter*, are (1) whether the party seeking the injunction is "likely to succeed on the merits," (2) whether that party is "likely to suffer irreparable harm" absent the injunction, (3) whether "the

balance of hardships tips in [that party's] favor," and (4) whether the "injunction is in the public interest." *Id.* at 320. This Court must ensure that each factor is "satisfied as articulated" before an injunction may issue. *Stinnie v. Holcomb*, 77 F.4th 200, 208 (4th Cir. 2023) (en banc) (quoting *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010))). The latter two factors "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

I. **Plaintiffs have not made a clear showing that they will likely prevail on the merits.**

A. **This Court lacks jurisdiction because Abrego Garcia is not in United States custody.**

Plaintiffs' claims fall within the historical "core" of the writ of habeas corpus. Because Plaintiffs' claims sound in habeas, they can proceed only in habeas. But because Plaintiffs concede that Abrego Garcia is not in United States custody, this Court cannot hear those claims.

Habeas corpus "is the appropriate remedy to ascertain . . . whether any person is rightfully in confinement or not." *DHS v. Thuraissigiam*, 591 U.S. 103, 117 (2020) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1333, p.206 (1833)). Thus, habeas requires as an essential element of jurisdiction that the detainee be in the custody of the United States. *See, e.g.*, *Carafas v. LaVallee*, 391 U.S. 234, 238 & n.9 (1968); *Smith v. Ashcroft*, 295 F.3d 425, 428 (4th Cir. 2002). And a person "is held 'in custody' by the United States

when the United States official charged with his detention has 'the power to produce him.'" *Munaf v. Geren*, 553 U.S. 674, 686 (2008) (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)).

The Supreme Court and Fourth Circuit's case law confirms that core habeas claims like the ones Plaintiffs bring—claims that challenge the authority of the Executive to exercise a power that led to the detention—*must* be brought in habeas. *See, e.g.*, *Nance v. Ward*, 597 U.S. 159, 167 (2022) ("[A]n inmate must proceed in habeas when the relief he seeks would 'necessarily imply the invalidity of his conviction or sentence.'" (quoting *Heck v. Humphrey*, 512 U.S. 477, 480 (1994))); *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973) (answering in the affirmative the question "whether the specific federal habeas corpus statute, explicitly and historically designed to provide the means for a state prisoner to attack the validity of his confinement, must be understood to be the exclusive remedy available" despite the broad language of 42 U.S.C. § 1983); *Plyler v. Moore*, 129 F.3d 728, 733 (4th Cir. 1997) (explaining that if "an action [i]s one challenging the legality of physical confinement . . . the only proper avenue for relief was a petition for a writ of habeas corpus").

Here, Plaintiffs seek review of the legality of the Executive's restraint of and removal of Abrego Garcia to El Salvador, leading to his present detention there. Compl. ¶ 63 (alleging Defendants "decided to deport Plaintiff Abrego Garcia without following the law"). Plaintiffs make it clear that the ultimate relief they seek is his return to the United States to live at liberty with his family. *Id.* ¶¶ 76–77, 82–83,

88–89, 94–95 (alleging irreparable harm from separation from his family and asking "the Court to immediately order Defendants to take all steps reasonably available to them, proportionate to the gravity of the ongoing harm, to return Plaintiff Abrego Garcia to the United States.") Because Plaintiffs seek Abrego Garcia's release from allegedly unlawful detention on the grounds that it was effected illegally, they make a core habeas claim, and they must therefore bring it exclusively in habeas.

But there is no jurisdiction in habeas. Plaintiffs admit—as they must—that the United States does not have custody over Abrego Garcia. They acknowledge that there may be "difficult questions of redressability" in this case, reflecting their recognition that Defendants do not have "the power to produce" Abrego Garcia from CECOT in El Salvador. Mem. Supp. TRO Mot. 2. But even more, they concede that Abrego Garcia is not in Defendants' custody. *Id.* (asking the Court to order Defendants to "request that the government of El Salvador return Plaintiff to Defendants' custody"). Despite their allegations of continued payment for Abrego Garcia's detention, Plaintiffs do not argue that the United States can exercise its will over a foreign sovereign. The most they ask for is a court order that the United States entreat—or even cajole—a close ally in its fight against transnational cartels. This is not "custody" to which the great writ may run. This Court therefore lacks jurisdiction.

And even if the writ were to run to Abrego Garcia's custody in El Salvador, the fact remains that the writ acts not on the detainee but the custodian. 28 U.S.C.

§§ 2242–43. Thus, a custodian with the power to produce Abrego Garcia must be physically within the jurisdiction of this Court for this Court to exercise jurisdiction in habeas. *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). But the only Defendant alleged to be within the physical jurisdiction of this Court is Defendant Nikita Baker. Compl. ¶¶ 3, 10. And no allegation is made that Defendant Baker, the Baltimore Field Office Director for ICE, has the power to produce Abrego Garcia to this Court. *See id.* ¶¶ 3, 10, 63 (containing the only allegations in the complaint about Defendant Baker individually).

## B. Plaintiffs cannot show redressability.

Plaintiffs cannot, as they must, show that it is "'likely,' as opposed to merely 'speculative,' that [their alleged] injury will be 'redressed by a favorable decision" in this Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)); *see also id.* ("The party invoking federal jurisdiction bears the burden of establishing [redressability]."). A failure to do so means that the "irreducible constitutional minimum" of standing to sue in federal court is not met. *Id.* at 560. This Court thus lacks Article III jurisdiction, for there is no justiciable case or controversy.

When "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to . . .

permit redressability of injury." *Id.* at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.)). Here, "Plaintiffs' injury can only be redressed by [a] foreign nation[] not before the court." *Lin v. United States*, 690 F. App'x 7, 8–9 (D.C. Cir. 2017) (collecting cases) (dismissing claim for declaratory relief for lack of redressability because plaintiffs did not show "that a court ruling invalidating [certain] decrees would likely cause [other nations] to provide relief"). Plaintiffs concede that Abrego Garcia is in the custody of El Salvador, a foreign sovereign over which this Court "has no jurisdiction." TRO Mot. 2. Plaintiffs instead seek orders from this Court directing the United States to obtain Abrego Garcia's release from Salvadoran custody by financial pressure and diplomacy. *Id.* at 2–3. But they have made no showing that such measures are *likely*, not merely speculative, to obtain the ultimate relief they seek—Abrego Garcia's release. There is no showing that any payment made to El Salvador is yet to occur; no showing that El Salvador is likely to release CECOT detainees but for any such payment; no showing that El Salvador is even inclined to consider a request to release a detainee at the United States' request.

Although their motion and supporting memorandum contemplate the futility of this Court's order, Plaintiffs relegate the redressability requirement to a later time. *Id.* at 2 ("If those efforts are unsuccessful, the parties can brief any further remedial steps that may lie within this Court's jurisdiction."); Mem. Supp. TRO Mot., ECF No. 10, at 2 ("This case may end up raising difficult questions of redressability in a subsequent phase, but a preliminary injunction should issue

promptly."). To the contrary—if Plaintiffs cannot clearly show a likelihood of satisfying redressability *now*, they cannot obtain the extraordinary remedy of a TRO. *See Lujan*, 504 U.S. at 561 ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."). Even if Plaintiffs could surpass the lighter burden of showing redressability for purposes of pleading, they have not met their higher burden for purposes of preliminary equitable relief.

Because this Court has no power over a foreign sovereign and because Plaintiffs have not clearly shown that enjoining Defendants as Plaintiffs ask will likely redress their injuries, Plaintiffs lack standing for the relief they seek.

## C.    8 U.S.C. § 1252(g) deprives this Court of jurisdiction.

This Court lacks jurisdiction to review Defendants' removal of Abrego Garcia. Section 1252(g) deprives district courts of jurisdiction to review "*any* cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien" under the INA, notwithstanding any other provision of law, except as otherwise provided in § 1252. 8 U.S.C. § 1252(g) (emphasis added). Interpreting this provision, the Supreme Court has held the statute's plain language bars any claim related to conduct falling within one of these three events—commencing proceedings, adjudicating cases, or executing removal orders.

*See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). While section 1252(g) "does not sweep broadly," the provision's "narrow sweep is firm" and this Court cannot "entertain challenges to the enumerated executive branch decisions or actions." *E.F.L. v. Prim*, 986 F.3d 959, 964 (7th Cir. 2021). It "precludes judicial review of 'any' challenge to 'the decision or action by [DHS] to . . . execute removal orders'" which "includes challenges to DHS's 'legal authority' to do so." *Id.* at 965 (alteration in original); *see also Camarena v. Director, ICE*, 988 F.3d 1268, 1273–74 (11th Cir. 2021) ("No matter how [the plaintiffs] characterize their claims, they amount to an attack on the government's execution of their removal orders. That runs afoul of § 1252(g): If we held otherwise, any petitioner could frame his or her claim as an attack on the government's *authority* to execute a removal order rather than its *execution* of a removal order."). And, although authority exists permitting "substantive review of the underlying legal bases for" an execution of an order of removal, that review is limited to whether a removal order exists at all. *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006); *see also Camarena*, 988 F.3d at 1273.

Here, Plaintiffs' claims are challenges to the execution of his removal order, review of those claims is barred in the district courts under § 1252(g). Contrary to their assertion otherwise, *see* Mem. Supp. TRO Mot. 10, they specifically challenge the decision to execute Abrego Garcia's removal order. Compl. ¶ 63 (alleging Defendants "decided to deport Plaintiff Abrego Garcia without following the law"). Their bare assertion that "there was no removal order to execute," Mem. Supp. TRO

Mot. 10, is refuted by their own admission. Mem. Supp. TRO Mot. 1 ("The government could have chosen to remove Mr. Abrego Garcia to any *other* country on earth, but did not."). *See also* Compl., Ex. A, at 2 ("Based on [Abrego Garcia]'s admissions and concessions, the Court found his removability to be established by clear and convincing evidence as required by INA § 240(c)(3)."); *id.* at 14 (granting withholding of removal under INA § 241(b)(3)).

And Plaintiffs' claims for relief fall within the § 1252(g) prohibition because they each raise a challenge "by or on behalf of" Abrego Garcia to the decision to execute his removal order. *See* Compl. ¶¶ 74, 79, 85, 92; *see also Mapoy v. Carroll*, 185 F.3d 224, 228 (4th Cir. 1999) (where basis for claim is denial of stay of removal and continued detention in anticipation of removal, claim arises from decision to execute order of removal); *see also Duron v. Johnson*, 898 F.3d 644, 647–48 (5th Cir. 2018) (court must look at substance of complaint to determine whether claim is "by or on behalf of" alien; complaint of unlawful discrimination against U.S. citizen's alien father, styled as violating U.S. citizens' Fifth Amendment rights, is necessarily claim on behalf of father "to be free of such discrimination").

Here, Plaintiffs' contention that their challenge to the Executive's destination of removal does not fall within § 1252(g) because the destination is illegal under the INA, Mem. Supp. TRO Mot. 10, is circular and proves too much. Under their logic, this Court may assume jurisdiction to decide whether the order is legal, but if the order were determined legal, then jurisdiction would disappear again. Besides the fact that this Court must determine its own jurisdiction before reaching the merits

of a claim, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998), if

Plaintiffs were correct, then any challenge to the legality of a removal order would

avoid § 1252(g) altogether. But Congress added that provision precisely to avoid the

"deconstruction, fragmentation, and hence prolongation of removal proceedings,"

which such an interpretation of § 1252(g) would incentivize. *Reno*, 525 U.S. at 487.

Thus, because Plaintiffs' claims arise from Defendants' decision to execute

Abrego Garcia's removal order, those claims cannot be raised in this Court, and

preliminary relief cannot issue.[2]

## II.    Plaintiffs have not clearly shown that irreparable harm is likely without the preliminary relief they seek.

Plaintiffs cannot meet the second *Winter* requirement, either. They point only

to two irreparable harms they say they will suffer: the separation of Plaintiffs'

family, and the alleged risk that Abrego Garcia will be tortured or killed in CECOT.

---

[2] Abrego Garcia should have requested a stay of removal in connection to a motion to reopen directed to the immigration judge, 8 C.F.R. § 1003.23(b)(v), and then filed a petition for review in the Fourth Circuit if the immigration judge (and Board of Immigration Appeals on appeal) ultimately denied reopening. That was Congress's intent—to streamline all matters into review of a final order of removal. *See* 8 U.S.C. § 1252(a)(5) (petition for review exclusive means of judicial review), (b)(9) (judicial review of all questions of law and fact arising from "any action taken . . . to remove an alien from the United States under this subchapter" available only in petition for review); *Shaboyan v. Holder*, 652 F.3d 988, 990–91 (9th Cir. 2010) ("[T]he BIA's order denying Shaboyan's request for a stay would still be reviewable as part of a petition for review stemming from a final order of removal.").

And Plaintiffs could have taken these steps while Abrego Garcia was still in the United States—Plaintiffs allege he was able to talk to his wife by phone multiple times and that, the morning of March 15, he told his wife that there were plans to remove him to El Salvador. Compl. ¶¶ 52–57. Plaintiffs' failure to invoke the appropriate remedy when they had the chance does not mean there was no adequate remedy to review the impending removal action.

Mem. Supp. TRO Mot. 8.[3] But family separation is not an injury of the kind necessary to prevail on this factor in light of the Supreme Court's admonishment not to "routinely apply[] . . . the traditional standards governing more orthodox 'stays'" in an area to which "the Government has traditionally been granted the widest latitude." *Sampson*, 415 U.S. at 83–84.

And Plaintiffs have not clearly shown a likelihood that Abrego Garcia will be tortured or killed in CECOT. Plaintiffs point to little evidence about conditions in CECOT itself (focusing primarily on its capacity for detainees), instead extrapolating from allegations about conditions in different Salvadoran prisons. Goebertus Decl., Ex. B to Mem. Supp. TRO Mot., ¶¶ 2–4; Bishop Decl., Ex. C to Mem. Supp. TRO Mot., ¶¶ 24 & n.17, 30 & n.27. While there may be allegations of abuses in other Salvadoran prisons—very few in relation to the large number of detainees—there is no clear showing that Abrego Garcia himself is likely to be tortured or killed in CECOT.

More fundamentally, this Court should defer to the government's determination that Abrego Garcia will not likely be tortured or killed in El Salvador. "[S]eparation of powers principles . . . preclude the courts from second-guessing the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign." *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009). The United States, as a signatory to the Convention Against Torture, is committed not

---

[3] Notably, Plaintiffs do not contend that Abrego Garcia is threatened by the reason he gave to get withholding of removal—alleged harm from the Barrios 18 gang's extortion of his family's pupusa shop. *See generally* Ex. 1 to Compl.

to return a person to a country where that person is likely to be tortured. *See generally* 8 C.F.R. § 1208.18. And, as one of Plaintiffs' declarants concedes, "El Salvador is a signatory to both the Convention Against Torture and the International Covenant on Civil and Political Rights." Bishop Decl. ¶ 32. Although the government erred in removing Abrego Garcia specifically to El Salvador, the government would not have removed *any* alien to El Salvador for detention in CECOT if it believed that doing so would violate the United States' obligations under the Convention. That judgment is therefore due respect under separation-of-powers principles. *See Kiyemba*, 561 F.3d at 515.

Thus, Plaintiffs cannot show the clear likelihood of irreparable harm necessary to satisfy the second *Winter* factor, especially in light of heightened burden necessitated by the intrusion of Plaintiffs' requested relief on the core of Executive foreign-affairs functions.

### III.    Plaintiffs have not shown that the balance of the equities and public interest clearly weigh in their favor.

Nor can Plaintiffs prevail on the remaining *Winter* factors. Abrego Garcia is a danger to the community—he is estopped from asserting otherwise—and there is a weighty public interest in ensuring the Executive can implement a unified course of conduct in foreign affairs. These interests tip the balance decisively against the Plaintiffs' asserted interests.

Abrego Garcia is barred from disputing that, as a member of the criminal gang MS-13, he is a danger to the community. This factual finding was made in his bond proceedings before the agency, IJ Order 2–3, and he appealed that finding to

the Board of Immigration Appeals, which affirmed it as not clearly erroneous, BIA

Opinion 1–2. Because he did not seek further review of the Board's decision, that

decision is a final judgment precluding relitigation of the issues it resolved. *Hagan*

*v. McNallen* (*In re McNallen*), 62 F.3d 619, 624 (4th Cir. 1995) (noting that

collateral estoppel may apply to administrative proceedings as well as judicial).

Collateral estoppel applies when "(1) the issue sought to be precluded [was]

the same as that involved in the prior action, (2) that issue [was] actually litigated,

(3) it [was] determined by a valid and final judgment, and (4) the determination

[was] essential to the prior judgment." *Combs v. Richardson*, 838 F.2d 112, 115

(4th Cir. 1988) (quoting *In re Ross*, 602 F.2d 604, 607–08 (3d Cir. 1979)); *see also In

re McNallen*, 62 F.3d at 624 (requiring that "the party against whom the prior

decision was asserted enjoyed a full and fair opportunity to litigate that issue in an

earlier proceedings").

Here, Abrego Garcia cannot now relitigate the finding that he is a danger to

the community. That issue was actually litigated and decided in his bond hearing in

2019. IJ Order 2–3 ("Respondent failed to meet his burden of demonstrating that

his release from custody would not pose a danger to others, as the evidence shows

that he is a verified member of MS-13" and he "has failed to present evidence to

rebut that assertion."). He appealed that decision to the appropriate administrative

review body, the Board of Immigration Appeals, which adopted and affirmed the

immigration judge's "danger ruling" notwithstanding Abrego Garcia's arguments.

BIA Opinion 1–2. There is no evidence of further review by the Fourth Circuit, and

the time for such review has passed, so the agency decision is a valid and final judgment. Moreover, because the Board affirmed the immigration judge solely on the ground that Abrego Garcia was a danger to the community, that ground is essential to the judgment. Restatement (Second) of Judgments § 27 cmt. o (Am. L. Inst. 1982). Finally, Abrego Garcia had a full and fair opportunity to litigate the issue. He had the opportunity to give evidence tending to show he was not part of MS-13, which he did not proffer. IJ Order 2–3. And he had sufficient motivation to challenge the finding—he needed to prevail on it to obtain bond pending his removal proceedings. *See* Compl. ¶ 39 (discussing missing the birth of his son because he was detained); *accord* Restatement (Second) of Judgments § 28 cmt. j (discussing unfairness in applying preclusive effect to first judgment when "the amount in controversy in the first action [was] so small in relation to the amount in controversy in the second"). Thus, the finding of Abrego Garcia's danger to the community is conclusive, and he is estopped from challenging it now.

In light of Abrego Garcia's danger to the community, the balance of equities and the public interest tip against an injunction ordering Defendants to orchestrate his return to the United States. Although there is a "public interest in preventing aliens from being wrongfully removed," *Nken*, 556 U.S. at 435, there too is a strong public interest in not importing members of violent transnational gangs into the country. *See id.* at 436 (noting a heightened "interest in prompt removal" if an "alien is particularly dangerous"). And though the danger to the general public may be mitigated if Abrego Garcia were detained upon return to the United States, even

18

while in detention, gang members may stoke violence against government officials and other detainees. *See* Michael E. Miller, Wash. Post, *"Vying for Control": How MS-13 Uses Violence and Extortion in America's Jails* (Feb. 4, 2018).[4] And detainees may also escape.

Further, as discussed above, an injunction as Plaintiffs request would harm the public interest by preventing the Executive from implementing a unified course of conduct for the United States' foreign affairs. "[M]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Hernandez v. Mesa*, 589 U.S. 93, 103–04 (2020) (ellipsis in original) (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)). "Between the two political branches, only the Executive has the characteristic of unity at all times," giving him the capability, which the other departments of government lack, "of engaging in the delicate and often secret diplomatic contacts" necessary in foreign affairs. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14–15 (2015). Thus, ordering the Executive to renege on any promise of payment that might exist would threaten the nation's credibility in any future negotiations or allow foreign negotiators to seek to leverage the disunity in foreign policy caused by this Court's order. *See id.*; *cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 ("[T]he President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire

---

[4] *Available at* https://www.washingtonpost.com/local/vying-for-control-how-ms-13-uses-violence-and-extortion-in-americas-jails/2018/02/04/c8b8ab92-06c8-11e8-8777-2a059f168dd2_story.html.

national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics."). And ordering the Executive to request the release of a member of a gang responsible for violence and drug trafficking throughout the Americas threatens the country's national security. Such orders would therefore constitute "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013).

The heavy interest in the President's primacy in foreign affairs outweigh the interests on the Plaintiffs' side of the scale. Although the Defendants recognize the financial and emotional hardships to Abrego Garcia's family, *see* Compl., Ex. 2, ¶ 47, the public interest in not returning a member of a violent criminal gang to the United States outweighs those individual interests. *See Nken*, 556 U.S. at 436. And to the extent that the Plaintiffs assert a general public interest in not perpetuating unlawful agency action, Mem. Supp. TRO Mot. 9, they have made no showing that the removal of Abrego Garcia to El Salvador was something other than an administrative error, *see* Cerna Decl. ¶¶ 12–15.

Because Plaintiffs have not made a clear showing that a TRO is warranted under these circumstances, their motion should be denied.

## <u>CONCLUSION</u>

The motion should be denied.

Respectfully submitted,

**Yaakov M. Roth**
Acting Assistant Attorney General
Civil Division

<u>s/Erez Reuveni</u>
**Erez Reuveni**
Acting Deputy Director
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 307-4293
Erez.R.Reuveni@usdoj.gov

**Christopher Ian Pryby**
Trial Attorney
Office of Immigration Litigation

Dated: March 31, 2025                    *Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | |
|---|---|
| _____ ) | |
| Kilmar Armando Abrego Garcia, *et al.*,  ) | |
| ) | |
| *Plaintiffs*,  ) | |
| ) | Civil Action No. <u>8:25-cv-00951-PX</u> |
| v.  ) | |
| ) | |
| Kristi Noem, *et al.*,  ) | |
| ) | |
| *Defendants*.  ) | |
| _____ ) | |

**REPLY MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

i

## Table of Contents

Table of Contents ............................................................................................................ ii

Introduction .................................................................................................................... 1

Standard of Review ........................................................................................................ 2

Argument ........................................................................................................................ 3

    I.    Defendant's "core habeas" argument makes no sense ........................................... 3

    II.   The jurisdictional bar at 8 U.S.C. § 1252(g) only applies to removals carried out within the immigration laws ............................................................................................... 6

    III.  Plaintiff's requested relief could be successful in returning him to the United States. ...... 9

    IV.  Plaintiff has adequately shown irreparable harm, and need not prove torture ................. 10

    V.   Equities and the public interest support the supremacy of law over power ...................... 11

Conclusion .................................................................................................................... 13

Certificate of Service .................................................................................................... 14

**Introduction**

Defendants admit they knew that Plaintiff Kilmar Abrego Garcia won an order from an immigration judge finding that he would more likely than not be persecuted in El Salvador on account of a protected ground, and that this order was never appealed or otherwise set aside. Dkt. 11-3 at ¶¶ 9, 13. They admit that notwithstanding their awareness of this order, *id.* ¶ 13, they arrested Plaintiff, *id.* ¶ 11; transferred him to a staging area for flights to El Salvador, *id.*; and placed his name on a flight manifest to El Salvador, *id.* ¶ 14. In light of these factual concessions, this Court need not accept as true Defendants' conclusory and self-contradictory protestations that the deportation represented "administrative error," "an oversight," and "was carried out in good faith." Id. ¶ 15.

Defendants do not deny that Plaintiff is currently incarcerated in the infamous CECOT jail, they merely quibble over whether his treatment therein rises to the level of torture. Defendants do not deny that they have paid the government of El Salvador millions of dollars to detain Plaintiff and others like him in CECOT, that Defendant Marco Rubio thanked the President of El Salvador on Twitter for detaining Plaintiff in CECOT, and that Defendant Kristi Noem *went inside the CECOT jail* after the filing of this lawsuit yet took no steps to attempt or request to extract Plaintiff therefrom.[1]

Most shockingly, Defendants do not claim to be attempting to seek Plaintiff's return to the United States absent this Court's intervention.[2] This would be a very different case if Defendants

---

[1] Defendants spend most of their brief seeking to paint Plaintiff as a member of the MS-13 gang, *see* Dkt. 11 at 2, 15-17, a contention which Plaintiff disputes, *see* Dkt. 1 at ¶¶ 19-41 and exhibits cited therein. Plaintiff has been neither charged nor convicted with any crime, *see* Dkt. 1-2, a fact which Defendants do not dispute. In any event, Defendants do not contend that Plaintiff's alleged gang membership gave them legal authority to deport Plaintiff to El Salvador. In addition, although the White House has accused Plaintiff of involvement in human trafficking, Defendants' court filing omits any such scandalous accusation.

[2] This is a new and upsetting development for the Department of Justice. Undersigned counsel has litigated prior cases arising out of erroneous deportations. *See, e.g.*, *Tomas-Ramos v. Hott*, 1:19-cv-01587-AJT-JFA (E.D. Va., filed Dec. 18, 2019) (noncitizen requested Reasonable Fear Interview, but was erroneously removed prior to interview being

1

came before the court hat in hand, confessing error and assuring the court that remedial steps were underway, and arguing that the Court should not short-circuit measures that were already in process. Instead, Defendants have already washed their hands of Plaintiff, of his U.S.-citizen wife, of his autistic nonverbal five-year-old U.S.-citizen child. Defendants' proposed resolution of this state of affairs, which they caused either intentionally or at best recklessly, is nothing at all.

This is an outrageous set of facts. If Defendants' actions in this case are allowed to remain without redress, then the withholding of removal statute and orders of immigration courts are meaningless, because the government can deport whomever they want, wherever they want, whenever they want, and no court can do anything about it once it's done.

## Standard of Review

Defendants seek to paint the injunction requested by Plaintiff as mandatory rather than prohibitive, *see* Dkt. 12-1 at 5, citing *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994); *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). They fail to respond to Plaintiff's citation to *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014), in which the Fourth Circuit explained that an injunction such as this one, restoring Plaintiff to his "last uncontested status between the parties which preceded the controversy," is considered a prohibitive injunction in the Fourth Circuit. *See also Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) ("The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy. To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . such an injunction restores, rather than disturbs, the status quo ante." (Internal

---

schedule). In prior cases, as soon as they realized a noncitizen had been erroneously deported, DOJ and DHS worked quickly to attempt to return him. Here, they are uninterested in helping unless ordered to do so by this Court.

citations omitted.)). Accordingly, this case—which seeks to restore Plaintiff's status as being physically present in the United States—would be analyzed under the more permissive standard for prohibitive injunctions.

## Argument

It is hard for Defendants to argue that Plaintiff is unlikely to succeed on the merits of this case when they admit all the facts that give rise to liability. Defendants' jurisdictional argument cites cases regarding disputed removal orders and challenges to removals under the law; Plaintiff's removal was wildly extrajudicial and undisputedly devoid of any basis in law, so the cited jurisdictional bars do not apply. Irreparable harm does not require a showing of actual torture, and the treatment that Plaintiff is suffering rises to the level of irreparable harm, whether or not it constitutes torture (although it does). Defendants' unsubstantiated belief that Plaintiff is an MS-13 member could well have formed a basis for them to file a motion before the immigration court seeking to set aside his order of protection, but it does not retroactively immunize his blatantly and concededly unlawful deportation to the one country where his removal was prohibited by an order from an immigration judge. Finally, the two things Plaintiff asks this Court to order are well within this Court's power, and Defendants ought not be heard to complain that such simple remedial steps will necessarily be ineffective if they have not attempted any steps whatsoever to remedy their grievous conduct.

### I.    Defendant's "core habeas" argument makes no sense.

This case was filed as a complaint for injunctive relief. Dkt. 1. Defendants argue that "because Plaintiffs' claims sound in habeas, they can proceed only in habeas. But because Plaintiffs concede that Abrego Garcia is not in United States custody, this Court cannot hear those claims." In other words, since Plaintiff's claims somehow *implicate* detention (because detention

goes hand-in-hand with removal), they should have been brought as habeas claims; but because his claims do not *challenge* current detention, the habeas claims would fail.[3]

This argument makes no sense, and is divorced from the facts of this case and the manner in which the complaint was pled. Plaintiff's core contention in this case is that Defendants *removed him from the United States* without legal justification, not that they *continue to detain him* without legal justification. For example, Plaintiff's first cause of action complains that "Defendants removed Plaintiff Abrego Garcia to El Salvador, the country from which he had been granted withholding of removal, without formally terminating his grant of withholding of removal, thus violating this law." Dkt. 1 at ¶ 74. His second cause of action complains that "Defendants removed Plaintiff Abrego Garcia to El Salvador, the country from which he had been granted withholding of removal, without formally terminating his grant of withholding of removal, thus violating his procedural due process rights under the Fifth Amendment to the U.S. Constitution." *Id.* at ¶ 80. And so on.

The fact that Plaintiff is now detained in the notorious CECOT jail rather than at liberty within El Salvador is relevant to Plaintiff's TRO motion on the irreparable harm prong, but is not relevant to liability on the core claim: Defendants deported him to a prohibited country. Since Plaintiff does not challenge his present confinement by Defendants, most of their case citations are irrelevant. *See, e.g.*, Dkt. 12 at 6 ("Habeas corpus 'is the appropriate remedy to ascertain . . . whether any person is rightfully in confinement or not,'" quoting *DHS v. Thuraissigiam*, 591 U.S. 103, 117 (2020)).

Defendants' citations (Dkt. 12 at 7) to *Nance v. Ward*, *Heck v. Humphrey* and *Preiser v.*

---

[3] An exception lies under *Smith v. Ashcroft*, 295 F.3d 425 (4th Cir. 2002), recognizing continuous jurisdiction over habeas corpus petitions filed while the Petitioner was still in custody but removed thereafter, as long as legal rights and obligations continue to stem therefrom.

*Rodriguez* for the principle that a challenge to detention implicating the underlying legal basis for the detention (e.g. a criminal conviction) must only be brought in habeas, are also inapposite here.[4] This case presents no controversy over the underlying legal judgment at issue, the 2019 grant of withholding of removal; both parties agree that was lawfully entered and remains in force. Nor is there a controversy regarding the actual removal by airplane to El Salvador, which both parties agree was not legally authorized. *Preiser* and its progeny are simply not implicated.

In the alternative, but not as Plaintiff's core legal contention, Plaintiff did bring a fifth cause of action under habeas corpus, alleging that he is in the constructive custody of the U.S. government, given that the government of El Salvador is detaining him "at the direct request of Defendants, and at the financial compensation of Defendants." Dkt. 1 at ¶ 98. This cause of action rests on the theory that the government of El Salvador is detaining Plaintiff at the behest of Defendants and subject to financial compensation from Defendants. Such a claim *does* fall within the core of habeas jurisprudence and is a viable claim. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723 (2008).[5] ICE frequently contracts with other governmental entities to hold its detainees.[6] Where ICE detainees are held in jails run by other governmental entities, the immediate custodian for purposes of habeas corpus is "the federal official most directly responsible for overseeing that contract facility when seeking a habeas writ." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1185 (N.D. Cal. 2017), *aff'd*, 905 F.3d 1137 (9th Cir. 2018); *see also Jarpa v. Mumford*, 211 F. Supp.

---

[4] Likewise, *Plyler v. Moore*, 129 F.3d 728 (4th Cir. 1997), which held that challenges to the length of confinement are properly brought at habeas petitions, has no bearing on this case.

[5] Plaintiff, who has lived in the United States with a legal work permit for five years after being granted immigration relief, has a stronger claim to access to the writ of habeas corpus than did Guantanamo detainees who had never set foot in the territorial United States.

[6] "ICE primarily uses intergovernmental service agreements (IGSA) to acquire detention space. Officials said IGSAs offer several benefits over contracts, including fewer requirements for documentation or competition." GAO, Report to the Chairman, Committee on Homeland Security, House of Representatives (January 2021), *available at* https://www.gao.gov/assets/gao-21-149.pdf, at 2 (showing 59 percent of ICE detainees housed in a facility operated by another governmental entity).

3d 706, 724 (D. Md. 2016) (where habeas petitioner held in local county jail on ICE contract, "[a]pplying the immediate custodian rule here would yield the 'impractical result' of having the immediate custodian . . . unable to grant the relief requested. Rather, the relief sought can only practically be delivered by the head of the agency in charge of interpreting and executing the immigration laws."); *Wilkinson v. Dotson*, 544 U.S. 74, 92 (2005).

This habeas corpus cause of action is therefore viable, on the theory that the government of El Salvador is acting as the jailer for Defendants pursuant to financial compensation from Defendants, as did the local county jail in *Jarpa*. *See* Dkt. 10-4 (tweet from El Salvador president acknowledging receipt of a "low fee" for detaining Plaintiff; response from Defendant Rubio thanking El Salvador president for same); Mary Beth Sheridan and Maria Sacchetti, "Noem visits El Salvador prison where deportees are in 'legal limbo,'" *The Washington Post* (March 26, 2025), *available at* https://www.washingtonpost.com/world/2025/03/26/el-salvador-noem-cecot-venezuelans/ (noting that the U.S. government has paid six million dollars to El Salvador to hold 238 Venezuelan nationals, along with 23 Salvadoran nationals accused of being MS-13 members—one of whom is Plaintiff—in CECOT). Again, Defendant's memorandum does not deny paying the government of El Salvador to detain Plaintiff in CECOT.

For the foregoing reasons, Plaintiff's complaint for injunctive relief did not need to be filed as a habeas corpus petition, and therefore all of Defendants' caselaw arguing against habeas corpus in the post-deportation context is irrelevant, and the Plaintiff is likely to succeed on the merits; in the alternative, since Plaintiff *did* plead a viable cause of action for habeas corpus, the complaint is likely to succeed on the merits.

II.    **The jurisdictional bar at 8 U.S.C. § 1252(g) only applies to removals carried out within the immigration laws.**

Defendants' argument for application of the jurisdictional bar at 8 U.S.C. § 1252(g)

attempts to improperly frame this case as a "challenge to the legality of a removal order[.]" Dkt. 12 at 14. But all parties agree that Plaintiff's removal was not legal nor pursuant to any removal order. The jurisdictional bar does not apply.

Section 1252(g) covers "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien *under this chapter*." (Emphasis added.) But Section 1252(g) does not apply to a removal conducted "not [as] part of Title 8, Chapter 12." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *28 (D.C. Cir., Mar. 26, 2025) (Millett, J., concurring).

As the District Court explained in *Coyotl v. Kelly*, Section 1252(g) "does not apply to the entire universe of deportation-related claims, but instead 'applies only to three discrete actions that the Attorney General may take: her "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders." There are of course many other decisions or actions that may be part of the deportation process[.]'" 261 F. Supp. 3d 1328, 1340 (quoting *Reno v. AADC*, 525 U.S. 471, 482 (1999). *See also Welch v. Reno*, 2000 WL 1481426, at *1 (D. Md., Sept. 20, 2000) (noting that the Supreme Court in *AADC* "defined the jurisdictional limitations of Section 1252(g) narrowly.").

Defendants argue that notwithstanding Section 1252(g)'s narrow scope, their actions fall within the provision stripping jurisdiction over the Secretary's "decision or action to . . . execute removal orders." Dkt. 11 at 11. But here, *there was no removal order as to El Salvador at all*. Such removal had been withheld. Surely if Defendants had removed Plaintiff to Panama, their Section 1252(g) argument would hold more water, as the parties would be fighting over whether such removal was carried out with observance of proper legal formalities and respect for due process. But here, there is no dispute over "the government's authority to execute a removal order" because

the government claims no such authority; and there was no removal-to-El-Salvador order for Plaintiff to attack. *See also Enriquez-Perdomo v. Newman*, 54 F.4th 855, 865 (6th Cir. 2022) ("Congress' purpose, as articulated in *AADC*, supports our interpretation that 'execute removal orders' contemplates removal orders that are subject to execution. By definition, when a removal order is not subject to execution, government officials have no authority, discretionary or otherwise, to execute it."); *Guerra-Castaneda v. United States*, 656 F. Supp. 3d 356, 362–63 (D. Mass. 2023) ("[T]he government had no authority to execute a removal order with respect to Guerra-Castaneda because there was no extant removal order for it to carry out. . . . The plain meaning of § 1252(g) does not extend to the government's removal of a non-citizen in the face of a court order precluding its authority to do so.").[7] Indeed, Defendants' corrected brief (Dkt. 12 at 12) cites to *Madu v. Attorney General*, 470 F.3d 1362, 1368 (11th Cir. 2006), which agrees that Section 1252(g) does not bar claims challenging deportation without lawful authorization. Defendants' citation to *Camarena v. Director, ICE*, 988 F.3d 1268, 1273–74 (11th Cir. 2021), therefore does not carry the day.

Finally, Defendants' suggestion in fn.2 that Plaintiff was somehow the party responsible to prevent his own removal by filing a motion to reopen and seeking a stay of removal, makes no sense. Plaintiff *had already won the order* barring his removal to El Salvador, there was no reason for him to seek it a second time. The party that was supposed to file a Motion to Reopen—and the party that would have born the burden of proof on such motion—was the government. 8 C.F.R. § 1208.24(f). Had they done this correctly, the parties could have taken the case back to the immigration judge, and then, as the government suggests in its fn.2, to the Board of Immigration

---

[7] Defendants' citation to *Mapoy v. Carroll*, 185 F.3d 224, 228 (4th Cir. 1999) does not change this outcome, as that case involved a dispute over whether the Board of Immigration Appeals was correct to deny a stay of removal. Here, again, Plaintiff won his case outright within the immigration court system; Defendants, convinced that he was an MS-13 gang member, decided to list him on a flight manifest and then put him on an airplane anyway.

Appeals and then ultimately the Fourth Circuit if necessary. But the government cut off that path by deporting him without lawful process in front of an immigration judge.

For the foregoing reasons, no jurisdictional bar prevents this Court from hearing and deciding Plaintiff's request for emergency injunctive relief.

### III.    Plaintiff's requested relief could be successful in returning him to the United States.

Plaintiff has requested that this Court order Defendants to request his return from the government of El Salvador: first, just ask them nicely to please give him back to us. It is inexplicable that Defendants have not done so already. Meanwhile, Plaintiff also asks this Court to order Defendants not to mix their messages by continuing to pay the government of El Salvador further compensation to hold on to him. Defendants' argument that this Court cannot order redress for their concededly unlawful removal of Plaintiff leaves a bitter aftertaste where the government has taken no voluntary steps in attempt to rectify what they themselves describe as an error.

As the Supreme Court explained in *Nken v. Holder*, 566 U.S. 418, 435 (2009), citing the government's brief which explained their successful track record in bringing noncitizens back to the United States, noncitizens who prevail in litigation challenging their removal "can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *See also Lopez-Sorto v. Garland*, 103 F.4th 242 (4th Cir. 2024) (ICE can bring a prevailing party back to the United States if that party prevails on their appeal).

The Fourth Circuit has held that the redressability requirement "is not onerous," that a plaintiff "need not show that a favorable decision will relieve their every injury," and that a plaintiff "need only show that they personally would benefit in a tangible way from the court's intervention." *Deal v. Mercer Co. Bd. of Ed.*, 911 F.3d 183, 189 (4th Cir. 2018). Here, there are no facts from which to conclude ICE cannot possibly be successful in bringing Plaintiff back to

9

the United States if they were ordered to try in good faith to do so, no specific reason to believe that the government of El Salvador would not simply hand Plaintiff over to the United States government upon our government's request. This is the same government of El Salvador that allowed Defendant Kristi Noem to enter its CECOT prison and take photographs with the detainees therein. Dkt. 10-3.[8] How can Defendants ask this Court to find as a matter of law that there is no possible redress for Plaintiff's injuries, when one Defendant stood within the same prison walls as him, after this action was filed, after this Court's first scheduling conference in this case, and made no effort to try? If anything, it is speculative to contend that simply asking the government of El Salvador *will likely not* be effective.[9]

For the foregoing reasons, it is wildly premature to hold that this Court can order no further redress for Plaintiff's injuries. Plaintiff's requested emergency injunctive relief should issue, and then if (and only if) it is unsuccessful, the parties can come back before this Court to make arguments as to why further efforts would be necessary or, to the contrary, futile.

### IV.    Plaintiff has adequately shown irreparable harm, and need not prove torture.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Defendants' brief implies that Plaintiff cannot meet the *Winter v. NRDC* standard for irreparable harm unless he makes a showing that he is being tortured, which they claim he is not. Dkt. 11 at 14. Regardless of whether his treatment rises to the level of torture (Judge Boasberg

---

[8] Notably, Defendants also do not deny paying six million dollars to the Government of El Salvador to continue to detain Plaintiffs and others in CECOT; they merely note that "[t]here is no showing that any payment made to El Salvador is yet to occur." Dkt. 11 at 9.

[9] It is disturbing to consider that Defendants' redressability argument would logically seek to prevent this Court from issuing the requested relief even if Plaintiff were a U.S. citizen.

found that conditions in CECOT present "the risk of torture, beatings, and even death," *J.G.G. v. Trump*, 2025 WL 890401, at *16 (D.D.C. Mar. 24, 2025)), it certainly rises to the level of irreparable harm. *See* Dkt. 1-4 (photos of Plaintiff's harsh treatment in CECOT); Dkt. 10-2 at ¶ 3 ("People held in CECOT, as well as in other prisons in El Salvador, are denied communication with their relatives and lawyers[.]"); Dkt. 10-3 at ¶ 30 ("An analysis of the CECOT's design using satellite footage found that if the prison were to reach full supposed capacity of forty thousand, each prisoner would have less than two feet of space in shared cells—an amount the authors point out is less than half the space required for transporting midsized cattle under EU law."). Such treatment rises to the level of irreparable harm.

The government's argument that "this Court should defer to the government's determination that Abrego Garcia will not likely be tortured or killed in El Salvador," Dkt. 11 at 14, is particularly ironic given the facts of this case. It is immigration judges who determine whether individuals will or will not be tortured in a country of removal. 8 C.F.R. §§ 1208.16, 1208.17. Defendants do not claim to have performed that review prior to deporting Plaintiff to El Salvador in violation of an IJ's order and without seeking to reopen proceedings before the IJ; indeed, by so doing, they prevented that IJ review from happening at all. The last immigration judge who looked at Plaintiff's case determined that he *would* more likely than not face persecution in El Salvador. Dkt. 1-1.

For the foregoing reasons, Plaintiff has established irreparable harm under *Winter*.

**V.    Equities and the public interest support the supremacy of law over power.**

Once Plaintiff is returned to the United States, this Court will not and cannot be the entity that decides whether he may continue to remain pursuant to a grant of withholding of removal, or whether that grant of withholding of removal is to be terminated; that role falls to the immigration

11

court (and then, ultimately, the U.S. Court of Appeals for the Fourth Circuit), with the government bearing the burden of proof that withholding of removal is no longer appropriate. 8 C.F.R. § 1208.24(f). It is also the immigration court that will decide whether Plaintiff may be at liberty or must remain detained while such proceedings are pending. 8 U.S.C. § 1226(a). Defendants' protestation that Plaintiff is an MS-13 member, their legal argument that he is estopped for arguing otherwise, and Plaintiff's contention that the gang allegations arise from the flimsiest of unreliable anonymous informants, will be properly addressed to that forum.

In this forum, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citations omitted). As the Supreme Court stated in *Nken*, "[o]f course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"; but this must be balanced against any injunctive relief that "permits and prolongs a continuing violation of United States law." 556 U.S. at 436, quoting *AADC*, 525 U.S. at 490. Here, however, the "continuing violation of United States law" is Plaintiff's *absence* from the United States, not his presence therein.

In the end, the public interest is best served by restoring the supremacy of laws over power. The Department of Homeland Security must obey the orders of the immigration courts, or else such courts become meaningless. Noncitizens—and their U.S.-citizen spouses and children—must know that if this nation awards them a grant protection from persecution, it will honor that commitment even when the political winds shift; and if the government seeks to rescind such a grant of protection, it will do so only by means of renewed judicial proceedings accordance with the rules of procedure as set forth in the Code of Federal Regulations, and the Due Process clause

of the Fifth Amendment. Plaintiff's deportation was carried out by force, not by law; the public

interest favors righting that wrong.

## **Conclusion**

For the foregoing reasons, this Court should enter a preliminary injunction as sought by

Plaintiff. Dkt. 6-3.

Respectfully submitted,

*//s// Simon Sandoval-Moshenberg*                                    Date: April 2, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com

## Certificate of Service

I, the undersigned, hereby certify that on this date, I uploaded the foregoing, as well as all attachments thereto, to this Court's CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record.

Respectfully submitted,

*//s// Simon Sandoval-Moshenberg*                                    Date: April 2, 2025
Simon Y. Sandoval-Moshenberg, Esq.
D. Md. Bar no. 30965
*Counsel for Plaintiff*
Murray Osorio PLLC
4103 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
Telephone: 703-352-2399
Facsimile: 703-763-2304
ssandoval@murrayosorio.com

14

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                      GREENBELT DIVISION


 3   _____
                                           )
 4   KILMAR ARMANDO ABREGO GARCIA,         )
     et al.,                               )
 5                                         )
          Plaintiff,                       )
 6                                         )Docket Number
               vs.                         )8:24-cv-00951-PX
 7                                         )
     KRISTI NOEM, et al,                   )
 8                                         )
          Defendant.                       )
 9   _____)

10                  TRANSCRIPT OF MOTIONS HEARING
                   BEFORE THE HONORABLE PAULA XINIS
11                 UNITED STATES DISTRICT COURT JUDGE
                   FRIDAY, APRIL 4, 2025, AT 1:00 P.M.
12   APPEARANCES:

13   On Behalf of the Plaintiff:
          BY:  SIMON SANDOVAL-MOSHENBERG, ESQUIRE
14        MURRAY OSORIO
          4103 Chain Bridge Road, Suite 300
15        Fairfax, VA  22030
          (703)352-2399
16
          BY:  JONATHAN COOPER, ESQUIRE
17        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
          1300 I Street NW
18        Suite 900
          Washington, DC  20005
19        (202)538-8000

20   On Behalf of the Defendant:
          BY:  EREZ REUVENI, ESQUIRE
21        UNITED STATES DEPARTMENT OF JUSTICE
          450 Fifth Street NW
22        Washington, D.C. 20530
          (202)t616-8962
23
24   ALSO PRESENT:  Jennifer Vasquez Sura, Plaintiff

25        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***
```

```
 1                    P R O C E E D I N G S

 2        (Court called to order.)

 3           DEPUTY CLERK:  All rise.  The United States District

 4   Court for the District of Maryland is now in session.  The

 5   Honorable Paula Xinis presiding.

 6           THE COURT:  Good afternoon everyone.  You all can

 7   have a seat.

 8        Mr. Ulander.

 9           DEPUTY CLERK:  The matter now pending before the

10   court is Civil Action Number PX25-951, Kilmar Armando Abrego

11   Garcia, et al. v. Kristi Noem, et al.  The matter comes before

12   this Court for a motions hearing.

13        Counsel, please identify yourselves for the record.

14           MR. SANDOVAL-MOSHENBERG:  Good morning, Your Honor.

15   Simon Sandoval-Moshenberg from the law firm Murray Osorio. With

16   me is Jonathan Cooper from the law firm Quinn, Emmanuel,

17   Urquhart, and Sullivan; and plaintiff Jennifer Vasquez Sura for

18   the plaintiffs.

19           THE COURT:  Okay.

20           MR. REUVENI:  Good afternoon.  Erez Reuveni from the

21   Department of Justice.

22           THE COURT:  I'm sorry.  Can you speak up a little bit

23   so I can hear you?

24           MR. REUVENI:  Yes.  Sorry, Your Honor.

25        Erez Reuveni from the Department of Justice, for
```

1  defendants.

2      **THE COURT:**  Okay.  Mr. Reuveni, am I saying your name

3  right?

4      **MR. REUVENI:**  You are.  Thank you, Your Honor.

5      **THE COURT:**  Okay.  Great.  Give me one second here.

6  Okay.  All right.  Counsel, at some point, I'm going to

7  have to get my computer up and running, but let's begin.

8  This -- we're all here together today on a motion from the

9  plaintiffs for a preliminary injunction.  The motion was filed

10  at ECF 10 and 11, and as you all know, the evidence has been

11  produced, but I want to check in with each of you to make sure

12  that you're not intending -- or if you are, intending to call

13  any witnesses or put on any additional evidence from both

14  sides, I would like to know it now.

15  So Mr. Sandoval-Moshenberg?

16      **MR. SANDOVAL-MOSHENBERG:**  No, Your Honor, the facts

17  of the case seem to be largely undisputed.

18      **THE COURT:**  Okay.  Well, we'll see about that.  But I

19  just wanted to make sure that there wasn't any additional

20  evidence presentation that you wished for today.

21      **MR. SANDOVAL-MOSHENBERG:**  That's right, Your Honor.

22      **THE COURT:**  Okay.

23  Same question to you, Mr. Reuveni.

24      **MR. REUVENI:**  Nothing further evidentiary-wise from

25  the government, Your Honor.

1      **THE COURT:**  Okay.  Well, word of caution, with

2   respect to questions of fact, if you're going to represent a

3   fact, and you don't have evidence to back it up, then it is not

4   a fact that the Court will recognize.  That's just the way that

5   it works in a court of law.

6      With respect to the law at issue, what I ask of both sides

7   is if you're going to cite me to authority, one, it should be

8   in your briefs already, but two, if not, it should be a rare

9   case in which that happens that you give me the case, the

10  citation, and -- and point me to the -- to the language you

11  want me to look at.  Because if these binders are any

12  indication, we've been working overtime to make sure that we

13  have considered all arguments from all sides and then some, and

14  I do need your help in directing me to where you want me to

15  look so that we make the best use of this time.

16     As I see it, there's some preliminary jurisdictional

17  questions, and then there are the *Winter* factors.  I intend to

18  hear them all.  It seems to me, best, to ask the movant to go

19  first, addressing first jurisdiction and then the *Winter*

20  factors, and then I'll turn to the government.  Okay?

21         **MR. SANDOVAL-MOSHENBERG:**  Thank you, Your Honor.

22         **THE COURT:**  All right.

23         **MR. SANDOVAL-MOSHENBERG:**  Your Honor, the government

24  raises two jurisdictional bars to this case, first the core

25  habeas argument that this was not filed as a habeas corpus

1 petition, and then 1252(g).

2     With regards to the core habeas argument, this is not a

3 case challenging his detention by the United States, primarily.

4 This is a case that was filed as a complaint for injunctive

5 relief.  It's challenging his deportation as having had -- not

6 only no basis in law, but being actually directly prohibited by

7 the governing law.

8     His detention for roughly a weekend prior to being

9 deported was really incidental to this case and isn't really

10 being challenged here.  And --

11       **THE COURT:**  I'm sorry.  I'm sorry.  Can I ask a

12 question about that?

13       **MR. SANDOVAL-MOSHENBERG:**  Of course, Your Honor.

14       **THE COURT:**  Have you gotten any information, any

15 document, any -- anything that we see in the ordinary course,

16 when a person is arrested, to explain the basis for the arrest?

17       **MR. SANDOVAL-MOSHENBERG:**  No, Your Honor.

18       **THE COURT:**  So not a warrant, not a statement of

19 probable cause, not a police report, nothing?

20       **MR. SANDOVAL-MOSHENBERG:**  Nothing.  The Cerna

21 declaration is the only factual information that we've been

22 given.

23       **THE COURT:**  The Cerna declaration?

24       **MR. SANDOVAL-MOSHENBERG:**  That's correct.

25       **THE COURT:**  Okay.  All right.  Go ahead.

1    Sorry to interrupt.

2         **MR. SANDOVAL-MOSHENBERG:**  So really we don't think

3   the habeas corpus necessarily applies here.  We have pled a

4   cause of action for habeas corpus in the alternative on the

5   theory of essentially constructive custody.  I think there's,

6   candidly, factual development that would need to be done in

7   order for that claim to proceed, but we're really not relying

8   on that here today.  We're relying on the fact that this is a

9   complaint for injunctive relief.  We've stated causes of action

10  under the withholding of removal statute, procedural due

11  process, administrative procedural act.

12        **THE COURT:**  Can I ask, with respect to that, there is

13  one area in which I think jurisdiction and perhaps the remedy

14  overlap.

15        **MR. SANDOVAL-MOSHENBERG:**  Yes, Your Honor.

16        **THE COURT:**  Because to the extent you are making the

17  argument that I can and should order the government to return

18  Mr. Abrego Garcia forthwith, immediately, because there is just

19  no basis, it was conceded to be a mistake, what do you say in

20  response to what I believe the argument will be that the United

21  States no longer has control over him, so how can they bring

22  him back?

23        **MR. SANDOVAL-MOSHENBERG:**  Your Honor, Courts

24  routinely order the United States to facilitate the return of

25  individuals.  We cited to the government's brief, to the

1    Supreme Court, and in the *Nken* case, in which the government

2    represented to the Supreme Court that they do this all the

3    time, and the Supreme Court relied on that.

4        Mindful of Your Honor's admonition not to bring new law

5    into the matter, I do have one case I would like to cite to the

6    Court.  I can hand it up, if you would like, but it's *Ramirez*

7    *v. Sessions*, it's 887 F.3d 693, which is a 2018 case from the

8    Fourth Circuit.

9        I can hand that up, if would you like.

10            **THE COURT:**  Okay.

11            **MR. SANDOVAL-MOSHENBERG:**  But the Fourth Circuit

12   granted an immigration appeal in a relatively routine case, and

13   then the last paragraph says, "We therefore grant Ramirez's

14   petition for review, vacate the order of removal, and remand

15   with directions for the government to facilitate Ramirez's

16   return to the United States for the purpose of participating in

17   further proceedings."

18       So the Fourth Circuit issues orders of this nature all the

19   time.  I've got two others, but they are basically word for

20   word the same.

21       It's pretty clear that Courts can order the government to

22   facilitate the return of an individual who is wrongly departed.

23            **THE COURT:**  And in these cases, obviously, what

24   you're talking about is folks who have been deported to a

25   country but not have actually been placed in a detention center

1  without any other independent lawful basis like

2  Mr. Abrego Garcia has.  These are just folks who are returned

3  to their country of origin, and then the Fourth Circuit is

4  saying, we command you, United States, to bring them back, to

5  facilitate bringing them back.  Is that the take-home point

6  here?

7          **MR. SANDOVAL-MOSHENBERG:**  I believe that to be

8  correct.  I think that this Court does have jurisdiction to

9  order the government to facilitate the return of

10  Mr. Abrego Garcia.  I think that it would be premature for this

11  Court to find that that cannot happen, that the government will

12  be incapable of doing that.

13      And then I think the facts in the record show that there's

14  significant coordination between the two governments with

15  regards to operations at this prison, not least of which being

16  defendant Kristi Noem being inside the walls of that prison on

17  Wednesday of last week.  So I think there's good reason to

18  believe that the government will be successful in facilitating

19  the return if so ordered.

20      We -- we understand that the government gets to take a

21  first and fair crack at it.  I'm -- the thing that flabbergasts

22  me the most about this case is they haven't done so.

23          **THE COURT:**  What do you mean by that?

24          **MR. SANDOVAL-MOSHENBERG:**  Your Honor, candidly, I

25  expected that between the time we filed this lawsuit and today,

1  they would be reaching out to me to say, all right, we agree

2  that we messed this one up, here's what we're doing to try to

3  bring him back.  And then their argument before this Court will

4  be something to the effect of, well, we're already working on

5  it.  You know, Judge, please don't get in the way, because

6  we're already working on it.

7      I expected that that was going to be the tenor of their

8  argument.

9      Instead, their argument is they've got no responsibility

10  to do anything about this situation whatsoever.  And

11  furthermore, that the Court can't order them to do anything

12  about the situation whatsoever.

13      Our position is that the Court does have jurisdiction to

14  order them to facilitate his return, and what we would like is

15  for the Court to enter that order and then enter a very --

16  relatively prompt status report ordering the government to

17  update the Court as to its efforts to comply with the order.

18      We think the government should be put on a very short

19  leash on this case with regards to how much time given --

20          **THE COURT:**  And before get to remedy --

21          **MR. SANDOVAL-MOSHENBERG:**  Of course, Your Honor.

22          **THE COURT:**  -- can we make sure we've tagged all the

23  bases with respect to the arguments --

24          **MR. SANDOVAL-MOSHENBERG:**  Yes, Judge.

25          **THE COURT:**  -- that the government makes?

1    The first is that this sounds, in habeas, it's a core

2 habeas challenge.  Frankly, I don't see it that way.  I

3 don't -- I think you have pled the case as you have chosen to

4 plead the case, and that the first four counts, especially the

5 statutory claim, the INA claim, the due process claim, all

6 challenges the fact of the removal to a country in which the

7 government was prohibited from removing Mr. Abrego Garcia to.

8 Never mind putting him in a facility where he faces the very

9 persecution of the persecutor that the IJ, also part of the

10 government, found to be a reason why he's not to be deported

11 there.

12    That's what you're challenging, correct?  You're not

13 challenging a condition of confinement or the fact of

14 confinement.  And frankly, the way I've been thinking about

15 this, and I would like your input on it, as well as the

16 government's, is you would be bringing the same challenge if

17 Mr. Abrego Garcia were removed to El Salvador and were on the

18 streets of El Salvador?

19        **MR. SANDOVAL-MOSHENBERG:**  That's exactly right, Your

20 Honor.  We would be bringing the same case if he were at large.

21    The fact that he's detained in a CECOT prison goes

22 certainly to irreparable harm, it goes to the speed at which

23 the government should be ordered to carry out its remedy.  And

24 then issues on relationships between the government of the

25 United States and the CECOT prison, you know, certainly would

1  be a defense to any claim of impossibility by the government.

2  But the remedy that we're ordering would be the same if he

3  were, you know, at large in El Salvador today.

4         **THE COURT:**  Okay.  So that handles that -- the

5  question from -- if I'm getting it right, unless you have

6  something else to add, to the this is not a core habeas action.

7  The -- the argument that the INA prohibits me, strips me of

8  jurisdiction, I believe, is the alternative argument that the

9  government has made.

10        **MR. SANDOVAL-MOSHENBERG:**  Yes, Your Honor.

11      Courts have generally held that Section 1252(g) applies to

12  actions seeking judicial review of removals under the INA.

13  This was not a removal under the INA, it was a removal entirely

14  outside of the INA.  The Courts hearing cases on the Alien

15  Enemies Act removals, which this was not --

16        **THE COURT:**  Right.

17        **MR. SANDOVAL-MOSHENBERG:**  -- it was temporally

18  proximate to the Alien Enemies Act removal, but it was not an

19  Alien Enemies Act removal.  Having agreed that 1252(g) doesn't

20  bar challenges to removals under other legal authority.

21  Likewise, the *Huisha-Huisha* court from the D.C. circuit, which

22  we cited with the Title 42 expulsions during COVID, and several

23  other cases that we've cited have all agreed that 1252(g)

24  prohibits review of removals under this chapter, and on the

25  facts of this case, it was not a removal under this chapter.

1          THE COURT:  So the argument is, even though, first, I

2    have to read that statute -- I don't read it expansively.

3    That's what the Supreme Court has said.  It has to fall into

4    one of three discrete categories, the only conceivable one here

5    would be the execution of a removal order.  But one, it has to

6    be a nondiscretionary -- it has to be a discretionary decision,

7    but I think more to your point, it has to be a lawful one.

8          If the challenge is to an execution of a deportation

9    order, which is, on its face, unlawful, then isn't that the

10   very thing that a district court can hear in the first

11   instance?

12          MR. SANDOVAL-MOSHENBERG:  I would even take a step

13   further -- step back further than that, Your Honor.

14          THE COURT:  Okay.

15          MR. SANDOVAL-MOSHENBERG:  And say that on the facts

16   of this case, there was no removal order to El Salvador at all.

17          THE COURT:  Because you haven't been -- you haven't

18   been given one, right?

19          MR. SANDOVAL-MOSHENBERG:  Correct.  He --

20          THE COURT:  Nothing?  No warrant of removal, no --

21   nothing that you would otherwise see in the ordinary course, is

22   that what you're saying?

23          MR. SANDOVAL-MOSHENBERG:  Correct.

24          If they had chosen to remove him to Panama, we would have

25   a very different case in front of us, and the 1252(g) argument

1  would -- we would still have a response to that, but I think it

2  would certainly carry a lot more water.  But in this case,

3  there was no removal order El Salvador at all.

4          THE COURT:  So what if the government gets up and

5  says well, in 2019, in order to find withholding of removal,

6  there had to be a removal order to begin with, and this was

7  just a big mistake, that's the order that was executed, but

8  there was a removal order.  What's your response to that?

9          MR. SANDOVAL-MOSHENBERG:  Your Honor, there is no

10  such thing as a removal order to no country, right?  So he is

11  certainly removable to many, many countries on earth,

12  El Salvador is simply not one of them.

13          THE COURT:  Okay.  So what you're saying, if I'm -- a

14  very practical sense is, you have certainly not seen an

15  executed removal order from the attorney general, am I getting

16  that right?  Or who --

17          MR. SANDOVAL-MOSHENBERG:  I'm sure if there were one,

18  they would have attached it to their pleadings.

19          THE COURT:  And you have not seen a companion warrant

20  for removal, meaning the very permission -- the very thing that

21  would give the agents, at the time that they apprehended

22  Mr. Abrego Garcia, permission to do so; am I right?

23          MR. SANDOVAL-MOSHENBERG:  That's right, Your Honor.

24          THE COURT:  And so you're saying, this just isn't a

25  removal at all?

1       **MR. SANDOVAL-MOSHENBERG:**  Correct.  This was not a

2  removal pursuant to a removal order in the INA because there

3  was no removal order as to El Salvador.  This was essentially

4  the equivalent of a forcible expulsion.

5       **THE COURT:**  And so it's -- yeah, the jurisdiction

6  stripping provision of the INA just simply does not apply?

7       **MR. SANDOVAL-MOSHENBERG:**  That's our contention, Your

8  Honor.

9       **THE COURT:**  Okay.  How about, lastly, redressability?

10  The government makes the argument that this case is not

11  redressable because there's nothing they can do now.  What do

12  you say to that?

13       **MR. SANDOVAL-MOSHENBERG:**  Yeah, Your Honor, I mean

14  they are coming before this Court saying we have tried nothing

15  and we're out of options.  I think it's really premature for

16  the government to ask this Court to find, as a matter of law,

17  that there's no steps that could be taken that would result in

18  Mr. Abrego Garcia being brought back to the United States.

19    We are not going to ask the Court to micromanage that

20  process.

21    We are going to ask the Court to order that they do it.

22  We are going to give them a fair chance to do it.  But then

23  we're also going to ask the Court to keep them on a very short

24  leash, both due to the fact that they didn't get things started

25  in the first place prior to today's hearing, and then also,

1  quite candidly, due to statements from the White House press

2  secretary that, quote, he's not coming back to the United

3  States, closed quote.

4      So we're not going to ask the Court, to, you know, order

5  particular government functionaries to communicate particular

6  messages to particular other government functionaries.  And we

7  do think that any foreign policy considerations can be

8  adequately addressed by the government if it deemed so

9  necessary, filing its status report under seal.

10         **THE COURT:**  And I'm sorry, I didn't catch the last

11  part of what you said was the basis to file it under seal.

12         **MR. SANDOVAL-MOSHENBERG:**  Well, if the government so

13  seeks.  You know, if the government is worried that providing

14  detailed explanations of their steps to get him back,

15  essentially, how they are complying with what I hope this Court

16  will order today, if the government is worried that revealing

17  that information would reveal, you know, sensitive foreign

18  policy information, then of course --

19         **THE COURT:**  They haven't argued that, right?

20         **MR. SANDOVAL-MOSHENBERG:**  Right, but if they do,

21  plaintiffs won't object to them filing it under seal.

22         **THE COURT:**  There's nothing in the pleadings.

23      Okay.  All right.  That's fine.  Do you know to move to

24  the *Winter* factors?

25         **MR. SANDOVAL-MOSHENBERG:**  Sure, Your Honor.  I think

1  that likelihood of success on the merits is practically

2  established given that the facts are undisputed.  They had --

3  they admit that they had no legal authorization to remove him

4  to El Salvador.  The parties quibble over whether it was

5  negligent or reckless, but I don't think that really makes any

6  difference at all to the ruling that we're asking this Court to

7  enter today.

8      Irreparable harm, I think the government's argument that

9  unless it rises to the level of torture, irreparable harm can't

10  be found, I think, doesn't have any support in the case law.  I

11  think clearly we've shown evidence that he's subject to harsh

12  treatment above and beyond the ordinary erroneous deportation,

13  and that that is sufficient under the Fourth Circuit standard

14  to meet the irreparable harm standard.

15      And then, finally, with regards to the equities in the

16  public interest, I think the Fourth Circuit is fairly clear,

17  the public interest lies in, you know, that the -- the

18  government following the law, essentially, that the -- the

19  substantial public interest in having governmental agencies

20  abide by the federal laws that govern their existence and

21  operations, that's a D.C. Circuit case; the Fourth Circuit has

22  held similarly.

23      The government raises a lot of issues about, you know,

24  their contention that this individual is an MS-13 gang member.

25  We've provided evidence explaining why he isn't.  But in any

1  event, that's a matter for the immigration court to decide on

2  further proceedings once he's brought back to the United

3  States.

4     **THE COURT:** I've been given -- again, I mean, that's

5  just chatter, in my view. I haven't been given any evidence.

6  I haven't been given any -- you know, in a court of law, when

7  someone is accused of membership in such a violent and

8  predatory organization, it comes in the form of an indictment,

9  a complaint, a criminal proceeding that is then -- you know,

10 has robust process so we can assess the facts.

11   I haven't yet, I'll hear from the government in a moment,

12 heard any of those.

13    **MR. SANDOVAL-MOSHENBERG:** Your Honor --

14    **THE COURT:** Have you?

15    **MR. SANDOVAL-MOSHENBERG:** No, Your Honor, and I think

16 it's right on the nose that Your Honor mentioned, indictment,

17 because if he were indicted for any of these crimes, you know

18 what they would be doing right now? They would be extraditing

19 him from El Salvador to the United States.

20   So I think the fact that they do this, you know, all day

21 every day, we extradite drug lords from Columbia prisons, we

22 extradite cartel leaders from Mexican prisons, we've extradited

23 MS-13 leaders from El Salvadorian prisons, this is not

24 something that's outside of the government's power.

25    **THE COURT:** And likewise, you have not received any

1  information that the opposite is true, that there is some

2  charge out in El Salvador for which there is an extradition

3  treaty, and that your client is facing some other reason why

4  he's being detained in El Salvador?  You see what I'm saying?

5          **MR. SANDOVAL-MOSHENBERG:**  Correct, Your Honor.

6          **THE COURT:**  Okay.

7          **MR. SANDOVAL-MOSHENBERG:**  The evidence indicates --

8  the evidence in the form of a tweet from the President of

9  El Salvador, and the responsive tweet from the Secretary of

10 State Rubio indicates that he is being detained at the

11 direction of the United States, not detained -- detained in a

12 CECOT prison at the direction of the United States, not due to

13 any legal process in El Salvador.

14         **THE COURT:**  Okay.  All right.

15         **MR. SANDOVAL-MOSHENBERG:**  Anything further, Your

16 Honor?

17         **THE COURT:**  No.  But given that you're the movant,

18 I'll certainly give you the last word.

19         **MR. SANDOVAL-MOSHENBERG:**  Thank you, Judge.

20         **THE COURT:**  Okay.  Thank you.

21     All right.  Mr. Reuveni, why don't we take it in the same

22 order.

23         **MR. REUVENI:**  Certainly, Your Honor.  Thank you.

24     Just one housekeeping item, I have given -- I've given

25 your court a notice of appearance today.

1      **THE COURT:**  Okay.

2      **MR. REUVENI:**  I've not actually been able to enter an

3    appearance on the docket due to technical issues that I don't

4    need to waste the Court's time with.

5      **THE COURT:**  Yes.  That's fine.

6    Mr. Ulander has told me he has received it and it's on the

7    docket.  So I do appreciate that.

8      **MR. REUVENI:**  Thank you.  My apologies for that.

9    So the facts are conceded.  This person --

10      **THE COURT:**  I'm sorry?

11      **MR. REUVENI:**  The facts -- we concede the facts.

12    This person should -- the plaintiff, Abrego Garcia, should not

13    have been removed.  That is not in dispute.

14      **THE COURT:**  Okay.  Let's -- okay.  That's -- and I

15    appreciate that.  That's an important concession.

16    Mr. Abrego Garcia should not have been removed, right?

17      **MR. REUVENI:**  Yes.

18      **THE COURT:**  Can you answer for me, then, on what

19    authority was he seized?  When he was -- when he was taken off

20    the street, taken out of his car, what authority did those law

21    enforcement officers have to do that?

22      **MR. REUVENI:**  So, Your Honor, my answer to a lot of

23    these questions is going to be frustrating.  I am also

24    frustrated that I have no answers for you on a lot of these

25    questions.

1          **THE COURT:**  Okay.  And don't -- I'm not shooting the

2    messenger, okay?  Because I really do appreciate your candor in

3    this respect, but I do take that answer seriously in that if

4    there isn't a document, a warrant, a statement of probable

5    cause, then there is no basis to have seized him in the first

6    place.  That's how I'm looking at it.  So that's why I wanted

7    to give you ample opportunity to be heard on that, because

8    that's a very important, in my view, that -- that -- that

9    supports everything that the plaintiff is saying, if even when

10   he was picked up, this was a quote, unquote, mistake, that

11   means from the moment he was seized, it was unconstitutional.

12        So I just -- I wanted to make sure there isn't any warrant

13   of removal, you know, an IN -- what is it?  What's the name of

14   the form?  I have it here that we're missing.

15          **MR. REUVENI:**  I think you're thinking of the I-205,

16   perhaps?  Or I-200, an arrest warrant?

17          **THE COURT:**  I can tell you -- right.  Exactly.  The

18   arrest warrant that says it is a warrant of removal which gives

19   the ICE officer the authority to seize the person pursuant

20   to -- yep, ICE Form I-205.  You're exactly right.

21          **MR. REUVENI:**  So I have a couple of responses, and

22   again, they are not going to be fully satisfactory.

23        We have the Cerna declaration from an ICE officer

24   explaining how things got to this point.

25        But before we get to that, I should sort of push back just

1  a little bit on the characterization of an absence of removal

2  order.

3      As plaintiffs' counsel noted, there is a final order of

4  removal, it is -- but the individual -- Mr. Abrego Garcia

5  cannot be removed to El Salvador due to the withholding grant

6  he received.

7          **THE COURT:** Right.

8          **MR. REUVENI:** That final order of removal is still

9  valid to remove Mr. Abrego Garcia anywhere else in the world so

10  long as the procedure is followed.

11          **THE COURT:** Okay. That's fine. And I just -- I want

12  to ask, though, the very specific question, if there is a final

13  order of removal, what -- what document got this process

14  started? There is no warrant for his arrest by an order of

15  removal. There is no statement of probable cause. There's no

16  charge. There's no report that says that anyone saw Mr. Abrego

17  Garcia doing anything illegal or criminal. So what is the

18  actual document that gave these officers the authority to start

19  this process?

20          **MR. REUVENI:** That is not in the record, and the

21  government has not put that into the record. And that's the

22  best I can do.

23          **THE COURT:** All right. Well, that's helpful. Thank

24  you.

25          **MR. REUVENI:** And so, really, all I can point the

1  Court to is Paragraphs 11 to 15 of the Cerna declaration.

2  That's the only evidence before you explaining why Immigration

3  and Customs Enforcement picked this -- picked plaintiff up on

4  the date that he was picked up.

5      Paragraph 11 does not refer to any warrant, just refers to

6  his alleged role in MS-13.  It also refers earlier in the

7  declaration to the events that led to the Alien Enemies flights

8  that left the United States in the case now pending before

9  Judge Boasberg in the District of Columbia.  As I understand

10 this declaration, and what this declaration says, is he was

11 picked up as part of that.  And that was --

12          **THE COURT:**  Part of what?

13          **MR. REUVENI:**  Of that group of individuals who were

14 picked up under the Alien Enemies Act to be put on a plane and

15 sent to El Salvador.

16          **THE COURT:**  See, I read it differently.  I read

17 this -- and Mr. Cerna, or Officer Cerna, whatever we call him,

18 Director Cerna, he is not here, right?

19          **MR. REUVENI:**  He is not here.

20          **THE COURT:**  Okay.  So the way I read it from Page --

21 from Paragraph 6 is that there was a plane with Title 8 removal

22 order detainees, which is its whole other kettle of fish, I

23 should say.  But my understanding is that Mr. Abrego Garcia was

24 on that flight, correct?

25          **MR. REUVENI:**  That is correct.

1    What I meant, Your Honor, that flight went out the same

2 weekend.  So he was picked up in that -- whatever ICE was doing

3 that weekend to get these -- to get -- pick up a number of

4 individuals that they believed they were -- had the authority

5 to send to El Salvador, either under the Alien Enemies Act or

6 under a Title 8 removal order.

7         **THE COURT:**  Okay.  So if there's a Title 8 removal

8 order, there would be an order of removal that's being

9 executed, and we don't have one for Mr. Abrego Garcia, right?

10        **MR. REUVENI:**  We don't have that document in the

11 record.  That is the removal order from 2019 that cannot be

12 executed as to El Salvador.

13        **THE COURT:**  Got it.

14    And so when Mr. Cerna says, in that same paragraph, this

15 removal was an error, I am to infer that that means because

16 there was no valid executable removal order as to Mr. Abrego

17 Garcia, am I right?

18        **MR. REUVENI:**  I don't want to quite use those terms,

19 because you'll see in a minute when we talk about 1252(g), but

20 this order could not be used to send Mr. Abrego Garcia to

21 El Salvador, that is correct.

22        **THE COURT:**  What order?

23        **MR. REUVENI:**  This removal order he has from 2019 of

24 which he also has withholding of removal of, so --

25        **THE COURT:**  Do you have that order?

1          **MR. REUVENI:** I do --

2          **THE COURT:** Is it in the record?

3          **MR. REUVENI:** I do not have that order. It is not in

4 the record.

5    What we do have is the -- I think plaintiffs put this in,

6 so we did not, it's Exhibit 1-1.

7          **THE COURT:** Okay.

8          **MR. REUVENI:** It is the decision --

9          **THE COURT:** Right.

10         **MR. REUVENI:** -- in removal proceedings that led to

11 the withholding of removal decision. It's 13 pages. This

12 is -- if you look at the last page, you can see what the

13 decision was.

14         **THE COURT:** Yes.

15         **MR. REUVENI:** The government did not appeal that

16 decision, so it is final.

17         **THE COURT:** Okay. And what that means, as a matter,

18 if I'm getting it right, is that there may have been an order

19 of removal which the immigration judge said must be withheld.

20         **MR. REUVENI:** As to El Salvador.

21         **THE COURT:** As to El Salvador.

22         **MR. REUVENI:** Correct.

23         **THE COURT:** And so that is pursuant to the INA, it's

24 a law Congress passed, and that means that order cannot be

25 executed, right?

```
1            MR. REUVENI:  That is what that means.

2            THE COURT:  As a matter of law?

3            MR. REUVENI:  That is what that means.

4            THE COURT:  Okay.  All right.  Very good.  And

5    there's not a factual question in that respect?

6            MR. REUVENI:  There's no dispute that the order could

7    not be used to send Mr. Abrego Garcia to El Salvador.

8            THE COURT:  Okay.  All right.  Very good.

9            MR. REUVENI:  So to go to the primary argument the

10   government has, and I mean, I'll just say it up front, if

11   you're not buying our jurisdictional arguments, like, we're

12   done here, right.  So our only arguments are jurisdictional.

13   We have nothing to say on the merits.  We concede he should not

14   have been removed to El Salvador.

15           THE COURT:  Okay.

16           MR. REUVENI:  We have three arguments.  I think

17   starting with 1252(g), so I will also apologize, I have two

18   cases for you that are not in our brief, that I think go to the

19   heart of the dispute as to whether 1252(g) applies to a

20   nonexecutable order, as Your Honor has put it.

21       There's a circuit split on this.

22           THE COURT:  Well, can I -- can I just put sort of a

23   bit of a finer point on it?

24           MR. REUVENI:  Sure.

25           THE COURT:  It's not just it was not executable, this
```

1   was an illegal act.  I mean, you've conceded the merits.  If

2   you've conceded the merits, then you've conceded that the

3   plaintiff is going to win on the acts of DHS, of the named

4   defendants.  Those acts were in violation of the Immigration

5   and Nationality Act.  That means that Congress said can't do

6   it, they did it anyway.

7        So it's just not a matter of executing an unexecutable

8   order or -- you know, this is -- this is -- this is orders of

9   magnitude different in that regard.

10           MR. REUVENI:  So here's why -- if the Court will

11  indulge me for a moment --

12           THE COURT:  Sure.

13           MR. REUVENI:  -- why I think it does matter.  And

14  again, my apologies, these are not in the brief.  We can give

15  you a short supplemental pleading if you would like, but I can

16  just give you the cases.

17           THE COURT:  Why don't you give me the cases.

18           MR. REUVENI:  There's a circuit split on this.

19  There's cases that support plaintiff on this, and there's cases

20  that support the government.

21       These are all cases wherein there was a stay --

22           THE COURT:  I was just about to say.  Are these the

23  stay cases?

24           MR. REUVENI:  These are the stay cases.  If you have

25  those already, I won't -- but just to get it in the record.

1          THE COURT:  Mr. Jenkins, we have these, don't we?

2      Yeah, but this is not a stay, right?

3          MR. REUVENI:  It's the same practical effect.  You

4  cannot execute the order.  And so the stay takes away the legal

5  effect.  The argument --

6          THE COURT:  Can I ask you a question about that,

7  though?

8          MR. REUVENI:  Sure.

9          THE COURT:  When there is a stay, is that a stay that

10  either the immigration judge or the BIA or the Fourth Circuit

11  issues, or is that a stay of another source of authority?

12          MR. REUVENI:  It's one of those three that you've

13  identified.  So the one -- the one at issue in two of the

14  cases, it's an automatic stay if you appeal your order to the

15  Board of Immigration Appeals.

16          THE COURT:  Okay.

17          MR. REUVENI:  And I think this is in plaintiffs'

18  brief, citing to *Nken,* the effect of the stay is to take away

19  the legal effect of the removal order.  So it has the same

20  practical effect as a withholding of removal for purposes of

21  whether, in our view, 1252(g) applies.

22          THE COURT:  Although this is a different legal

23  posture, in that it is not a stay, it's an outright violation

24  of the Immigration and Nationality Act 1231, right, which says

25  the attorney general may not deport or remove, I can't remember

1  that exact language, back to the country for which withholding

2  of removal has been granted.

3       So can you ask -- answer for me why should I -- I mean

4  this, is a highly unusual circumstance.  I dare say

5  unprecedented.  Why am I looking to the stay cases for analogy,

6  especially if there's a circuit split?

7            MR. REUVENI:  We -- my job is to find the best

8  authority for my client, and that's what I've done.  That's

9  what the brief has, these are the cases I've got.

10           THE COURT:  Okay.

11           MR. REUVENI:  There is no case directly on point to

12  Your Honor's question.

13           THE COURT:  Okay.  All right.  I understand.

14      And so your argument is, the stay has the same practical

15  effect as what DHS did here?

16           MR. REUVENI:  Yes.  So if I can just briefly point to

17  the same sort of arguments that were raised in the *Silva* case,

18  866 F.3d 938, that's the Eighth Circuit.

19           THE COURT:  Yes, I've got it.

20           MR. REUVENI:  And *Foster,* 243 F.3d 210, that's the

21  Fifth Circuit case.  And put it all out there, there's

22  obviously a case going the other way, as I mentioned, in the

23  Ninth Circuit*, Arce,* 899 F.3d 796.

24      And so the dispute between the parties in each of those

25  cases is whether something that has no legal effect, if it's

1  unlawful from the get-go, whether the Court can review that

2  before deciding whether the 1252(g) applies, and the Ninth

3  Circuit says yes; the Eighth Circuit and the Fifth Circuit say

4  no.

5       To me, that seems similar to the situation we have here.

6       Plaintiffs cite one other case out of Sixth Circuit,

7  *Enriquez-Perdomo,* that's in the briefs, that sides with the

8  Ninth Circuit on this issue in a slightly different context

9  involving the wrongful removal of an individual by DACA.

10 That's not quite this circumstance here as well.

11      But those are the cases.  I know there's a couple of

12 district court cases, one of which plaintiff cites in his brief

13 that follows the Ninth Circuit.  There's a couple of others

14 that are not in our briefs that go the other way.  So there's a

15 circuit split and no controlling authority on this exact set of

16 facts.

17         **THE COURT:**  Okay.  And just so I'm clear, in -- in

18 *Silva*, in particular, there was an order from an immigration

19 judge to deport, and Mr. Silva was fighting that deportation,

20 right?

21         **MR. REUVENI:**  That's correct.

22         **THE COURT:**  He was appealing it.

23         **MR. REUVENI:**  He appealed it, and by operation of a

24 regulation that was applicable at the time.  It may have

25 changed, but it was the same sort of regulation now that stayed

1  the effect of the order.

2      **THE COURT:**  But here we actually have an immigration

3  judge making findings as to why the removal would be unlawful

4  because Mr. Abrego Garcia would be subject.  There was a clear

5  probability, which means, what, more likely than not, that he

6  would be subject to persecution and torture in El Salvador.  I

7  see that as distinct in that where Mr. Silva lost, essentially,

8  before the IJ and the Court, was simply pressing pause before

9  the execution of the order was lawfully obtained.  Here,

10  there's no lawful way that the United States could execute that

11  order because of what the immigration judge had found.

12      So I -- again, I'm not even yet convinced that these

13  cases, which I appreciate you saying they go both ways, would

14  really apply because of the difference, the substantive

15  difference in the decision that would -- that led to the

16  withholding of that removal order.

17      **MR. REUVENI:**  So I will push back a little bit on

18  that.  Yes, this order --

19      **THE COURT:**  Okay.

20      **MR. REUVENI:**  -- could not have been executed, as

21  we've all agreed in this court today.  But the text of

22  8 U.S.C. 1252(g) doesn't make so fine a distinction.  It says

23  simply execute an order of removal.

24      And the way I read *Silva* and the way I read *Foster*, it

25  didn't matter to those Courts whether the underlying order

1  itself, there was no legal authority to execute it.  And that's

2  what made the difference.

3      The Ninth Circuit went the other way.

4      And there's a little bit of wrinkle, of course, you

5  mentioned discretionary and versus nondiscretionary decisions

6  earlier --

7          **THE COURT:**  Correct, right.

8          **MR. REUVENI:**  -- and we get that from *Reno,* I think.

9  But I don't believe --

10          **THE COURT:**  Well, we also don't get that from in our

11  circuit.  So there's *Bowrin* in the Fourth Circuit.  My

12  wonderful colleague, Judge Grimm, followed it in a case very

13  similar in that when the detainee is challenging the execution

14  of a removal order for which there was no discretion, and

15  should not have happened, then it -- it goes to the heart of

16  the -- of the legal question, it's a pure legal question, did

17  the government violate the law.  There's a companion question

18  here.  Did the government deny Mr. Abrego Garcia due process,

19  and then did they violate the APA?  All of which are -- because

20  you've conceded the facts, are pure questions of law.

21      At least in our circuit, the way I read the cases, it

22  would be not.  My jurisdiction has not been stripped because

23  what the plaintiff is challenging is the outright illegality.

24  Not any sort of decision-making that -- in other words, this

25  would be a different situation if the plaintiff was conceding

 1  legality, but challenging the basis for the decision.  That's

 2  at least how I read the cases in this circuit in my district.

 3      Would you disagree with that?

 4          **MR. REUVENI:**  That is not an unreasonable reading.

 5      I am not familiar with the Fourth Circuit case you

 6  mentioned.  I didn't see it in plaintiffs' papers.  But I

 7  believe you.  And if there is controlling law in the Fourth

 8  Circuit that makes that discretionary/nondiscretionary

 9  distinction, then that seems to put the Fourth Circuit squarely

10  with the Ninth Circuit on this point.

11          **THE COURT:**  Well, what *Bowrin* says is that following

12  *Reno,* that the Supreme Court reasoned that 1252(g) does not

13  apply to, quote, all claims arising from deportation

14  proceedings, because 1252 stripped federal courts of

15  jurisdiction only to review challenges to the attorney

16  general's decision to exercise her discretion to initiate or

17  prosecute these three specific stages that we've talked about.

18      And so *Bowrin,* at least, suggests that -- well, I believe

19  it holds that when the -- when the -- when the issue is a

20  question of discretion, then my jurisdiction is stripped.  But

21  when the issue is a pure question of nondiscretionary law or of

22  constitutional magnitude, whereas you say the facts are not

23  disputed, then I have jurisdiction to hear the matter.  So --

24          **MR. REUVENI:**  So just to put the -- to respond to one

25  of your points, to put our argument in the record and move on,

1   since I understand you can read it that way.

2           **THE COURT:**  Sure.  Okay.

3           **MR. REUVENI:**  1252(g) does cover constitutional

4   claims, discretionary or otherwise.  It says any cause or

5   action, statutory and nonstatutory, regardless --

6           **THE COURT:**  But isn't that what *Reno* said?  You can't

7   read it so expansively, because then that rule would swallow

8   all questions of jurisdiction.  I would never have jurisdiction

9   to hear anything.  And that's what all of these circuits, you

10  know, have followed, and that's why we're having a conversation

11  about a circuit split when it came to stays, right?  I mean,

12  you would agree with that?  It's not -- it can't be read so

13  expansively.

14          **MR. REUVENI:**  *Reno* does say that.

15          **THE COURT:**  Okay.

16          **MR. REUVENI:**  I want to make clear our point, though,

17  that we don't concede that just because it raises a

18  constitutional claim, that takes it outside of 1252(g).

19          **THE COURT:**  Understood.

20          **MR. REUVENI:**  I understand Your Honor's discretionary

21  and nondiscretionary distinction, and understand that if you

22  view it that way, our argument doesn't work.

23          **THE COURT:**  Okay.  Got it.  Thank you.

24          **MR. REUVENI:**  I do have one other or two other

25  points, I know just briefly, I'll touch on.

1     You mentioned in your colloquy with plaintiffs' counsel

2 that you didn't view this as a habeas case, and that may be so,

3 that may be right, because they pleaded in the alternative, and

4 they asked one of their two forms of relief is for you to order

5 the government to cease paying the country of El Salvador to

6 detain Mr. Abrego Garcia, that, to me, sounds like an argument

7 that he -- plaintiffs believes he's in the constructive custody

8 of the United States.  And that's why we've spent some time in

9 our brief discussing habeas jurisdiction.

10     **THE COURT:**  Well, isn't that, though, really a

11 response to the argument, if I read your argument right, that,

12 hey, there's nothing we can do about it now, he's -- he's in

13 a -- he's in another country, somewhere else, we have no

14 control to practically redress the injury?

15     **MR. REUVENI:**  We made that argument in response to

16 the opening papers in the complaint, which both made the

17 argument, as I understood it, and if I misunderstood it, that's

18 my fault, that they believed -- or plaintiffs believed that

19 there's an argument to be made that Mr. Abrego Garcia is still

20 in the constructive custody of the United States, because the

21 United States, in plaintiffs' view, is paying for El Salvador

22 to detain him.

23     **THE COURT:**  Well, in what -- what basis is he held in

24 CECOT?  And I hope I'm saying that right.  But what basis is he

25 held?  Why is he there of all places?

1          **MR. REUVENI:**  This is where I'm going to respond in a
2     frustrating way:  I don't know.

3          **THE COURT:**  You don't know?

4          **MR. REUVENI:**  I don't know.  That information has not
5     been given to me.  I don't know.

6          **THE COURT:**  Okay.  Well, then, again, for everyone
7     here, that means there is no evidence that there is a basis to
8     hold him in the very place, in the very country that this
9     administration, that the -- the immigration judge was -- it was
10    2019, said should never have happened.  So -- so we got that
11    straight.

12         But let me ask you this:  So there's not some other legal
13    authority to hold him?

14         **MR. REUVENI:**  I don't know.

15         **THE COURT:**  Let --

16         **MR. REUVENI:**  Oh, I'm sorry.

17         **THE COURT:**  Can we talk about, then, just very
18    practically, why can't the United States get Mr. Abrego Garcia
19    back?

20         **MR. REUVENI:**  Your Honor, I will say, for the Court's
21    awareness, that when this case landed on my desk, the first
22    thing I did was ask my clients that very question.

23         I've not received, to date, an answer that I find
24    satisfactory.

25         **THE COURT:**  Okay.  Well, I, again, appreciate your

1   candor.

2       The way I see the record, though, is that there is an

3   agreement between your clients and El Salvador where your

4   clients are the payor of $6 million.  And the payor to house

5   individuals who, but a couple of weeks ago, were in the custody

6   of immigration, just happened to be in the United States, but

7   there's nothing to suggest that they are still not in the

8   custody of DHS and immigration, they are just being housed in

9   El Salvador.

10      And what is more, is that the named defendants in this

11  case have told the public, and I can take note of this, that

12  plaintiffs have put it in their pleadings, that the facility is

13  one of the tools in the United States' tool kit that the United

14  States will use if an individual commits crimes against the

15  American people.

16      The Republic of El Salvador has confirmed that they will

17  hold individuals for one year pending the United States'

18  disposition -- decision on disposition; that the contract, or

19  the agreement is renewable after one year.  There were terms

20  and conditions under which certain people were transported and

21  certain people were returned.

22      The United States had the ability -- we know this from

23  JGG, the United States had the ability and in fact returned

24  certain people.  They are affiants now in JGG.  All of this

25  points to a functional control, and that if the United States,

1   as a contracting party, can strike terms and conditions for the

2   placement, then certainly they have the functional control to

3   unwind that decision when -- the wrong decision when it comes

4   to Mr. Abrego Garcia.  Those are the facts -- the findings of

5   fact that I'm prepared to make in terms of the practical

6   implications of an order to -- to return him.

7        Tell me what the impediment is to that or why that's not

8   the case.

9            MR. REUVENI:  So just so I -- just to give you the

10  correct line of argument here, I heard you say earlier to

11  plaintiffs' counsel you didn't view this as a habeas case, but

12  now what we're talking about is constructive control for

13  purposes of finding this person to be in the custody of the

14  United States constructively, which to me sounds like habeas.

15           THE COURT:  No, because we're mixing apples and

16  oranges.  You made an argument that this is a challenge to

17  confinement, and, therefore, the immediate custodian rule

18  applies, full stop.

19       I'm saying the immediate custodian rule does not apply to

20  the challenges at hand, but a habeas claim can proceed,

21  especially in this case.  The Supreme Court has said it, that

22  this is for time and memorial, writs of habeas have to be

23  flexible, and they have to handle those situations in which a

24  person, the body, has been moved.  And moved in ways in which

25  the plaintiff can't -- can't catch up with the body.

1    And when you make claims of now we can't get him back when

2   that's the -- the facts are belied by that, I do think that

3   there is room for both to live in the same place.

4    The plaintiff can say we're not challenging the fact of

5   confinement, however, the remedy is still that you have control

6   enough to bring him back.  I think those things can -- can live

7   in the same space.

8    Or let me ask a more simple question, what if I say,

9   you're right about the habeas, now we're just going under the

10  *Winter* factors, there's likelihood of success on the merits of

11  the other claims, why isn't the remedy still a very practical

12  fact-bound question of bring him back?  You can bring him back?

13  That's what the facts show.  Why isn't it as simple as that?

14           **MR. REUVENI:**  So I have a couple of responses.

15           **THE COURT:**  Okay.

16           **MR. REUVENI:**  That was a lot.

17    I just want to make sure we get our argument in on this

18  custody point.

19    I hear what you're saying.  I understand what you -- where

20  you're going with the factual discussion, but I don't think the

21  facts, as you're describing the matter, given the law, and we

22  cite these cases in our brief, the *Munaf* decision 553 U.S. 674,

23  which I'll talk about in a moment, the *Kiyemba* decision from

24  the D.C. Circuit, 561 F.3d 515, these are both cases that

25  involved, not similar circumstances, but circumstances where

1  individuals were detained outside the territory of the United

2  States.  In the *Munaf* case, it was even a military base in

3  Baghdad, Iraq; and in the *Kiyemba* case, it's Guantanamo.

4          THE COURT:  Right.

5          MR. REUVENI:  The *Munaf* decision defined habeas

6  jurisdiction, but only because they were American citizens held

7  overseas by American soldiers subject to a United States chain

8  of command.  That's not what we have here.  We have an

9  individual in the custody of El Salvador, a foreign sovereign

10 nation.

11         THE COURT:  Is that the only exclusive way I can do

12 it?  Because didn't *Munaf* also say 2241(c)(1), that section of

13 the habeas statute applies to persons, quote, held in custody

14 or under -- or by color of the authority of the United States,

15 an individual is held in custody by the United States when the

16 United States official charged with his detention has the power

17 to produce him.  That's the law.

18         MR. REUVENI:  Yeah, that --

19         THE COURT:  So I don't have to find that's only

20 satisfied in one particular way.  If I do find from the facts,

21 that are given to me, you certainly have the power to produce

22 him.  You had the power to produce him there.  The facts lead

23 to the logical inference that they are still -- they are still

24 wards of the United States.  You haven't relinquished them.

25 There's no facts that you've relinquished those detainees.

1          **MR. REUVENI:**  I don't think it's in dispute that he

2    is in the custody of a foreign country.  I don't think anyone

3    disputes that.

4          **THE COURT:**  Right.

5          **MR. REUVENI:**  I think the dispute is whether the

6    United States can pick up a phone and call someone in

7    El Salvador and say, give us our guy back.

8          **THE COURT:**  But that's *Munaf,* right?  That's *Munaf.*

9    There were two potential custodians in *Munaf,* the United States

10   and Iraq.  Right?

11         **MR. REUVENI:**  The distinction, however, is that it

12   was a U.S. military base controlled by the United States, not a

13   foreign sovereign entity not in any way controlled by the

14   United States.  And I will, then, point the Court to *Kiyemba,*

15   if I may.

16         **THE COURT:**  Let's not get away from this quite yet.

17         **MR. REUVENI:**  Sure.

18         **THE COURT:**  Because this is a Supreme Court case, and

19   I do want to make sure I understand it.

20      There is no dispute that there is a contract, right, by

21   which the United States paid money for a particular service.

22         **MR. REUVENI:**  That is -- that is in dispute.

23         **THE COURT:**  That is in dispute?

24         **MR. REUVENI:**  There's nothing in the record that

25   shows a contract.

1        **THE COURT:**  Well, no that's because you didn't want

2  to produce it or didn't produce it, but there's certainly in

3  the record, we have an agreement with El Salvador.  I believe

4  that's what Secretary of State Rubio said, as well as Secretary

5  Noem, right?

6        **MR. REUVENI:**  I can't speak to where they got their

7  information from.  I --

8        **THE COURT:**  But they are the named defendants.

9        **MR. REUVENI:**  I understand.  I understand, Your

10  Honor, but neither of them said there was a contract.

11        **THE COURT:**  Okay.  So they may not have used the word

12  "contract," but agreement sounds a lot like contract, where we

13  paid $6 million, which is a really -- you know, to house, I

14  believe that's what was said, and that we have President Bukele

15  saying this is -- someone said it's pennies on the dollar, and

16  that President Bukele said this is a good deal for us.

17      So I think I can draw the logical inference that there is

18  an agreement in which the United States is the payor to house

19  these individuals.

20      If you would -- if you wanted to present contrary evidence

21  or evidence which shines a different light on this, you

22  certainly had that opportunity.  So I don't have it.

23        **MR. REUVENI:**  That is -- that is correct.  And I will

24  say again, the government made a choice here to produce no

25  evidence.  So --

1    **THE COURT:**  Okay.  So -- so I see, you know, with

2    *Munaf,* you read it strictly as it has to be the custody of the

3    United States military.  I don't know if I agree with that

4    reading.  I think that the power to produce is the critical

5    legal issue.  But in any event, you said you wanted me to look

6    at another case.

7         **MR. REUVENI:**  Yes, two other cases, actually, also

8    *Boumediene,* another Supreme Court case, which extended habeas

9    jurisdiction to Guantanamo, notwithstanding Guantanamo not

10   technically a part of the United States.  It extended there

11   because, and I'll quote there, it was under the, quote,

12   complete and total control of our government, end quote, so

13   another thing that is different between the situation here and

14   the situation in a prior Supreme Court decision extending

15   habeas outside the territory of the United States.

16        I go back to *Munaf* for a moment as well, that Court did

17   find habeas jurisdiction over U.S. citizens and U.S. custody

18   abroad, but it did not grant habeas relief, because the Court

19   decided that article three courts have no authority to prevent

20   the United States from transferring even U.S. citizens to a

21   foreign government.  So it didn't grant habeas relief.  It had

22   jurisdiction, but said there was no remedy.

23        **THE COURT:**  Right.  But in that case there was

24   actually some basis to believe that those individuals should be

25   in foreign jurisdiction.  That's why I asked the question of,

1  do you know why he's in the detention facility in El Salvador?

2  Is there any evidence he's there because the El Salvadorans

3  want him?  And the answer is no.  Which leads to the logical

4  inference that he's there because the United States wants him

5  there, although there's no legal basis for that either.  So

6  different -- different, I believe, than *Munaf,* although I'll

7  take a close look at it.

8          **MR. REUVENI:**  I appreciate that, Your Honor.

9      One other case I would like to point you to is *Kiyemba*.

10 It's a D.C. Circuit case, so not a Fourth Circuit case, but

11 many of the big habeas decisions come out of the D.C. Circuit

12 given that Guantanamo jurisdiction goes there.

13         **THE COURT:**  I'm sorry.  Can you slow down just a

14 little bit and let me get the citation from you?

15         **MR. REUVENI:**  Yes.  It's 561 F.3d at 515.

16         **THE COURT:**  All right.  And you did cite this in your

17 brief?

18         **MR. REUVENI:**  We did, Your Honor.

19         **THE COURT:**  Give me the -- it's *Kiyemba,* is that

20 right?

21         **MR. REUVENI:**  *Kiyemba,* K-I-Y-E-M-B-A.

22         **THE COURT:**  Okay.

23         **MR. REUVENI:**  And that was a decision explaining that

24 once an individual in U.S. custody or in U.S. territory, I

25 should say, was transferred to another sovereign, quote, the --

1    after the transfer, quote, would be effected by the foreign

2    government pursuant to its own laws and not on behalf of the

3    United States, end quote.

4         The dissent in that decision was inclined to adopt a view

5    that it sounds like you might be inclined to adopt, Your Honor,

6    but the majority in that case rejected that as a basis for

7    finding habeas jurisdiction.

8         Another --

9              THE COURT:  I'm sorry, what is the basis?  You --

10   you're moving real fast for me.  Okay?  And I want to slow it

11   down so I understand it.

12             MR. REUVENI:  The individual began in the United

13   States custody and then ended up in the custody of a foreign

14   government.

15             THE COURT:  Okay.  And?

16             MR. REUVENI:  That case goes on to respond, I think,

17   to some of the questions you and I are talking about today.  At

18   Page 515, so after the release from U.S. custody --

19             THE COURT:  Okay.  Hold on.  *Kiyemba* was about enemy

20   combatants and the entire statutory scheme regarding enemy

21   combatants, am I right?

22             MR. REUVENI:  Not exactly.  It was based on habeas

23   jurisdiction because it found the jurisdiction stripping

24   provision that Congress had put into effect was

25   unconstitutional as to --

```
 1            THE COURT:  Right.  But it says while this appeal was
 2   pending, that Congress passed the Military Commissions Act of
 3   which provided no Court shall have jurisdiction to hear or
 4   consider an application for writ of habeas corpus filed by or
 5   on behalf of an alien detained by the United States who has
 6   been determined by the United States to have been properly
 7   detained as an enemy combatant or is awaiting such
 8   determination.
 9       Am I right about that?
10            MR. REUVENI:  I don't think so, Your Honor.  That's
11   the provision that *Boumediene* declared unconstitutional.
12            THE COURT:  Okay.  I'm reading from *Kiyemba.*
13            MR. REUVENI:  *Kiyemba* predates *Boumediene.*
14            THE COURT:  I'm sorry?
15            MR. REUVENI:  This particular *Kiyemba* decision
16   predates *Boumediene.*
17            THE COURT:  This predates *Boumediene*?
18            MR. REUVENI:  That's my understanding.  There's a
19   follow on *the Kiyemba* case that deals with *Boumediene* on
20   remand, but that's not the case we're relying on here.
21            THE COURT:  Okay.  Then this was your -- from your
22   brief, *Kiyemba v. Obama* that -- I'm pulling up the case
23   according to --
24            MR. REUVENI:  Yes, this is from our brief.
25            THE COURT:  Okay.
```

1          **MR. REUVENI:**  And what that case goes on to discuss,

2    after an individual is transferred from the sovereign territory

3    of the United States to the sovereign territory of another

4    country, and recites this longstanding principle from a Supreme

5    Court case from 1812, the jurisdiction of a nation within its

6    own territory is necessarily exclusive and absolute, and then

7    it went on to explain why the Court can't order habeas relief

8    in that context.

9          **THE COURT:**  Can you give me the -- first of all, give

10   me the cite so I know I'm looking at the right case.

11         **MR. REUVENI:**  Absolutely.  561 F.3d at 515.

12         **THE COURT:**  And where are you reading from?

13         **MR. REUVENI:**  It's a document in which I have the

14   quote, but it's Page 515 in the F.3d reports.

15         **THE COURT:**  515?

16       And what was the grounds on which these individuals were

17   held?

18         **MR. REUVENI:**  They were enemy combatants.

19         **THE COURT:**  Enemy combatants.

20       So a moment ago when I asked you about enemy combatants,

21   you told me I had the wrong -- wrong part of the case, right?

22         **MR. REUVENI:**  No.  I was saying the Court

23   nevertheless reviewed their claims in habeas under Section

24   2241, 28 U.S.C. 2241.

25         **THE COURT:**  Okay.  But the point I'm trying to make,

1  just real basic, is Mr. Abrego Garcia is not an enemy

2  combatant.  He has not been designated as such, and those facts

3  matter in these analyses, don't they?

4       **MR. REUVENI:**  No, I don't think so.  It's different,

5  yes.  He's not an enemy combatant, no one contends that today.

6       The principle that we're saying those cases provide and

7  that the other cases all provide, is that once an individual

8  has been transferred to the custody of another sovereign, the

9  habeas remedy does not lie.

10      **THE COURT:**  Okay.  But you will agree with me, just

11  so when I'm looking at this case, that there is just no factual

12  basis right now that anyone can hold Mr. Abrego Garcia, the

13  United States or El Salvador, there's just nothing.  At least

14  in this case, there was some showing that the individuals were

15  held pursuant to a Congressional act that allows certain acts

16  to be taken against alleged enemy combatants?  You know,

17  there's some framework.  Where here, we've got -- we've got

18  nothing.  I just don't have any -- any facts on what authority

19  Mr. Abrego Garcia is being held anywhere.

20      **MR. REUVENI:**  I also do not know, and therefore,

21  cannot answer your question as to what authority

22  Mr. Abrego Garcia is being held by in El Salvador.

23      **THE COURT:**  Okay.  All right.  I'll take a close look

24  at this case.

25      **MR. REUVENI:**  The last point, Your Honor, of the

1  threshold issues, then I'm happy to sit down, is on

2  redressability. And I think you discussed this a bit with

3  plaintiffs' counsel. Our position from our brief, citing a

4  case out of the D.C. Circuit, *Lin*, which also has other cases

5  it cites there for the same proposition, is where relief

6  depends on the actions of a foreign government not before the

7  Court. The case lacks redressability. So we don't -- we

8  don't -- I know the question you've asked is why can't I order

9  you just to -- your clients, my clients, to ask the question,

10  and we think those cases stand for the proposition you can't

11  order even that.

12         **THE COURT:** But, again, I think I'm taking a

13  different view of this, as the case has evolved, and we've all

14  had an opportunity to look at the evidence, is that this isn't

15  an ask. This is in the absence of you showing otherwise, you

16  have an agreement with this facility where you're paying the

17  money to perform a certain service. And so it stands to reason

18  that you can go to the payee and say, we need one of our

19  detainees back, especially when the payee says we're only

20  holding them for a period of time until the United States

21  figures out what they want to do.

22         **MR. REUVENI:** I understand.

23         **THE COURT:** So all of which suggests that the terms

24  of the agreement -- you know, I have the authority to review

25  and interpret agreements. That's what treaties are. That's

1  what contracts -- that's what they are.  So I'm happy to take a

2  look at it, if you wish to produce it.

3       But otherwise, based on the facts, I'm going to have to

4  make certain inferences.  I think those are logical ones.

5            **MR. REUVENI:**  I understand, Your Honor.  My clients

6  also understand that the absence of evidence speaks for itself.

7            **THE COURT:**  Got it.  Okay.

8       So that handles redressability.  I think it also handles

9  the practical implications of any potential remedy, which I

10 would, again, and I fully acknowledge, injunctive relief is

11 extraordinary.  I'm looking at the most -- the narrowest relief

12 if I do enjoin, to issue the injunction, that it be narrow.

13      What have we not addressed, Mr. Reuveni, that you believe

14 we should?

15           **MR. REUVENI:**  I don't have much more to say on the

16 equities, we haven't addressed that.  But our brief says what

17 it has to say, and I don't have much more to add to it.

18           **THE COURT:**  On the merits.

19           **MR. REUVENI:**  That's right.  Nothing on the merits,

20 nothing on the equities.

21           **THE COURT:**  All right.  I appreciate that.  Very

22 good.

23           **MR. REUVENI:**  I would suggest one thing.

24           **THE COURT:**  Yeah, sure.

25           **MR. REUVENI:**  Although this is sort of is the boy who

1  cried wolf a little bit here, that's the wrong metaphor, but I

2  would ask the Court to give us, the defendants, one more chance

3  to do this without Court superintendence here.

4      **THE COURT:**  Without what?  Without what?

5      **MR. REUVENI:**  Give us 24 hours to --

6      **THE COURT:**  You want to try to work it out to get

7  Mr. Abrego Garcia here, you got it.

8      **MR. REUVENI:**  That's my recommendation to my clients,

9  but, of course, that's why that hasn't happened.

10      **THE COURT:**  Okay.  And, Mr. Reuveni, I very much

11  appreciate your candor to the Court.  Good clients listen to

12  their lawyers.

13      I'll -- I'll turn to the plaintiffs and see if they are

14  amenable.

15      **MR. REUVENI:**  Thank you, Your Honor.

16      **THE COURT:**  The practical reality is, I'm going to

17  try to get out an order as quickly as possible and then write,

18  if I need to, to explain the order, but Mr. Reuveni has asked

19  for 24 hours.

20      **MR. SANDOVAL-MOSHENBERG:**  By all means, Your Honor,

21  if the defendants can produce Mr. Abrego Garcia in this court

22  on Monday, we're -- we're more than happy to accept that.

23      **THE COURT:**  Okay.

24      **MR. SANDOVAL-MOSHENBERG:**  I have a -- not much to say

25  at this point.  Just essentially, very small point to make with

1  regards to this Court's remedial order to the extent that I

2  sincerely hope Mr. Reuveni is able to persuade his clients, but

3  in case he's not, given the defendants' course of dealing in

4  this matter, and the matter in which they have chosen to

5  litigate this case, at least today it doesn't appear that they

6  are taking it seriously.  And so for that reason, I think that

7  to the extent that the Court orders any sort of status reports

8  or any sort of essentially the defendants to inform the Court

9  as to what the defendants are doing in order to carry out the

10 Court's order, I would request that the Court order that the

11 declarations be provided by individuals with personal

12 knowledge.

13      What we've seen is -- for example, if you look at the

14 Cerna declaration, and this is very typical of these ICE

15 declarations generally, is that it's a hearsay declaration, and

16 it doesn't specify what he knows versus what his -- I'm looking

17 at Paragraph 4 here specifically, it doesn't specify what he

18 knows versus what is his reasonable inquiry, versus what is the

19 information obtained from various records, systems, databases,

20 other DHS employees, et cetera.

21            **COURT REPORTER:**  I'm sorry.  I'm sorry.

22            **THE COURT:**  Slow down.

23            **MR. SANDOVAL-MOSHENBERG:**  Apologies.

24      Essentially, Your Honor, to the extent that Your Honor is

25 going to order that anyone within the government provide this

1   Court with ongoing information about the government's remedial

2   steps, we would request that the Court specify that the person

3   who provides that declaration is a person with personal

4   knowledge and that they state the basis of their personal

5   knowledge, not these sort of generic 30(b)(6) declarations.

6       Thank you, Your Honor.

7           **THE COURT:**  Okay.  All right.  Well, if you would all

8   indulge me for a few minutes, I want to take a brief recess.

9   I'll be back in ten.

10          **THE DEFENDANT:**  All rise.  This Honorable Court now

11  stands in recess.

12      (Recess taken from 2:05 p.m. to 2:43 p.m.)

13          **DEPUTY CLERK:**  All rise.  This Honorable Court now

14  resumes in session.

15          **THE COURT:**  All right, everyone.  You can have a

16  seat.

17      All right.  I want to thank all counsel here for your

18  attention to this matter, for your professionalism, for your

19  candor.  It's very much appreciated.

20      I also want to thank everyone who has come out today,

21  because this case is certainly important to Mr. Abrego Garcia

22  and his family.  It's also very important to you all.

23      And in recognition of that, I feel like I can't wait on

24  giving my order.  I will write a formal opinion to support the

25  order, but my plan right now is to read the order itself based

1  on the record, all of the evidence, and the argument as I see

2  it into the record.  I will sign it.  And it will be on the

3  docket immediately.

4      So I am going to grant the motion for preliminary

5  injunction.  I've reviewed -- and I'll read this word for word

6  so that there is no dispute that the oral order is the written

7  order.

8      The Court has reviewed plaintiffs' motion for injunctive

9  relief pursuant to Rule 65 of the Federal Rules of Civil

10 Procedure, along with supporting memoranda, reply briefs, and

11 the record in this case.

12     The defendants named in this suit are the United States

13 Secretary of Homeland Security; the Attorney General of the

14 United States; the United States Secretary of State; the acting

15 director of U.S. Immigration and Customs Enforcement, ICE; the

16 Acting Executive Associate Director of ICE Enforcement and

17 removal operations; and the director of ICE's Baltimore field

18 office, collectively, the defendants.

19     Kilmar Armando Abrego Garcia -- Abrego Garcia, a native of

20 El Salvador, was granted withholding of removal in 2019 which

21 prohibited his removal to El Salvador.  The record reflects

22 that Abrego Garcia was apprehended in Maryland without legal

23 basis on March 12, 2025, and without further process or legal

24 justification was removed to El Salvador by March 15th, 2025.

25     Abrego Garcia is detained in El Salvador's terrorism

1  confinement center, Centro de Confinamiento del Terrorismo, or

2  CECOT.  Plaintiffs contend that his removal violated 8 U.S.C.

3  Section 1231(b)(3)(A), and it's implementing regulations, as

4  well as the Fifth Amendment to the United States Constitution,

5  the Administrative Procedures Act, 5 U.S.C. 706(2)(A), and

6  other applicable legal protections.  Based on the record before

7  the Court, I find that this Court retains subject matter

8  jurisdiction.

9      I further find that, first, plaintiffs are likely to

10  succeed on the merits because Abrego Garcia was removed to El

11  Salvador in violation of the Immigration and Nationality Act,

12  specifically U.S.C. Section 1231(b)(3)(A), and without any

13  legal process; his continued presence in El Salvador for

14  obvious reasons constitutes irreparable harm; the balance of

15  equities and the public interest weigh in favor of returning

16  him to the United States; and last, fourth, the issuance of a

17  preliminary injunction without further delay is necessary to

18  maintain the status quo, I should say restore him to the status

19  quo, and to avoid ongoing irreparable harm resulting from

20  Abrego Garcia's unlawful removal.

21      For the reasons stated above, the Court hereby directs

22  defendants to return Abrego Garcia to the United States no

23  later than 11:59 p.m. on April 7th, 2025.

24      A memorandum opinion further setting forth the basis for

25  this ruling will be issued in due course.  Accordingly, it is

1   this 4th day of April, 2025, by the United States District

2   Court for the District of Maryland, hereby ordered that, one,

3   plaintiffs' motion ECF Number 6 construed as one for

4   preliminary injunction relief is granted; two, defendants are

5   here by ordered to facilitate and effectuate the return of

6   plaintiff Kilmar Armando Abrego Garcia to the United States by

7   no later than 11:59 p.m. on Monday, April 7, 2025; three, this

8   preliminary relief is issued to restore the status quo and to

9   preserve Abrego Garcia's access to due process in accordance

10  with the Constitution and governing immigration statutes;

11  fourth, the clerk is directed to transmit copies of this order

12  to the parties.

13      I will sign it, and I will get it filed.

14      Is there anything else that we need to discuss today,

15  Counsel?

16          **MR. SANDOVAL-MOSHENBERG:**  Nothing further for the

17  plaintiff, Your Honor.

18          **THE COURT:**  Mr. Reuveni?

19          **MR. REUVENI:**  Nothing further.

20      Just one housekeeping matter.  You said it twice, I just

21  want to make sure I have it correct when I leave the courtroom,

22  11:59 p.m., April 7th?

23          **THE COURT:**  That's right, Monday, April 7th.  I did

24  do the calendar right, Monday, April 7th, 11:59 p.m.

25          **MR. REUVENI:**  Thank you.

1          **THE COURT:**  All right.  Thank you all.

2          **DEPUTY CLERK:**  All rise.  This Honorable Court now

3   stands adjourned.

4       (Proceedings were concluded at 2:48 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4        I, Paula J. Leeper, Federal Official Court Reporter, in

 5   and for the United States District Court for the District of

 6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

 7   the foregoing is a true and correct transcript of the

 8   stenographically-reported proceedings held in the

 9   above-entitled matter and the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12

                           Dated this 4th day of April 2025.
13

14

15                        /S/ Paula J. Leeper
                          _____
16
                          Paula J. Leeper, RPR, CRR
17                        Federal Official Reporter

18

19

20

21

22

23

24

25
```

COURT REPORTER: [1] 51/21
DEPUTY CLERK: [4] 2/3 2/9 52/13 56/2
MR. REUVENI: [111]
MR. SANDOVAL-MOSHENBERG: [43] 2/14 3/16 3/21 4/21
 4/23 5/13 5/17 5/20 5/24 6/2 6/15 6/23 7/11 8/7
 8/24 9/21 9/24 10/19 11/10 11/17 12/12 12/15 12/19
 12/23 13/9 13/17 13/23 14/1 14/11 15/12 15/20
 15/25 17/13 17/15 18/5 18/7 18/15 18/19 19/20
 50/24 51/23 55/16
THE COURT: [156]
THE DEFENDANT: [16] 52/10

**$**
$6 [2] 36/4 41/13
$6 million [2] 36/4 41/13

**/**
/S [1] 57/15

**1**
1-1 [1] 24/6
10 [1] 3/10
11 [1] 3/10 22/1 22/5
11:59 p.m [4] 54/23 55/7 55/22 55/24
12 [1] 53/23
1231 [3] 27/24 54/3 54/12
1252 [15] 5/1 11/11 11/19 11/23 12/22 12/25 23/19 25/17
 25/19 27/21 29/2 30/22 32/12 32/14 33/3 33/18
13 [4] 16/24 17/23 22/6 24/11
1300 [1] 1/17
15 [1] 22/1
15th [1] 53/24
1812 [1] 46/5
1:00 [1] 1/11

**2**
200 [1] 20/16
20005 [1] 1/18
2018 [1] 7/7
2019 [5] 13/5 23/11 23/23 35/10 53/20
2022 [2] 1/19 1/22
2025 [7] 1/11 53/23 53/24 54/23 55/1 55/7 57/12
205 [2] 20/15 20/20
20530 [1] 1/22
210 [1] 28/20
22030 [1] 1/15
2241 [3] 39/12 46/24 46/24
2399 [1] 1/15
24 [2] 50/5 50/19
243 [1] 28/20
28 [2] 46/24 57/6
2:05 [1] 52/12
2:43 [1] 52/12
2:48 [1] 56/4

**3**
30 [1] 52/5
300 [1] 1/14
352-2399 [1] 1/15

**4**
4103 [1] 1/14
42 [1] 11/22
450 [1] 1/21
4th [2] 55/1 57/12

**5**
515 [6] 38/24 43/15 44/18 46/11 46/14 46/15
538-8000 [1] 1/19
553 [1] 38/22
561 [3] 38/24 43/15 46/11

**6**
65 [1] 53/9
674 [1] 38/22
693 [1] 7/7

**7**
703 [1] 1/15
706 [1] 54/5
753 [1] 57/6
796 [1] 28/23
7th [4] 54/23 55/22 55/23 55/24

**8**
8 U.S.C. 1252 [1] 30/22
8000 [1] 1/19
866 [1] 28/18
887 [1] 7/7
8962 [1] 1/22
899 [1] 28/23
8:24-cv-00951-PX [1] 1/6

**9**
900 [1] 1/18
938 [1] 28/18
951 [1] 2/10

**A**
abide [1] 16/20
ability [2] 36/22 36/23
able [2] 19/22 36/23
above [3] 19/12 52/24 57/9
above-entitled [1] 57/9
ABREGO [41] 1/4 2/10 6/18 8/2 8/10 10/7 10/17
 13/22 14/18 19/12 19/16 21/4 21/9 21/16 22/23 23/9
 23/16 23/20 25/7 30/4 31/18 34/6 34/19 35/18 37/4

47/1 47/12 47/19 47/22 50/7 50/21 52/21 53/19
 53/19 53/22 53/25 54/10 54/20 54/22 55/6 55/9
abroad [1] 42/18
absence [3] 21/11 48/15 49/6
absolute [1] 46/6
Absolutely [1] 46/11
accept [2] 55/9
access [1] 55/9
accordance [1] 55/9
according [1] 45/23
Accordingly [1] 54/25
accused [1] 17/7
acknowledge [1] 49/10
act [13] 6/11 11/15 11/18 11/19 22/14 23/5 26/1
 26/5 27/24 45/2 47/15 54/5 54/11
acting [2] 53/14 53/16
action [5] 2/10 6/4 6/9 11/6 33/5
actions [2] 11/12 48/6
acts [3] 26/3 26/4 47/15
actual [1] 21/18
actually [6] 5/6 7/25 19/2 30/2 42/7 42/24
add [2] 11/6 49/17
additional [2] 3/13 3/19
addressed [3] 15/8 49/13 49/16
addressing [1] 4/19
adequately [1] 15/8
adjourned [1] 56/3
administration [1] 35/9
administrative [2] 6/11 54/5
admit [1] 16/3
admonition [1] 7/4
adopt [2] 44/4 44/5
affiants [1] 36/24
after [4] 36/19 44/1 44/18 46/2
afternoon [2] 2/6 2/20
again [9] 17/4 20/22 26/14 30/12 35/6 35/25 41/24
 43/12 49/10
against [2] 36/14 47/16
agencies [1] 16/19
agents [1] 13/21
ago [2] 36/5 46/20
agree [4] 9/1 33/12 42/3 47/10
agreed [3] 11/19 11/23 30/21
agreement [7] 36/3 36/19 41/3 41/12 41/18 48/16
 48/24
agreements [1] 48/25
ahead [1] 5/25
AIDED [1] 1/25
al [3] 1/4 1/7 2/11
al. [1] 2/11
al. v. Kristi [1] 2/11
alien [7] 11/14 11/18 11/19 22/7 22/14 23/5 45/5
all [58]
alleged [2] 22/6 47/16
allows [1] 47/15
along [1] 53/10
already [4] 4/8 9/4 9/6 26/25
also [17] 1/23 10/9 14/23 14/25 19/23 22/6 23/24
 25/17 31/10 39/12 42/7 47/20 48/4 49/6 49/8 52/20
 52/22
alternative [3] 6/4 11/8 34/3
although [4] 27/22 43/5 43/6 49/25
am [15] 3/2 13/15 13/22 19/23 23/15 23/17 28/5
 32/5 44/21 45/9 53/4
amenable [1] 50/14
Amendment [1] 54/4
American [3] 36/15 39/6 39/7
ample [1] 20/7
analogy [1] 28/5
analyses [1] 47/3
another [9] 27/11 34/13 42/6 42/8 42/13 43/25 44/8
 46/3 47/8
answer [7] 19/18 19/22 20/3 28/3 35/23 43/3 47/21
answers [1] 19/24
anyone [4] 21/14 40/2 47/12 51/25
anything [7] 5/15 9/10 9/11 15/18 21/17 33/9 55/14
anyway [1] 24/6
anywhere [2] 21/9 47/19
APA [1] 31/19
apologies [3] 19/8 26/14 51/23
apologize [1] 25/17
appeal [4] 7/12 24/15 27/14 45/1
appealed [1] 29/23
appealing [1] 29/22
Appeals [12] 27/15
appear [1] 51/5
appearance [2] 18/25 19/3
APPEARANCES [1] 1/12
apples [1] 37/15
applicable [2] 29/24 54/6
applicable [1] 45/4
applies [7] 6/3 11/11 25/19 27/21 29/2 37/18 39/13
apply [4] 14/6 30/14 32/17 37/19
appreciate [8] 19/7 19/15 20/2 30/13 35/25 43/8
 49/21 50/11
appreciated [1] 52/19
apprehended [2] 13/21 53/22
APRIL [8] 1/11 54/23 55/1 55/7 55/22 55/23 55/24
 57/12
April 7 [1] 55/7
April 7th [4] 54/23 55/22 55/23 55/24
Arce [1] 28/23
area [1] 6/13
argued [1] 15/19
argument [28] 4/25 5/2 6/17 6/20 9/3 9/8 9/9 11/7
 11/8 12/1 12/24 14/10 16/8 25/9 27/5 28/14 32/25
 33/22 34/6 34/11 34/11 34/15 34/19 37/10
 37/16 38/17 53/1
arguments [6] 4/2 10/3 23/11 25/12 25/16 28/17
arising [1] 32/13
ARMANDO [1] 1/4 2/10 53/19 55/6
arrest [6] 5/16 20/16 20/18 21/14
arrested [1] 5/16

article [1] 42/19
ask [18] 4/6 4/18 5/11 6/12 14/16 14/19 14/21
 14/23 15/4 21/12 27/6 28/3 35/12 35/22 38/8 48/9
 48/15 50/2
asked [5] 34/4 42/25 46/20 48/8 50/18
asking [1] 16/6
assess [1] 17/10
Associate [1] 53/16
attached [1] 13/18
attention [1] 52/18
attorney [4] 13/15 27/25 32/15 53/13
authority [18] 4/7 11/20 19/19 19/20 20/19 20/19 21/18
 23/4 27/11 28/8 29/15 31/1 35/13 39/14 47/18
authorization [1] 16/3
automatic [1] 27/14
avoid [1] 54/19
awaiting [1] 45/7
awareness [1] 35/21
away [1] 27/18 40/16

**B**
back [22] 4/3 6/22 8/4 8/5 9/3 12/13 14/18 15/2
 15/14 17/2 20/25 28/1 30/17 35/19 38/1 38/6 38/12
 38/12 40/7 42/16 48/19 52/9
Baghdad [1] 39/3
balance [1] 54/14
Baltimore [1] 53/17
bar [1] 11/20
bars [1] 4/24
base [2] 39/2 40/12
based [4] 44/22 49/3 52/25 54/6
bases [1] 9/23
basic [1] 47/1
basically [1] 7/16
basis [18] 5/6 5/16 6/19 8/1 15/11 20/5 32/1 34/23
 34/24 35/7 42/24 43/5 44/9 47/12 52/4 53/25
 54/24
because [34] 4/11 6/16 6/18 9/5 12/17 14/2 14/11
 17/17 20/2 20/7 23/15 23/19 30/4 30/11 30/14 31/19
 31/22 32/14 33/7 33/17 34/3 34/20 37/15 39/6 39/12
 40/18 41/1 42/11 42/18 43/2 43/4 44/23 52/21 54/10
before [14] 1/10 2/9 2/11 9/3 9/20 14/14 20/25
 22/2 22/8 29/2 30/8 30/8 48/6 54/6
began [1] 44/12
begin [2] 3/7 13/6
behalf [4] 1/13 1/20 44/2 45/5
being [12] 5/6 5/9 5/10 8/15 8/16 14/18 18/4 18/10
 23/8 36/8 47/19 47/22
belied [1] 38/2
believe [12] 6/20 8/7 8/18 11/8 31/9 32/7 32/18
 41/3 41/14 42/24 43/6 49/13
believed [3] 23/4 34/18 34/18
believes [1] 34/7
best [4] 4/15 4/18 21/22 28/7
between [6] 8/14 8/25 10/24 28/24 36/3 42/13
beyond [1] 16/12
BIA [1] 27/10
big [2] 13/7 43/11
binders [1] 4/1
bit [8] 2/22 21/1 25/23 30/17 31/4 43/14 48/2 50/1
Board [1] 27/15
Boasberg [1] 22/9
body [2] 37/24 37/25
both [7] 3/13 4/6 14/24 30/13 34/16 38/3 38/24
Boumediene [6] 42/8 45/11 45/13 45/16 45/17 45/19
bound [1] 38/12
Bowrin [3] 31/11 32/11 32/18
boy [1] 49/25
Bridge [1] 1/14
brief [14] 6/25 25/18 26/14 27/18 28/9 29/12 34/9
 34/23 42/17 45/22 45/24 48/3 49/16 52/8
briefly [2] 28/16 33/25
briefs [4] 4/8 29/7 29/14 53/10
bring [7] 6/21 7/4 8/4 9/3 38/6 38/12 38/12
bringing [3] 8/5 10/16 10/20
brought [2] 14/18 17/2
Bukele [2] 41/14 41/16
buying [1] 25/11

**C**
calendar [1] 55/24
call [3] 3/12 22/17 40/6
called [1] 2/2
came [1] 33/11
can't [15] 9/11 16/9 26/5 27/25 33/6 33/12 35/18
 37/25 37/25 38/1 41/6 46/7 48/8 48/10 52/23
candidly [3] 6/6 8/24 15/1
candor [6] 20/2 36/1 50/11 52/19
cannot [6] 8/11 21/5 23/11 24/24 27/4 47/21
car [1] 19/20
carry [1] 10/23 13/2 51/9
cartel [1] 17/22
case [65]
cases [27] 7/23 11/14 11/23 25/18 26/16 26/17
 26/19 26/19 26/21 26/23 26/24 27/4 27/24 28/9
 28/25 29/11 29/12 30/3 31/21 32/2 38/22 38/24
 42/7 47/6 47/7 48/4 48/10
catch [2] 15/10 37/25
categories [1] 12/4
cause [5] 5/19 6/4 20/5 21/15 33/4
causes [1] 6/9
caution [1] 4/1
cease [1] 34/5
CECOT [5] 10/21 10/25 18/12 34/24 54/2
center [2] 7/25 54/1
Centro [1] 54/1
Cerna [5] 5/20 5/23 20/23 22/1 22/17 22/17 22/18
 23/14 51/14
certain [4] 36/20 36/21 36/24 47/15 48/17 49/4
certainly [12] 10/22 10/25 13/2 13/11 13/14 18/18
 18/23 37/2 39/21 41/2 41/22 52/21
CERTIFICATE [1] 56/5

**C**

certify [1] 57/6
cetera [1] 51/20
chain [2] 1/14 39/7
challenge [4] 10/6 11/20 32/15 37/20
challenged [1] 5/10
challenges [4] 10/6 11/20 32/15 37/20
challenging [8] 5/3 5/5 10/12 10/13 31/13 31/23 32/1 38/4
chance [1] 14/22 50/2
changed [1] 29/25
chapter [2] 11/24 11/25
characterization [1] 21/1
charge [2] 18/2 21/16
charged [1] 39/16
chatter [1] 17/5
check [1] 3/11
choice [1] 41/24
chosen [3] 10/3 12/24 51/4
circuit [38] 7/8 7/11 7/18 8/3 11/21 16/13 16/16
 16/21 16/21 16/25 21/1 26/18 27/10 28/6 28/18 28/21
 28/23 29/3 29/3 29/3 29/6 29/19 29/19 29/15 31/3
 31/11 31/11 31/21 32/2 32/5 32/8 32/9 32/10 33/11
 38/24 43/10 43/10 43/11 48/4
circuits [1] 33/9
circumstance [2] 28/24 29/10
circumstances [2] 38/25 38/25
citation [2] 4/10 43/14
cite [6] 4/7 7/5 29/6 38/22 43/16 46/10
cited [3] 6/25 11/22 11/23
cites [2] 29/12 48/5
citing [2] 27/18 48/3
citizens [3] 39/6 42/17 42/20
Civil [2] 2/10 53/9
claim [7] 6/7 10/5 10/5 10/5 11/1 13/18 37/20
claims [5] 32/13 33/4 38/1 38/11 46/23
clear [5] 7/21 16/16 29/17 30/4 33/16
clearly [1] 16/11
clerk [1] 55/11
client [2] 18/3 28/8
clients [9] 35/22 36/3 36/4 48/9 48/9 49/5 50/8
 50/11 51/2
close [2] 43/7 47/23
closed [1] 15/3
colleague [1] 31/12
collectively [1] 53/18
colloquy [1] 34/1
color [1] 39/14
Columbia [2] 17/21 22/9
combatant [3] 45/7 47/2 47/5
combatants [6] 44/20 44/21 46/18 46/19 46/20 47/16
come [2] 43/11 52/20
comes [3] 2/11 17/8 37/3
coming [2] 14/14 15/2
command [2] 8/4 39/8
Commissions [1] 45/2
commits [1] 36/14
communicate [1] 15/5
companion [2] 13/19 31/17
complaint [4] 5/4 6/9 17/9 34/16
complete [1] 42/12
comply [1] 9/17
complying [1] 15/15
computer [1] 1/25 3/7
COMPUTER-AIDED [1] 1/25
concede [6] 19/11 25/13 33/17
conceded [6] 6/19 19/9 26/1 26/2 26/2 31/20
conceding [1] 31/25
conceivable [1] 12/4
concession [1] 19/15
concluded [1] 56/4
condition [1] 10/13
conditions [2] 36/20 37/1
Conference [1] 57/10
Confinamiento [1] 54/1
confinement [5] 10/13 10/14 37/17 38/5 54/1
confirmed [1] 36/16
conformance [1] 57/10
Congress [4] 24/24 26/5 44/24 45/2
Congressional [2] 47/15
consider [1] 45/4
considerations [1] 15/7
considered [1] 4/13
constitutes [1] 54/14
Constitution [2] 54/4 55/10
constitutional [3] 32/22 33/3 33/18
constructive [4] 6/5 34/7 34/20 37/12
constructively [1] 37/14
construed [1] 55/3
contend [1] 54/2
contends [1] 47/5
contention [2] 14/7 16/24
context [2] 29/8 46/8
continued [1] 54/13
contract [6] 36/18 40/20 40/25 41/10 41/12 41/12
contracting [1] 37/1
contracts [1] 49/1
contrary [1] 41/20
control [7] 6/21 34/14 36/25 37/2 37/12 38/5 42/12
controlled [2] 40/12 40/13
controlling [2] 29/15 32/7
conversation [1] 33/10
convinced [1] 30/12
COOPER [2] 1/16 2/16
coordination [1] 8/14
copies [1] 55/11
core [4] 4/24 5/2 10/1 11/6
corpus [4] 4/25 6/3 6/4 45/4
correct [17] 5/24 8/8 10/12 12/19 12/23 14/1 18/5
 22/24 22/25 23/21 24/22 29/21 31/7 37/10 41/23
 55/21 57/7
counsel [8] 2/13 16/4 21/3 34/1 37/11 48/3 52/17
 55/15

**D**

countries [1] 13/11
country [10] 7/25 8/3 10/6 13/10 28/1 34/5 34/13
 35/8 40/2 46/4
counts [1] 10/4
couple [5] 20/21 29/11 29/13 36/5 38/14
course [9] 5/13 5/15 9/21 12/21 15/18 31/4 50/9
 51/3 54/25
court [71]
Court's [4] 19/4 35/20 51/1 51/10
courtroom [1] 55/21
courts [7] 6/23 7/21 11/11 11/14 30/25 32/14 42/19
cover [1] 33/3
COVID [1] 11/22
crack [1] 8/21
cried [1] 50/1
crimes [2] 17/17 36/14
criminal [2] 17/9 21/17
critical [1] 42/4
CRR [1] 57/16
custodian [2] 37/17 37/19
custodians [1] 40/9
custody [18] 6/5 34/7 34/20 36/5 36/8 37/13 38/18
 39/9 39/13 39/15 40/2 42/2 42/17 43/24 44/13 44/13
 44/18 47/8
Customs [2] 22/3 53/15
cv [1] 1/6

**D**

D.C [7] 1/22 11/21 16/21 38/24 43/10 43/11 48/4
DACA [1] 29/9
dan [1] 28/14
databases [1] 51/19
date [2] 22/4 35/23
Dated [1] 57/12
day [4] 17/20 17/21 55/1 57/12
DC [1] 1/18
de [1] 54/1
deal [1] 41/16
dealing [1] 51/3
deals [1] 45/19
decide [1] 17/1
decided [1] 42/19
deciding [1] 29/22
decision [19] 12/6 24/8 24/11 24/13 24/16 30/15
 31/24 32/1 32/14 36/18 37/3 37/3 38/22 38/23 39/5
 42/14 43/23 44/4 45/15
decision-making [1] 31/24
decisions [2] 31/5 43/11
declaration [10] 5/21 5/23 20/23 22/1 22/7 22/10
 22/10 51/14 51/15 52/3
declarations [3] 51/11 51/15 52/5
declared [1] 49/11
deemed [1] 15/8
defendant [3] 1/8 1/20 8/16
defendants [12] 3/1 26/4 36/10 41/8 50/2 50/21
 51/8 51/9 53/12 53/18 54/22 55/4
defendants' [1] 51/3
defense [1] 11/1
defined [1] 39/3
del [1] 54/1
delay [1] 54/17
deny [1] 31/18
departed [1] 7/22
DEPARTMENT [1] 1/21 2/21 2/25
depends [1] 48/6
deport [2] 27/25 29/19
deportation [2] 5/5 12/8 16/12 29/19 32/13
deported [2] 5/9 7/24 10/10
describing [1] 38/21
designated [1] 47/2
desk [1] 35/21
detailed [1] 15/14
detain [2] 34/6 34/22
detained [9] 10/21 18/4 18/10 18/11 18/11 39/1
 45/5 45/7 53/25
detainee [1] 31/13
detainees [3] 22/22 39/25 48/19
detention [5] 5/3 5/8 7/25 39/16 43/1
determination [1] 45/8
determined [1] 6/6
development [1] 6/6
DHS [4] 26/3 28/15 36/8 51/20
difference [4] 16/6 30/14 30/15 31/2
different [11] 12/25 26/9 27/22 29/8 31/25 41/21
 42/13 43/6 43/6 47/4 48/13
differently [1] 22/16
directed [1] 55/11
directing [1] 4/14
direction [2] 18/11 18/12
directions [1] 7/15
directly [2] 5/6 28/11
director [4] 22/18 53/15 53/16 53/17
directs [1] 54/21
disagree [1] 12/4
discrete [1] 12/4
discretion [3] 31/14 32/16 32/20
discretionary [5] 12/6 31/5 32/8 33/4 33/20
discretionary/nondiscretionary [1] 32/8
discuss [2] 46/1 55/14
discussed [1] 48/2
discussing [1] 34/9
discussion [2] 38/10 38/18
dispute [10] 19/13 25/6 25/19 28/24 40/1 40/5
 40/20 40/22 40/23 53/6
disputed [1] 32/23
disputes [1] 40/3
distinct [1] 30/7
distinction [4] 30/22 32/9 33/21 40/11
district [11] 1/1 1/1 1/11 2/3 2/4 12/10 22/9
 29/12 32/2 55/1 55/2 57/5 57/5
DIVISION [1] 1/2

**do [39]** 4/14 6/19 7/2 7/5 8/23 9/10 9/11 13/22
 14/11 14/11 14/21 14/22 15/7 15/20 15/23 17/20
 19/7 19/21 20/2 20/3 21/22 23/25 24/1 24/3 24/5
 26/5 33/24 34/12 38/2 39/11 39/20 40/19 43/1 47/20
 48/21 49/12 50/3 55/24 57/6
docket [1] 1/6 19/3 19/7 53/3
document [6] 5/2 5/4 21/13 21/18 23/10 46/13
doing [6] 9/12 9/2 17/18 17/21 23/2 51/9
dollar [1] 41/15
down [4] 43/3 44/11 48/1 51/22
draw [1] 41/17
drug [1] 17/21
due [10] 6/10 10/5 14/24 15/1 18/12 19/3 21/5
 31/18 54/25 55/9
during [1] 11/22

**E**

each [2] 3/11 28/24
earlier [2] 22/6 31/6 37/10
earth [1] 13/11
ECF [2] 3/10 55/3
effect [10] 9/4 27/3 27/5 27/18 27/19 27/20 28/15
 28/25 30/1 44/24
effected [1] 44/1
effectuate [1] 55/5
efforts [1] 9/17
Eighth [2] 28/18 29/3
either [3] 23/5 27/10 43/5
El [42] 10/17 10/18 11/3 12/16 13/3 13/12 14/3
 16/4 17/19 17/23 18/2 18/14 18/9 18/13 21/5 22/15
 23/5 23/12 23/21 24/24 25/8 25/17 25/14 30/6 34/5
 34/21 36/3 36/9 36/16 39/9 40/7 41/3 43/1 43/2
 47/13 47/22 53/20 53/21 53/24 53/25 54/10 54/13
 El Salvador [7] 13/12 18/9 23/21 25/14 30/6 40/7
 54/13
El Salvadorian [1] 17/23
else [4] 11/6 21/9 34/13 55/14
EMANUEL [1] 1/17
Emmanuel [2] 2/16
employees [1] 51/20
end [2] 42/12 44/3
ended [1] 44/13
Enemies [6] 11/15 11/18 11/19 22/7 22/14 23/5
enemy [9] 44/19 44/20 45/7 46/18 46/19 46/20 47/1
 47/5 47/16
enforcement [4] 19/21 22/3 53/15 53/16
enjoin [1] 49/12
enough [1] 38/6
Enriques [1] 29/7
Enriquez-Perdomo [1] 29/7
enter [4] 9/15 9/15 16/7 19/2
entire [1] 44/20
entirely [1] 11/13
entitled [1] 37/9
entity [1] 40/13
equities [4] 16/15 49/16 49/20 54/15
equivalent [1] 14/4
EREZ [3] 1/20 2/20 2/25
erroneous [1] 16/12
error [1] 23/15
especially [4] 10/4 28/6 37/21 48/19
ESQUIRE [3] 1/13 1/16 1/20
essentially [8] 6/5 14/3 15/15 16/18 30/7 50/25
 51/8 51/24
established [1] 16/2
et [5] 1/1 1/7 2/11 2/11 51/20
even [7] 12/1 12/12 20/9 30/12 39/2 42/20 48/11
event [2] 17/1 42/5
events [1] 22/7
every [1] 17/21
everyone [4] 2/6 35/6 52/15 52/20
everything [1] 20/9
evidence [18] 3/10 3/13 3/20 4/3 16/11 16/25 17/5
 18/7 18/8 22/2 35/7 41/20 41/21 41/25 43/2 48/14
 49/6 53/1
evidentiary [1] 3/24
evidentiary-wise [1] 3/24
evolved [1] 48/13
exact [2] 28/1 29/15
exactly [4] 10/19 20/17 20/20 44/22
example [1] 51/13
exclusive [2] 39/11 46/6
executable [2] 23/16 25/25
execute [4] 27/4 30/10 30/23 31/1
executed [6] 13/7 13/15 23/9 23/12 24/20 35/1
executing [1] 26/7
execution [4] 12/5 12/8 30/9 31/13
Executive [1] 53/16
exercise [1] 32/16
Exhibit [1] 24/6
existence [1] 16/20
expansively [2] 12/2 33/7 33/13
expected [2] 8/25 9/7
explain [3] 5/16 46/7 50/18
explaining [4] 16/25 20/24 22/2 43/23
explanations [1] 12/4
expulsion [1] 14/4
expulsions [1] 11/22
extended [2] 42/8 42/10
extending [1] 42/14
extent [4] 6/16 51/1 51/7 51/24
extradite [2] 17/21 17/22
extradited [1] 17/22
extraditing [1] 17/18
extradition [1] 18/2
extraordinary [1] 49/11

**F**

F.3d [8] 7/7 28/18 28/20 28/23 38/24 43/15 46/11
 46/14
face [1] 12/9
faces [1] 10/8
facilitate [7] 6/24 7/15 7/22 8/5 8/9 9/14 55/5

**F**

facilitating [1]  8/18
facility [4]  10/8 36/12 43/1 48/16
facing [1]  18/3
fact [13]  4/2 4/3 4/4 6/8 10/6 10/13 10/21 14/24 17/20 36/23 37/5 38/4 38/12
fact-bound [1]  38/12
factors [4]  4/17 4/20 15/24 38/10
facts [3]  3/16 8/13 11/5 12/15 16/2 17/10 19/9 19/11 19/11 29/16 31/20 32/22 37/4 38/2 38/13 38/21 39/20 39/22 39/25 47/7 47/18 49/3
factual [5]  5/21 6/6 25/5 38/20 47/11
fair [2]  8/21 14/22
Fairfax [1]  1/15
fairly [1]  16/16
fall [1]  12/3
familiar [1]  32/5
family [1]  52/22
fast [1]  44/10
fault [1]  34/18
favor [1]  54/15
federal [5]  16/20 32/14 53/9 57/4 57/17
feel [1]  52/23
few [1]  52/8
field [1]  53/17
Fifth [4]  1/21 28/21 29/3 54/4
fighting [1]  29/19
figures [1]  48/21
file [1]  15/11
filed [6]  3/9 4/25 5/4 8/25 45/4 55/13
filing [2]  15/9 15/21
final [4]  21/3 21/8 21/12 24/16
finally [1]  16/15
find [10]  8/11 13/5 14/16 28/7 35/23 39/19 39/20 42/17 54/7 54/9
finding [2]  37/13 44/7
findings [2]  30/3 37/4
fine [4]  15/19 15/21 21/11 30/22
firm [2]  2/15 2/16
first [13]  4/19 4/19 4/24 8/21 10/1 10/4 12/1 12/10 14/25 20/5 35/21 46/9 54/9
fish [1]  22/22
flabbergasts [1]  8/21
flexible [1]  37/3
flight [2]  22/24 23/1
flights [1]  22/7
folks [1]  7/24 8/2
follow [1]  45/19
followed [3]  21/10 31/12 33/10
following [2]  16/18 32/11
follows [1]  29/13
forcible [1]  14/4
foregoing [1]  57/7
foreign [10]  15/7 15/17 39/9 40/2 40/13 42/21 42/25 44/1 44/13 48/6
form [4]  17/8 18/8 20/14 20/20
formal [1]  52/24
format [1]  57/9
forms [1]  34/4
forth [1]  54/24
forthwith [1]  6/18
Foster [2]  28/20 30/24
found [4]  10/10 16/10 30/11 44/23
framework [1]  47/17
frankly [2]  10/2 10/14
FRIDAY [1]  1/11
front [2]  12/25 25/10
frustrated [1]  19/24
frustrating [2]  19/23 35/2
full [1]  37/18
fully [2]  20/22 49/10
functional [2]  36/25 37/2
functionaries [2]  15/5 15/6
further [12]  3/24 7/17 12/13 12/13 17/2 18/15 52/9 54/17 54/24 55/16 55/19
furthermore [1]  9/11

**G**

gang [1]  16/24
GARCIA [39]  1/4 2/11 6/18 8/2 8/10 10/7 10/17 13/22 14/18 19/12 19/24 21/5 22/17 22/23 23/9 23/17 23/20 25/7 30/4 31/18 34/6 34/19 35/18 37/4 47/1 47/12 47/19 47/22 50/7 50/21 52/21 53/19 53/19 53/22 53/24 54/10 54/22 55/6
Garcia's [2]  54/20 55/9
gave [1]  21/18
general [3]  13/15 27/25 53/13
general's [1]  32/16
generally [2]  11/11 51/15
generic [1]  52/24
get-go [1]  29/1
getting [3]  11/5 13/15 24/18
give [16]  3/5 4/9 13/21 14/22 28/7 26/14 26/16 26/17 37/9 40/7 43/19 46/9 46/9 50/2 50/5
given [15]  5/22 9/19 12/18 16/2 17/4 17/5 17/6 18/17 18/24 18/24 35/5 38/21 39/21 43/12 51/3
gives [1]  20/18
giving [1]  52/24
go [9]  4/18 5/25 25/9 25/18 29/1 29/14 30/13 42/16 48/10
goes [6]  10/21 10/22 31/15 43/12 44/16 46/1
going [20]  3/6 4/2 4/7 9/7 14/19 14/21 14/22 14/23 15/4 19/23 20/22 53/4 53/4 53/4 53/4 54/9 39/3 50/16 51/25 53/4
good [9]  2/6 2/14 2/20 8/17 25/4 25/8 41/16 49/22 50/11
got [14]  7/19 9/9 20/24 21/13 23/13 28/9 28/19 33/23 35/10 41/6 47/17 47/17 49/7 50/7

**Gotten, govern...**

gotten [1]  5/14
govern [1]  16/20
governing [2]  5/7 55/10
government [46]  3/25 4/20 4/23 6/17 7/1 7/15 7/21 8/9 8/11 8/18 8/20 9/16 9/18 9/25 10/7 10/10 10/23 10/24 11/1 11/19 14/14 14/16 15/5 15/6 15/18 15/12 15/13 15/16 16/18 16/23 17/11 21/22 24/15 25/10 26/20 31/17 31/18 34/5 41/24 42/22 42/24 44/2 44/14 48/6 51/25
government's [5]  6/25 10/16 16/8 17/24 52/1
governmental [1]  16/19
governments [1]  8/14
grant [5]  7/13 21/5 42/18 42/21 53/4
granted [4]  7/12 28/2 53/20 55/4
Great [1]  3/5
GREENBELT [1]  1/2
Grimm [1]  31/12
grounds [1]  46/16
group [1]  22/13
Guantanamo [4]  39/3 42/9 42/9 43/12
guy [1]  40/7

**H**

habeas [29]  4/25 4/25 5/2 6/3 6/4 10/1 10/2 11/6 34/2 34/9 37/11 37/14 37/20 37/23 38/22 39/4 39/15 42/8 42/15 42/17 42/18 42/21 43/11 44/7 44/22 45/4 46/7 46/23 47/9
hand [3]  7/6 7/9 37/20
handle [1]  37/23
handles [1]  11/4 49/8 49/8
happen [1]  8/11
happened [4]  31/15 35/10 36/6 50/9
happens [1]  49/4
happy [3]  48/1 49/1 50/22
harm [6]  10/22 16/8 19/6 16/14 54/14 54/19
harsh [1]  16/11
hasn't [1]  50/9
having [4]  5/5 11/19 16/19 33/10
hear [8]  2/23 4/18 12/10 17/11 32/23 33/9 38/19 45/3
heard [3]  17/12 20/7 37/10
hearing [4]  1/10 2/12 11/14 14/25
hearsay [1]  51/15
heart [2]  25/19 31/15
held [12]  11/11 16/22 34/23 34/25 39/6 39/23 39/15 46/17 47/15 47/19 47/22 57/8
help [1]  4/14
helpful [1]  21/23
hereby [3]  54/21 55/2 57/6
hey [1]  34/12
highly [1]  28/4
him [15]  6/21 6/22 9/3 10/8 12/24 15/14 16/3 17/19 20/5 22/17 34/22 35/8 35/13 37/6 38/1 38/6 38/12 38/12 39/17 39/22 39/22 43/3 43/4 54/16 54/24 29/12
his [16]  5/3 5/5 5/8 9/14 19/20 21/14 26/24 29/12 39/16 51/2 51/16 51/18 52/22 53/21 54/2 54/13 54/16 35/8 35/13 36/17 44/19 47/12
hold [5]  35/8 35/13 36/17 44/19 47/12
holding [1]  48/20
holds [1]  32/19
home [1]  8/5
Homeland [1]  53/13
Honor [45]  2/24 2/24 3/4 3/16 3/21 3/25 4/21 4/23 5/13 5/17 6/15 6/23 8/24 9/21 10/20 11/10 12/13 13/9 13/23 14/8 14/13 15/25 17/13 17/16 18/5 18/16 18/23 19/22 23/1 25/20 35/20 41/10 43/8 43/18 44/5 45/9 50/15 50/20 51/24 51/24 52/6 55/17
Honor's [3]  7/4 28/12 33/20
HONORABLE [1]  1/10 2/5 52/10 52/13 56/2
hope [3]  15/15 34/24 51/2
hours [2]  50/5 50/19
house [4]  15/1 36/4 41/13 41/18
housed [1]  36/8
housekeeping [2]  18/24 55/20
however [2]  38/5 40/11
Huisha [2]  11/21 11/21
Huisha-Huisha [1]  11/21

**I**

I'll [13]  4/20 17/11 18/18 25/10 33/25 38/23 42/11 43/6 47/23 50/13 50/13 52/9 53/5
I'm [38]  2/22 3/6 5/11 5/11 8/21 11/5 13/13 13/17 15/10 18/4 19/10 20/1 20/6 24/18 29/17 30/12 34/24 35/1 35/16 37/5 37/19 43/13 44/9 45/12 45/14 45/22 46/10 46/25 47/1 48/1 48/12 49/1 49/3 49/11 50/16 51/16 51/21 51/21
I've [10]  7/19 10/14 17/4 18/24 19/2 28/8 28/9 28/19 35/23 53/5
I-200 [1]  20/16
I-205 [2]  20/15 20/20
ICE [7]  20/19 20/20 20/23 23/2 51/14 53/15 53/16
ICE's [1]  53/17
illegal [2]  11/21 26/1
identify [1]  2/13
IJ [2]  10/9 30/8
illegal [2]  21/17 26/1
illegality [1]  11/23
immediate [2]  37/17 37/19
immediately [2]  6/18 53/1
immigration [17]  7/12 17/1 22/2 24/19 26/4 27/10 27/15 27/24 29/18 30/2 30/11 35/9 36/6 36/8 53/15 54/11 55/10
impediment [1]  37/7
implementing [1]  54/3
implications [2]  37/6 49/9
important [4]  19/15 20/5 52/21 52/22
impossibility [1]  11/1
INA [8]  10/5 11/7 11/12 11/13 11/14 14/2 14/6 14/10
incapable [1]  8/12
incidental [1]  5/9
inclined [2]  44/4 44/5
independent [1]  8/1

**I (continued / right column)**

indicates [2]  18/7 18/10
indication [1]  4/12
indicted [1]  17/17
indictment [2]  17/8 17/16
individual [11]  7/22 16/24 21/4 29/9 36/14 39/9 39/15 43/24 44/12 46/2 47/7
individuals [11]  6/25 22/13 23/4 36/5 36/17 39/1 41/19 42/24 46/16 47/14 51/11
indulge [2]  26/11 52/8
infer [1]  23/15
inference [3]  39/23 41/17 43/4
inferences [1]  49/4
inform [1]  15/7
information [9]  5/14 5/21 15/17 15/18 18/1 35/4 41/7 51/19 52/1
initiate [1]  32/16
injunction [5]  3/9 49/12 53/5 54/17 55/4
injunctive [4]  5/4 6/9 49/10 53/8
injury [1]  34/14
input [1]  10/15
inquiry [1]  51/18
inside [1]  8/16
instance [1]  12/23
Instead [1]  9/9
intend [1]  4/17
intending [2]  3/12 3/12
interest [4]  16/16 16/17 16/19 54/15
interpret [1]  48/25
interrupt [1]  6/1
involved [1]  38/25
involving [1]  29/9
Iraq [2]  39/3 40/10
irreparable [6]  10/22 16/8 16/9 16/14 54/14 54/19
is [195]
isn't [11]  5/9 12/9 13/24 16/25 20/4 20/12 33/6 34/10 38/11 38/13 48/14
issuance [1]  54/16
issue [7]  4/6 27/13 29/8 32/19 32/21 42/5 49/12
issued [2]  54/25 55/8
issues [6]  7/18 10/24 16/23 19/3 27/11 48/1 49/6
item [1]  18/24
itself [3]  31/1 49/6 52/25

**J**

Jenkins [2]  27/1
Jennifer [2]  1/23 2/17
JGG [2]  36/23 36/24
job [1]  28/7
JONATHAN [2]  1/16 2/16
judge [12]  1/11 9/5 9/24 18/19 22/9 24/19 27/10 27/25 30/3 30/11 31/12 35/9
judicial [2]  11/12 57/10
jurisdiction [25]  4/19 6/13 8/9 8/13 11/8 14/5 31/22 32/15 32/20 32/23 33/8 33/8 34/9 39/6 42/9 42/17 42/22 42/25 43/12 44/7 44/23 44/23 45/3 46/5 54/8
jurisdictional [4]  4/16 4/24 25/11 25/12
JUSTICE [3]  1/21 2/21 2/25
justification [1]  53/24

**K**

K-I-Y-E-M-W-B-A [1]  43/21
keep [1]  14/23
kettle [1]  22/22
KILMAR [4]  1/4 2/10 53/19 55/6
kit [1]  36/13
Kiyemba [12]  38/23 39/3 40/14 43/9 43/19 43/21 44/19 45/12 45/13 45/15 45/19 45/22
knowledge [5]  51/12 52/4 52/5
knows [2]  51/16 51/18
KRISTI [1]  1/7 2/11 8/16

**L**

lacks [1]  48/7
landed [1]  35/21
language [2]  4/10 28/1
large [2]  10/20 11/3
largely [1]  3/17
last [7]  7/13 8/17 10/18 18/24 24/12 47/25 54/16
lastly [1]  14/9
later [2]  54/23 55/7
law [20]  2/15 2/16 4/5 4/6 5/6 5/7 7/4 14/16 16/10 16/18 17/6 19/20 24/24 25/2 31/17 31/20 32/7 32/21 38/21 39/17
lawful [3]  8/1 12/7 30/10
lawfully [1]  30/9
laws [2]  16/20 44/2
lawsuit [1]  8/25
lawyers [1]  50/12
lead [1]  39/22
leaders [2]  17/22 17/23
leads [1]  43/3
leash [2]  9/19 14/24
leave [1]  42/15 31/21 32/2 32/18 47/13 51/5
leave [1]  55/21
led [3]  22/7 24/10 30/15
Leeper [3]  57/4 57/15 57/16
left [1]  22/8
legal [17]  11/20 16/3 18/13 27/4 27/19 27/22 28/25 31/1 31/16 31/16 35/12 42/5 53/22 53/23 54/6 54/13
legality [1]  32/1
level [1]  16/9
lie [1]  47/9
lies [1]  16/17
light [1]  41/21
likelihood [2]  16/1 38/10
likely [2]  30/5 54/9
likewise [1]  11/21 17/25
Lin [1]  48/4
line [1]  37/10
listen [1]  50/11

**L**

litigate [1]  51/5
little [6]  2/22 21/1 30/17 31/4 43/14 50/1
live [2]  38/3 38/6
LLP [1]  1/17
logical [4]  39/23 41/17 43/3 49/4
long [1]  21/10
longer [1]  6/21
longstanding [1]  46/4
look [9]  4/11 4/12 42/5 43/7 47/23 48/14
  49/2 51/13
looking [2]  20/6 28/5 46/10 47/11 49/11 51/16
lords [1]  17/21
lost [1]  30/7
lot [6]  13/2 16/23 19/22 19/24 38/16 41/12

**M**

made [7]  11/9 31/2 34/15 34/16 34/19 37/16 41/24
magnitude [2]  26/9 32/22
maintain [1]  54/18
majority [1]  44/6
make [16]  3/11 3/19 4/13 4/15 9/22 20/12 30/22
  33/16 37/5 38/1 38/17 40/19 46/25 49/4 50/25 55/21
makes [4]  9/25 14/10 16/5 32/8
making [1]  6/16 30/3 31/24
many [3]  13/11 13/11 43/11
March [2]  53/23 53/24
March 12 [1]  53/23
March 15th [1]  53/24
MARYLAND [5]  1/1 2/4 53/22 55/2 57/6
matter [19]  2/9 2/11 7/5 14/16 17/1 24/17 25/2
  26/7 26/13 30/25 32/23 38/1 37/13 51/4 51/4 52/18
  54/7 55/20 57/9
may [7]  24/18 27/25 29/24 34/2 34/3 40/15 41/11
mean [7]  8/23 14/13 17/4 25/10 26/1 28/3 33/11
meaning [1]  13/20
means [10]  21/21 23/15 24/17 24/24 25/1 25/3 26/5
  30/5 35/7 50/20
meant [1]  23/1
meet [1]  16/14
member [1]  16/24
membership [1]  17/7
memoranda [1]  53/10
memorandum [1]  54/24
memorial [1]  37/22
mentioned [5]  17/16 28/22 31/5 32/6 34/1
merits [8]  16/1 25/13 26/1 26/2 38/10 49/18 49/19
  54/10
messages [1]  15/6
messed [1]  9/2
messenger [1]  20/2
metaphor [1]  50/1
Mexican [1]  17/22
micromanage [1]  14/19
might [1]  44/5
military [4]  39/2 40/12 42/3 45/2
million [2]  36/4 41/13
mind [1]  10/8
Mindful [1]  7/4
minute [1]  23/19
minutes [1]  52/8
missing [1]  20/14
mistake [3]  6/19 13/7 20/10
misunderstood [1]  34/17
mixing [1]  37/15
moment [5]  17/11 20/11 26/11 38/23 42/16 46/20
Monday [4]  50/22 55/7 55/23 55/24
money [2]  40/21 48/17
more [9]  12/7 13/2 30/5 36/10 38/8 49/15 49/17
  50/2 50/22
morning [1]  2/14
MOSHENBERG [3]  1/13 2/15 3/15
most [2]  8/22 49/11
motion [5]  3/8 3/9 53/4 53/8 55/3
motions [2]  1/10 2/12
movant [2]  4/18 18/17
move [2]  15/23 32/25
moved [2]  37/24 37/24
moving [1]  44/10
Mr [1]  23/14
Mr. [44]  2/8 3/2 3/15 3/23 6/18 8/2 8/10 10/7
  10/17 13/22 14/18 18/21 19/6 19/11 21/4 21/9 21/16
  22/17 22/23 23/9 23/16 23/20 25/7 27/1 29/19 30/4
  30/7 31/18 34/6 34/19 35/18 37/4 47/1 47/12 47/19
  47/22 49/13 50/7 50/18 50/21 51/2 52/21
  55/18
Mr. Abrego [25]  6/18 10/7 10/17 13/22 14/18 21/4
  21/9 21/16 22/23 23/9 23/16 25/7 30/4 31/18
  34/6 34/19 35/18 37/4 47/1 47/12 47/19 50/7 50/21
  52/21
Mr. Abrego Garcia [4]  8/2 8/10 19/16 47/22
Mr. Cerna [1]  22/17
Mr. Jenkins [1]  27/1
Mr. Reuveni [3]  3/2 3/23 18/21 49/13 50/10 50/18
  51/2 55/18
Mr. Sandoval-Moshenberg [1]  3/15
Mr. Silva [2]  29/19 30/7
Mr. Ulander [2]  2/8 19/6
MS [1]  16/24 17/23 22/6
MS-13 [3]  16/24 17/23 22/6
much [6]  9/19 49/15 49/17 50/10 50/24 52/19
Munaf [10]  38/22 39/2 39/5 39/12 40/8 40/8 40/9
  42/2 42/16 43/6
MURRAY [2]  1/14 2/15
must [1]  24/19

**N**

name [1]  3/2 20/13
named [4]  26/3 36/11 41/8 53/12
narrow [1]  49/12
narrowest [1]  49/11
nation [2]  39/10 46/5

**Nationality [3]**  26/5 27/24 54/11
native [1]  53/19
native [1]  7/18
necessarily [2]  6/3 46/6
necessary [2]  15/9 54/17
need [6]  4/14 6/6 19/4 48/18 50/18 55/14
negligent [1]  16/5
neither [1]  41/10
never [3]  10/8 33/8 35/10
nevertheless [1]  46/23
new [1]  7/4
Ninth [6]  28/23 29/2 29/8 29/13 31/3 32/10
Nken [2]  7/1 27/18
no [51]  3/16 5/6 5/17 6/19 6/21 9/9 12/16 12/20
  12/20 13/3 13/9 13/10 14/3 14/17 16/3 17/15 18/17
  19/24 20/5 21/14 21/15 21/15 21/16 23/16 25/6
  28/11 28/25 29/4 29/5 30/10 31/1 31/14 34/13 35/7
  37/15 39/25 40/20 41/1 41/24 42/19 42/22 43/3 43/5
  45/3 46/22 47/4 47/5 47/11 53/6 54/22 55/7
NORM [4]  1/7 2/11 8/16 41/5
nondiscretionary [5]  12/6 31/5 32/8 32/21 33/21
nonexecutable [1]  15/20
nonstatutory [1]  33/5
nose [1]  17/16
not [104]
note [1]  36/11
noted [1]  21/3
NOTES [1]  1/25
nothing [18]  3/24 5/19 5/20 12/20 12/21 14/11
  14/14 15/22 25/13 34/12 36/7 40/24 47/13 47/18
  49/19 49/20 50/16 55/6
notice [1]  18/25
notwithstanding [1]  42/9
number [4]  1/6 2/10 23/3 55/3
NW [2]  1/17 1/21

**O**

Obama [1]  45/22
object [1]  15/21
obtained [2]  30/9 51/19
obvious [1]  54/14
obviously [2]  7/23 28/22
off [1]  19/19
office [1]  53/18
officer [3]  19/20 20/23 22/17
officers [2]  19/21 21/18
official [4]  39/16 57/1 57/4 57/17
Oh [1]  35/16
okay [58]
once [3]  17/2 43/24 47/7
one [34]  3/5 4/7 6/13 7/5 9/2 12/4 12/4 12/5 12/7
  12/18 13/12 13/17 18/24 23/9 27/12 27/13 27/13
  29/26 29/12 32/24 33/24 34/4 36/13 36/17 36/19
  39/20 43/9 47/5 48/18 49/23 50/2 55/2 55/3 55/20
ones [1]  49/4
ongoing [2]  52/1 54/19
only [10]  5/6 5/21 12/4 22/2 25/12 32/15 39/6
  39/11 39/19 48/19
opening [1]  34/16
operation [1]  29/23
operations [3]  8/15 16/21 53/17
opinion [2]  52/24 54/24
opportunity [3]  27/7 41/22 48/14
opposite [1]  18/1
options [1]  14/3
oral [1]  53/6
oranges [1]  37/16
order [78]
ordered [4]  8/19 10/23 55/2 55/5
ordering [2]  9/16 11/2
orders [3]  7/18 26/8 51/7
ordinary [3]  5/15 12/21 16/12
organization [1]  17/8
origin [1]  8/3
OSORIO [2]  1/14 2/15
other [21]  8/1 11/20 11/23 15/6 18/3 22/22 28/22
  29/6 29/14 31/3 31/24 33/24 34/24 35/12 38/11 42/7
  43/9 47/7 48/4 51/20 54/6
others [2]  7/19 29/13
otherwise [4]  12/21 33/4 48/15 49/3
out [15]  9/1 10/23 14/15 18/12 19/1 21/1 28/21
  29/13 41/4 48/4 48/21 50/6 50/17 51/9 52/20
outright [2]  27/23 31/23
outside [5]  11/14 17/24 33/18 39/1 42/15
overlap [1]  6/14
overseas [1]  39/7
overtime [1]  4/12
own [2]  44/2 46/6

**P**

p.m [8]  1/11 52/12 52/12 54/23 55/7 55/22 55/24
  56/4
page [5]  22/20 24/12 44/18 46/14 57/9
pages [1]  24/11
paid [2]  40/21 41/13
Panama [1]  12/24
papers [2]  32/6 34/16
paragraph [5]  7/13 22/5 22/21 23/14 51/17
Paragraphs [1]  7/12
part [6]  10/9 15/11 22/11 22/12 42/10 46/21
participating [1]  7/16
particular [7]  15/5 15/5 15/6 29/18 39/20 40/21
  45/15
parties [1]  16/4 28/24 55/12
party [1]  37/1
passed [2]  24/24 45/2
PAULA [5]  1/12 2/5 57/4 57/15 57/16
pause [1]  30/8
paying [3]  34/5 34/21 48/16
payor [3]  36/4 36/4 41/18
pending [4]  2/9 22/8 36/17 45/2

pennies [1]  41/15
people [4]  36/15 36/20 36/21 36/24
Perdomo [1]  29/7
perform [1]  48/17
perhaps [2]  6/13 20/16
period [1]  48/20
permission [2]  13/20 13/22
persecution [2]  10/9 30/6
persecutor [1]  10/9
person [8]  5/16 19/9 19/12 20/19 37/13 37/24 52/2
  52/3
personal [3]  51/11 52/3 52/4
persons [1]  39/13
persuade [1]  51/2
petition [2]  5/1 7/14
phone [1]  40/6
pick [2]  23/3 40/6
picked [7]  20/10 22/3 22/3 22/4 22/11 22/14 22/3
place [4]  14/25 20/6 35/8 38/3
placed [1]  7/25
placement [1]  37/22
places [1]  34/25
plaintiff [16]  1/5 1/13 1/23 2/17 19/12 20/9 22/3
  26/3 26/19 29/12 31/23 31/25 37/25 38/4 55/6 55/17
plaintiffs [11]  2/18 3/9 15/21 24/5 29/6 34/7
  34/18 36/12 50/13 54/2 54/9
plaintiffs' [9]  21/3 27/17 32/6 34/1 34/21 37/11
  48/3 53/8 53/9
plan [1]  52/25
plane [2]  22/14 22/21
plead [1]  10/4
pleaded [1]  34/3
pleading [1]  26/15
pleadings [3]  13/18 15/22 36/12
please [2]  2/13 9/5
pled [2]  6/3 10/3
point [18]  3/6 4/10 8/5 12/7 20/24 21/25 25/23
  28/11 28/16 32/10 33/16 38/18 40/14 43/9 46/25
  47/25 50/25 50/25
points [3]  32/25 33/25 36/25
police [1]  5/19
policy [1]  15/7 15/18
position [2]  9/13 48/3
possible [1]  50/17
posture [1]  27/23
potential [2]  40/9 40/9
power [5]  17/24 39/16 39/21 39/22 42/4
practical [8]  13/14 27/7 27/20 28/14 37/5 38/11
  49/9 50/16
practically [3]  16/1 34/14 35/18
predates [3]  45/13 45/16 45/17
predatory [1]  17/8
preliminary [6]  3/9 4/16 53/4 54/17 55/4 55/8
premature [2]  8/10 14/15
prepared [1]  37/5
presence [1]  54/13
present [2]  1/23 41/20
presentation [1]  3/20
preserve [1]  55/9
President [3]  18/8 41/14 41/16
presiding [1]  2/5
press [1]  15/1
pressing [1]  30/8
pretty [1]  7/21
prevent [1]  42/19
primarily [1]  5/3
primary [1]  25/9
principle [2]  46/4 47/6
prior [3]  5/8 14/25 42/14
prison [5]  8/15 8/16 10/21 10/25 18/12
prisons [3]  17/21 17/22 17/23
probability [1]  30/5
probable [5]  5/19 20/4 21/15
procedural [2]  6/10 6/10
procedure [2]  21/10 53/10
Procedures [1]  54/5
proceed [2]  6/7 37/20
proceeding [1]  17/9
proceedings [6]  7/17 17/2 24/10 32/14 56/4 57/8
process [6]  6/11 10/5 14/20 17/10 18/13 21/13
produce [9]  39/17 39/21 39/22 41/2 41/2 42/24 42/4
  49/2 50/21
produced [1]  3/11
professionalism [1]  52/18
prohibited [3]  5/6 10/7 53/21
prohibits [2]  11/7 11/24
prompt [1]  9/16
properly [1]  45/6
proposition [2]  48/5 48/10
prosecute [1]  32/17
protections [1]  54/6
provide [3]  47/6 47/7 51/25
provided [3]  16/25 45/3 51/11
provides [1]  52/3
providing [1]  15/13
provision [2]  44/24 45/11
proximate [1]  11/18
public [5]  16/16 16/17 16/19 36/11 54/15
pulling [1]  45/22
pure [3]  31/16 31/20 32/21
purpose [1]  7/16
purposes [2]  27/20 37/13
pursuant [7]  14/2 20/19 24/23 44/2 47/15 53/9 57/6
push [2]  20/25 30/17
put [3]  3/13 9/18 21/21 22/14 24/5 25/20 25/22
  28/21 32/9 32/24 32/25 36/12 44/24
putting [1]  10/8
PX [1]  1/6
PX25 [1]  2/10
PX25-951 [1]  2/10

**Q**

question [19]  3/23 5/12 11/5 21/12 25/5 27/6 28/12

**Q**

question... **[12]** 31/16 31/16 31/17 32/20 32/21 35/22 38/8 38/12 42/25 47/21 48/8 48/9
questions **[7]** 4/2 4/17 19/21 19/25 31/20 33/8 44/17
quibble **[1]** 16/14
quickly **[1]** 50/17
QUINN **[2]** 1/17 2/16
quite **[4]** 15/1 23/18 29/10 40/16
quo **[3]** 54/18 54/19 55/8
quote **[12]** 15/2 15/3 29/10 32/13 39/13 42/11 42/11 42/12 43/25 44/1 44/3 46/14

**R**

raised **[1]** 28/17
raises **[3]** 4/24 16/23 33/17
Ramirez **[1]** 7/6
Ramirez's **[2]** 7/13 7/15
rare **[1]** 4/8
reaching **[1]** 9/1
read **[16]** 12/2 12/22 22/16 22/16 22/20 30/24 30/24 31/21 32/2 33/1 33/7 33/8 42/24 52/1 42/2 52/25 53/5 54/6
reading **[4]** 32/4 42/4 45/12 46/12
real **[2]** 44/10 47/1
reality **[1]** 50/16
really **[11]** 5/9 5/9 6/2 6/7 14/15 16/5 20/2 21/25 30/14 34/10 41/13
reason **[5]** 8/17 10/10 18/3 48/17 51/6
reasonable **[1]** 51/18
reasoned **[1]** 32/12
reasons **[2]** 54/14 54/21
received **[4]** 17/25 19/6 21/6 35/23
recess **[3]** 52/8 52/11 52/12
recites **[1]** 46/4
reckless **[1]** 16/5
recognition **[1]** 52/23
recognize **[1]** 4/4
recommendation **[1]** 50/8
record **[17]** 2/13 8/13 21/20 21/21 23/11 24/2 24/4 26/25 32/25 36/2 40/24 41/3 53/1 53/2 53/11 53/21 54/6
records **[1]** 51/19
redress **[1]** 48/24
redressability **[4]** 14/9 48/2 48/7 49/8
redressable **[1]** 14/11
refer **[1]** 22/5
refers **[2]** 22/5 22/6
reflects **[1]** 53/21
regard **[1]** 26/9
regarding **[1]** 44/20
regardless **[1]** 33/5
regards **[5]** 5/2 8/15 9/19 16/15 51/1
regulation **[1]** 29/24 29/25
regulations **[2]** 54/3 57/10
rejected **[1]** 44/6
relationships **[1]** 10/24
relatively **[2]** 7/12 9/16
release **[1]** 44/18
relied **[1]** 7/3
relief **[12]** 5/5 6/9 34/4 42/18 42/21 46/7 48/5 49/10 49/11 53/9 55/4 55/8
relinquished **[2]** 39/24 39/25
relying **[3]** 6/7 6/8 45/20
remand **[2]** 7/14 45/20
remedial **[2]** 51/1 52/1
remedy **[6]** 6/13 9/20 10/23 11/2 38/5 38/11 42/22 47/9 49/9
remember **[1]** 27/25
removable **[1]** 13/11
removal **[54]** 6/10 7/14 10/6 11/13 11/13 11/18 11/19 11/25 12/5 12/16 12/20 13/3 13/5 13/6 13/8 13/10 13/15 13/20 13/25 14/2 14/2 14/3 20/13 20/18 21/2 21/4 21/8 21/13 21/15 22/2 23/3 23/7 23/8 23/11 23/15 23/16 23/23 23/24 24/6 24/10 24/11 24/19 27/19 27/20 28/2 29/9 30/3 30/16 34/6 34/11 53/17 53/20 53/21 54/2 54/20
removals **[4]** 11/12 11/15 11/20 11/24
remove **[4]** 12/24 16/3 21/9 27/25
removed **[7]** 10/17 19/13 19/16 21/5 25/14 53/24 54/10
removing **[1]** 10/7
renewable **[1]** 36/19
Reno **[4]** 31/8 32/12 33/6 33/14
reply **[1]** 53/10
report **[4]** 5/19 9/16 15/9 21/16
reported **[1]** 57/8
REPORTER **[3]** 57/1 57/4 57/17
reports **[2]** 46/14 51/7
represent **[1]** 4/2
represented **[1]** 7/2
Republic **[1]** 36/16
request **[2]** 51/10 52/2
respect **[6]** 4/2 4/6 6/23 9/23 20/3 25/5
respond **[2]** 32/24 35/1 44/16
response **[5]** 6/20 13/1 13/8 34/11 34/15
responses **[2]** 20/21 38/14
responsibility **[1]** 9/9
responsive **[1]** 18/9
restore **[2]** 54/18 55/8
result **[1]** 44/17
resulting **[1]** 54/19
resumes **[1]** 52/14
retains **[1]** 54/7
return **[10]** 6/17 6/24 7/16 7/22 8/9 8/19 9/14 37/6 54/22 55/5
returned **[3]** 8/2 36/21 36/23
returning **[1]** 54/7
REEUVENI **[11]** 1/20 2/20 2/20 2/25 3/2 3/23 18/21 49/13 50/10 50/18 51/2 55/18
reveal **[1]** 15/17
revealing **[1]** 15/16
review **[6]** 7/14 11/12 11/24 29/1 32/15 48/24

reviewed **[3]** 46/23 53/5 53/8
right **[70]**
rise **[4]** 2/3 52/10 52/13 56/2
rises **[1]** 16/9
Road **[1]** 1/14
robust **[1]** 17/10
role **[1]** 22/6
room **[1]** 38/3
roughly **[1]** 5/8
routine **[1]** 7/12
routinely **[1]** 6/24
RPR **[1]** 57/16
Rubio **[2]** 18/10 41/4
rule **[4]** 33/7 37/17 37/19 53/9
Rules **[1]** 53/9
ruling **[2]** 16/6 54/25
running **[1]** 3/7

**S**

Salvador **[39]** 10/17 10/18 11/3 12/16 13/3 13/12 14/3 16/4 17/19 18/2 18/4 18/9 18/13 21/5 22/15 34/21 34/22 34/24 34/20 34/21 25/7 25/14 30/6 34/5 34/21 34/23 36/9 36/16 39/9 40/4 40/7 41/3 43/1 47/13 47/22 53/20 53/21 53/24 54/11 54/13
Salvador's **[1]** 53/25
Salvadorans **[1]** 43/2
Salvadorian **[1]** 17/23
same **[16]** 3/23 7/20 10/16 10/20 11/2 18/21 23/1 23/14 27/3 27/19 28/14 28/17 29/25 38/3 38/7 48/5
SANDOVAL **[3]** 1/13 2/15 3/15
SANDOVAL-MOSHENBERG **[2]** 1/13 2/15
satisfactory **[2]** 20/22 35/24
satisfied **[1]** 39/20
saw **[1]** 21/16
saying **[15]** 3/2 8/4 12/22 13/3 13/24 14/14 18/4 20/9 30/13 34/24 37/19 38/19 41/15 46/22 47/6
scheme **[1]** 44/20
seal **[3]** 15/9 15/11 15/21
seat **[2]** 2/7 52/16
second **[1]** 3/5
secretary **[5]** 12/2 18/9 41/4 41/4 53/13 53/14
section **[5]** 11/11 39/12 14/20 53/13 53/1
Security **[1]** 53/13
see **[15]** 3/18 4/16 5/15 10/2 12/21 18/4 22/16 22/24 32/12 40/7 32/6 36/2 42/1 50/13 53/1
seeking **[1]** 11/12
seeks **[1]** 15/13
seen **[1]** 3/17
seems **[3]** 4/18 29/5 32/9
seen **[3]** 13/14 13/19 51/13
seize **[1]** 20/19
seized **[3]** 19/19 20/5 20/11
send **[3]** 23/5 23/20 37/6
sense **[1]** 13/14
sensitive **[1]** 15/17
sent **[1]** 22/15
seriously **[2]** 20/3 51/6
service **[2]** 40/21 48/17
session **[2]** 2/4 52/14
Sessions **[1]** 7/7
set **[1]** 29/15
setting **[1]** 54/24
several **[1]** 11/22
shall **[1]** 45/3
shines **[1]** 41/21
shooting **[1]** 20/1
short **[3]** 9/18 14/23 26/15
show **[2]** 8/13 38/13
showing **[2]** 47/14 48/15
shown **[1]** 16/11
shows **[1]** 40/25
sides **[4]** 3/4 4/6 4/13 29/7
sign **[2]** 53/2 55/13
significant **[1]** 8/14
Silva **[5]** 28/17 29/18 29/19 30/7 30/24
similar **[3]** 29/5 31/13 38/25
similarly **[1]** 54/2
SIMON **[2]** 1/13 2/15
simple **[2]** 38/8 38/13
simply **[4]** 13/12 14/6 30/8 30/23
since **[1]** 33/1
sincerely **[1]** 51/2
sit **[1]** 48/1
situation **[4]** 9/10 9/12 29/5 31/25 42/13 42/14
situations **[1]** 37/23
Sixth **[1]** 29/6
slightly **[1]** 29/8
slow **[3]** 43/13 44/10 51/22
small **[1]** 50/25
so **[96]**
soldiers **[1]** 3/7
someone **[1]** 17/7 40/6 41/15
something **[4]** 9/4 11/6 17/24 28/25
somewhere **[1]** 34/13
sorry **[12]** 2/22 2/24 5/1 5/11 6/11 15/10 19/10 35/16 43/13 44/9 45/14 51/21 51/21
sort **[9]** 20/25 25/22 28/17 29/25 31/24 49/25 51/7 51/8 52/5
sounds **[5]** 10/1 34/6 37/14 41/12 44/5
source **[1]** 27/11
sovereign **[6]** 39/9 40/13 43/25 46/2 46/3 47/8
sovereign's **[1]** 38/7
speak **[2]** 2/22 46/4
speaks **[1]** 49/6
specific **[2]** 21/12 32/17
specifically **[2]** 51/17 54/12
specify **[3]** 51/16 51/17 52/2
speed **[1]** 10/22
spend **[1]** 34/8
split **[5]** 25/21 26/18 28/6 29/15 33/11
squarely **[1]** 32/9
stages **[1]** 32/17
stand **[1]** 48/10

standard **[2]** 16/13 16/14
stands **[3]** 48/17 52/11 56/3
start **[1]** 21/18
started **[2]** 14/24 21/14
starting **[1]** 25/17
state **[4]** 18/10 41/4 52/4 53/14
stated **[2]** 6/9 54/21
statement **[3]** 5/18 20/4 21/15
statements **[1]** 15/1
STATES **[62]**
States' **[2]** 36/13 36/17
status **[6]** 9/16 15/9 51/17 54/18 54/18 55/8
statute **[6]** 6/10 12/2 39/13
statutes **[1]** 55/10
statutory **[3]** 10/5 33/5 44/20
stay **[13]** 26/21 26/23 26/24 27/2 27/4 27/9 27/9 27/11 27/14 27/18 27/23 28/5 28/14
stayed **[1]** 29/25
stays **[1]** 33/11
stenographically **[1]** 57/8
stenographically-reported **[1]** 57/8
STENOTYPED **[1]** 1/25
step **[2]** 12/12 12/13
steps **[3]** 14/17 15/14 52/2
still **[8]** 13/1 21/8 34/19 36/7 38/5 38/11 39/23 39/23
stop **[1]** 37/18
straight **[1]** 35/11
street **[3]** 1/17 1/21 19/20
streets **[1]** 10/18
strictly **[1]** 42/2
strike **[1]** 37/1
stripped **[3]** 31/22 32/14 32/20
stripping **[2]** 14/6 44/23
strips **[1]** 11/7
subject **[5]** 16/11 30/4 30/6 39/7 54/7
substantial **[1]** 57/6
substantive **[1]** 30/14
succeed **[1]** 54/10
success **[2]** 16/1 38/10
successful **[1]** 8/18
such **[4]** 13/10 17/7 45/7 47/2
sufficient **[1]** 16/13
suggest **[2]** 36/7 49/23
suggests **[2]** 32/18 48/23
suit **[1]** 53/12
Suite **[2]** 1/14 1/18
SULLIVAN **[2]** 1/17 2/17
superintendence **[1]** 50/3
supplemental **[1]** 26/15
support **[4]** 16/10 26/19 26/20 52/24
supporting **[1]** 53/10
supports **[1]** 20/9
Supreme **[10]** 7/1 7/2 7/3 12/3 32/12 37/21 40/18 42/8 42/14 46/4
Sura **[2]** 1/23 2/17
swallow **[1]** 33/7
systems **[1]** 51/19

**T**

t616 **[1]** 1/22
t616-8962 **[1]** 1/22
tagged **[1]** 9/22
take-home **[1]** 8/5
taken **[5]** 14/17 19/19 19/20 47/16 52/12
takes **[2]** 27/4 33/18
taking **[2]** 48/12 51/6
talk **[3]** 23/19 35/17 38/23
talked **[1]** 32/17
talking **[3]** 7/24 37/12 44/17
technical **[1]** 19/3
technically **[1]** 42/10
tell **[2]** 20/17 37/7
temporally **[1]** 11/17
ten **[1]** 52/9
tenor **[1]** 9/7
terms **[5]** 23/18 36/19 37/1 37/5 48/23
territory **[6]** 39/1 42/15 43/24 46/2 46/3 46/6
terrorism **[1]** 53/25
Terrorismo **[1]** 54/1
text **[1]** 30/21
theory **[1]** 6/5
therefore **[3]** 7/13 37/17 47/20
they've **[1]** 9/9
thing **[7]** 8/21 12/10 13/10 13/20 35/22 42/13 49/23
things **[3]** 14/24 20/24 38/6
think **[45]** 6/2 6/5 6/13 8/8 8/10 8/13 8/17 9/18 10/3 12/7 13/1 14/15 15/3 15/22 15/24 16/10 16/11 16/16 17/15 17/20 20/15 24/5 25/16 25/18 26/13 27/17 31/8 38/2 38/6 38/20 40/1 40/2 40/5 41/17 42/4 44/9 45/4 47/4 48/2 48/10 48/12 49/4 49/8 51/6
thinking **[2]** 10/14 20/15
though **[6]** 12/4 21/7 33/16 34/10 36/2
three **[6]** 12/4 25/16 27/12 32/17 42/19 55/7
threshold **[1]** 48/1
time **[11]** 4/15 7/3 7/19 8/25 9/19 13/21 19/4 29/24 30/21 44/17 47/5 51/5 52/20 55/14
today's **[1]** 14/25
together **[1]** 3/8
told **[3]** 19/6 36/11 46/21
tool **[1]** 36/13
tools **[1]** 36/13
torture **[2]** 16/9 30/6
total **[1]** 42/12
touch **[1]** 33/25
transcript **[1]** 1/10 57/7 57/9
TRANSCRIPTION **[1]** 1/25
transfer **[1]** 44/1
transferred **[3]** 43/25 46/2 47/8

**T**

transferring **[1]** 42/20
transmit **[1]** 55/11
transported **[1]** 36/20
treaties **[1]** 48/25
treatment **[1]** 16/12
treaty **[1]** 18/3
tried **[1]** 14/14
true **[2]** 18/1 57/7
try **[3]** 9/2 50/6 50/17
trying **[1]** 46/25
turn **[2]** 4/20 50/13
tweet **[2]** 18/8 18/9
twice **[1]** 55/20
two **[11]** 4/8 4/24 7/19 8/14 25/17 27/13 33/24 34/4
40/9 42/7 55/4
typical **[1]** 51/14

**U**

U.S **[9]** 38/22 40/12 42/17 42/17 42/20 43/24 43/24
44/18 53/15
U.S.C **[5]** 46/24 54/2 54/5 54/12 57/6
U.S.C. **[1]** 30/22
Ulander **[2]** 2/8 19/6
unconstitutional **[3]** 20/11 44/25 45/11
under **[18]** 6/10 11/12 11/13 11/20 11/24 11/25 15/9
15/11 15/21 16/13 22/14 23/5 23/6 36/20 38/9 39/14
42/11 46/23
underlying **[1]** 30/25
understand **[14]** 8/20 22/9 28/13 33/1 33/20 33/21
38/19 40/19 41/9 41/9 44/11 48/22 49/5 49/6
understanding **[2]** 22/23 45/18
understood **[2]** 33/19 34/17
undisputed **[2]** 3/17 16/2
unexecutable **[1]** 26/7
UNITED **[64]**
unlawful **[1]** 12/9 29/1 30/3 54/20
unless **[2]** 11/5 16/9
unprecedented **[1]** 28/5
unquote **[1]** 20/10
unreasonable **[1]** 32/4
until **[1]** 48/20
unusual **[1]** 28/4
unwind **[1]** 37/3
up **[19]** 2/22 3/7 4/3 7/6 7/9 9/2 13/4 20/10 22/3
22/4 22/11 22/14 23/2 23/3 25/10 37/25 40/6 44/13
45/22
update **[1]** 9/17
URQUHART **[2]** 1/17 2/17
use **[3]** 4/15 23/18 36/14
used **[3]** 23/20 25/7 41/11

**V**

v. **[1]** 2/11
VA **[1]** 1/15
vacate **[1]** 7/14
valid **[2]** 21/9 23/16
various **[1]** 51/19
Vasquez **[2]** 1/23 2/17
versus **[4]** 31/5 51/16 51/18 51/18
very **[25]** 9/15 9/18 10/8 12/10 12/25 13/14 13/20
13/20 14/23 20/8 21/12 25/4 25/8 31/12 35/8 35/8
35/17 35/22 38/11 49/21 50/10 50/25 51/14 52/19
52/22
view **[9]** 17/5 20/8 27/21 33/22 34/2 34/21 37/11
44/4 48/13
violate **[2]** 31/17 31/19
violated **[1]** 54/2
violation **[3]** 26/4 27/23 54/11
violent **[1]** 17/7
vs **[1]** 1/6

**W**

wait **[1]** 52/23
walls **[1]** 8/16
want **[17]** 3/11 4/11 4/14 21/11 23/18 33/16 38/17
40/19 41/1 43/3 44/10 48/21 50/6 52/8 52/17 52/20
55/21
wanted **[5]** 3/19 20/6 20/12 41/20 42/5
wants **[1]** 43/4
wards **[1]** 39/24
warrant **[10]** 5/18 12/20 13/19 20/4 20/12 20/16
20/18 20/18 21/14 22/5
was **[81]**
Washington **[2]** 1/18 1/22
wasn't **[1]** 3/19
waste **[1]** 19/4
water **[1]** 13/2
way **[19]** 4/4 9/5 10/2 10/14 22/20 28/22 29/14
30/10 30/24 30/24 31/3 31/21 33/1 33/22 35/2 36/2
39/11 39/20 40/13
ways **[2]** 30/13 37/24
we'll **[1]** 3/18
Wednesday **[1]** 8/17
week **[1]** 8/17
weekend **[3]** 5/8 23/2 23/3
weeks **[1]** 36/5
weigh **[1]** 54/15
well **[21]** 3/18 4/1 9/4 10/15 13/5 15/12 21/23
25/22 29/10 31/10 32/11 32/18 34/10 34/23 35/6
35/25 41/1 41/4 42/16 52/7 54/4
went **[3]** 23/1 31/3 46/7
whatever **[2]** 22/17 23/2
whatsoever **[2]** 9/10 9/12
whereas **[1]** 32/22
wherein **[1]** 26/21
whether **[8]** 16/4 25/19 27/21 28/25 29/1 29/2 30/25
40/5
while **[1]** 45/1
White **[1]** 15/1
whole **[1]** 22/22
win **[1]** 26/3

Winter **[4]** 4/17 4/19 15/24 38/10
wise **[1]** 3/24
wish **[1]** 49/2
wished **[1]** 3/20
withheld **[1]** 24/19
withholding **[9]** 6/10 13/5 21/5 23/24 24/11 27/20
28/1 30/16 53/20
within **[2]** 46/5 51/25
without **[8]** 8/1 50/3 50/4 50/4 53/22 53/23 54/12
54/17
witnesses **[1]** 3/13
wolf **[1]** 50/1
won't **[2]** 15/21 26/25
wonderful **[1]** 31/12
word **[7]** 4/1 7/19 7/20 18/18 41/11 53/5 53/5
words **[1]** 31/24
work **[2]** 33/22 50/6
working **[3]** 4/12 9/4 9/6
works **[1]** 4/5
world **[1]** 21/9
worried **[2]** 15/13 15/16
wrinkle **[1]** 31/4
writ **[1]** 45/4
write **[2]** 50/17 52/24
writs **[1]** 37/22
written **[1]** 53/6
wrong **[4]** 37/3 46/21 46/21 50/1
wrongful **[1]** 29/9
wrongly **[1]** 7/22

**X**

XINIS **[2]** 1/10 2/5

**Y**

yeah **[5]** 14/5 14/13 27/2 39/18 49/24
year **[2]** 36/17 36/19
yep **[1]** 20/20
yes **[15]** 2/24 6/15 9/24 11/10 19/5 19/17 24/14
28/16 28/19 29/3 30/18 42/7 43/15 45/24 47/5
yet **[3]** 17/11 30/12 40/16
you'll **[1]** 23/19
yourselves **[1]** 2/13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

Abrego Garcia, et al.                    *

                                         *

**v.**                                    *        Case No. ___25-cv-00951___

Noem, et al.                             *

                                         *

**NOTICE OF APPEAL**

Notice is hereby given that___Kristi Noem, Todd Lyons, Kenneth Genalo, Nikita Baker, Pamela Bondi, and Marco Rubio___,

(fill in names of **all** parties who are appealing)

___Defendants___ in the above captioned case, hereby appeals to the

(indicate plaintiff/s or defendant/s)

United States Court of Appeals for the Fourth Circuit the ___order___

(indicate order or judgment)

entered in this case on ___Apr. 4, 2025___.

___Apr. 4, 2025___                       ___s/Erez Reuveni___

Date                                     Signature

                                         ___Erez Reuveni, #___

                                         Printed Name and Bar Number

                                         P.O. Box 878, Ben Franklin Station, Washington, D.C. 20044-0878

                                         _____

                                         Address

                                         ___Erez.R.Reuveni@usdoj.gov___

                                         Email Address

                                         ___(202) 307-4293___

                                         Telephone Number

                                         _____

                                         Fax Number

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KILMAR ARMANDO
ABREGO GARCIA, *et al.*,                        *

    Plaintiffs,                                 *

    v.                                          *            Civil Action No. 8:25-cv-00951-PX

KRISTI NOEM, Secretary,                         *
United States Department                        *
of Homeland Security, *et al.*,                 *

    Defendants.

                                                    *

                                                    ***

## MEMORANDUM OPINION

In 2019, an immigration judge—acting under the authority delegated by the United States Attorney General and pursuant to powers vested by Congress—granted Plaintiff Kilmar Armando Abrego Garcia ("Abrego Garcia") withholding of removal, thereby protecting him from return to his native country, El Salvador.  ECF No. 1 ¶ 41; ECF No. 1-1.  Such protection bars the United States from sending a noncitizen to a country where, more likely than not, he would face persecution that risks his "life or freedom."  *See* Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16–.18 & .24 (setting forth the standard for withholding of removal and the procedures required for its termination).

Six years later, without notice, legal justification, or due process, officers from U.S. Immigration and Customs Enforcement ("ICE"), a subagency of the Department of Homeland Security ("DHS"), put him on a plane bound for the Terrorism Confinement Center ("CECOT")

1

in El Salvador.  ECF No. 1¶ 59. [1]  Neither the United States nor El Salvador have told anyone why he was returned to the very country to which he cannot return, or why he is detained at CECOT. [2] *See* Hr'g Tr., Apr. 4, 2025, 25: 13–14 (Mr. Reuveni: "We have nothing to say on the merits.  We concede he should not have been removed to El Salvador."); *see* Hr'g Tr., Apr. 4, 2025, 34:25–35:5 (The Court: "[W]hat basis is he held?  Why is he [in CECOT] of all places?" . . . Mr. Reuveni: "I don't know.  That information has not been given to me.  I don't know.").

That silence is telling.  As Defendants acknowledge, they had no legal authority to arrest him, no justification to detain him, and no grounds to send him to El Salvador[3]—let alone deliver him into one of the most dangerous prisons in the Western Hemisphere. [4]  Having confessed grievous error, the Defendants now argue that this Court lacks the power to hear this case, and they lack the power to order Abrego Garcia's return.  ECF No. 11 at 3.  For the following reasons, their jurisdictional arguments fail as a matter of law.  Further, to avoid clear irreparable harm, and because equity and justice compels it, the Court grants the narrowest, daresay only, relief warranted: to order that Defendants return Abrego Garcia to the United States.

## I.    Background

Abrego Garcia was born and raised in Los Nogales, El Salvador.  ECF No. 1-1 at 2.  His family owned a small and successful pupuseria.  *Id.*  For years, they were subject to extortion and

---

[1] Louis Casiano, *U.S. Paid El Salvador to Take Venezuelan Tren de Aragua Members for 'Pennies on the Dollar,' White House Says*, FOX NEWS (Mar. 26, 2025), https://www.foxnews.com/politics/us-paid-el-salvador-take-venezuelan-tren-de-aragua-members-pennies-dollar-white-house-says.

[2] Defendants did not assert—at any point prior to or during the April 4, 2025, hearing—that Abrego Garcia was an "enemy combatant," an "alien enemy" under the Alien Enemies Act, 50 U.S.C. § 21, or removable based on MS-13's recent designation as a Foreign Terrorist Organization under 8 U.S.C. § 1189.  Invoking such theories for the first time on appeal cannot cure the failure to present them before this Court.  In any event, Defendants have offered no evidence linking Abrego Garcia to MS-13 or to any terrorist activity.  And vague allegations of gang association alone do not supersede the express protections afforded under the INA, including 8 U.S.C. §§ 1231(b)(3)(A), 1229a, and 1229b.

[3] ECF No. 11-3 at 3 ("Through administrative error, Abrego-Garcia was removed from the United States to El Salvador. This was an oversight . . . ."); Hr'g Tr., Apr. 4, 2025, 19:11–13 (Mr. Reuveni: "This person should -- the plaintiff, Abrego Garcia, should not have been removed. That is not in dispute.").

[4] ECF No. 1-4; ECF No. 10-2; ECF No. 10-3.

2

threats of death by one of El Salvador's most notorious gangs, Barrio 18. *Id.* at 2. The gang used Abrego Garcia as a pawn in its extortion, demanding that his mother give Abrego Garcia over to the gang or he and others in their family would be killed. *Id.* at 3. Attempting to escape the gang's reach, the family moved three times without success. *Id.* To protect Abrego Garcia, they ultimately sent him to the United States to live with his older brother, a U.S. citizen, in Maryland. ECF No. 1 ¶ 22.

Abrego Garcia lived in Maryland for many years without lawful status. *Id.* In early 2019, while waiting at the Home Depot in Hyattsville, Maryland, to be hired as a day laborer, Abrego Garcia was arrested. *Id.* ¶¶ 25–26. The Prince George's County Police Department questioned him about gang affiliation, but nothing came of it. *Id.* ¶ 27. He was then turned over to ICE custody. *Id.* ¶ 28.

On March 29, 2019, DHS initiated removal proceedings against Abrego Garcia pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). ECF No. 1 ¶ 29. On April 24, 2019, Abrego Garcia appeared before an immigration judge ("IJ") where he conceded his deportability and applied for asylum, withholding of removal, and protection under the Convention Against Torture. ECF No. 1-1.

Pending resolution of the requested relief, DHS argued for Abrego Garcia to be detained in ICE custody. ECF No. 1 ¶ 30. DHS relied principally on a singular unsubstantiated allegation that Abrego Garcia was a member of MS-13.[5] The IJ ultimately detained Abrego Garcia pending the outcome of his requested relief from deportation, a decision affirmed by the Board of Immigration Appeals. ECF Nos. 11-1 & 11-2.

October 10, 2019, following a full evidentiary hearing, the IJ granted Abrego Garcia

---

[5] The "evidence" against Abrego Garcia consisted of nothing more than his Chicago Bulls hat and hoodie, and a vague, uncorroborated allegation from a confidential informant claiming he belonged to MS-13's "Western" clique in New York—a place he has never lived. ECF No. 31.

withholding of removal to El Salvador pursuant to 8 U.S.C. § 1231(b)(3)(A).  As a matter of law, withholding of removal prohibits DHS from returning an alien to the specific country in which he faces clear probability of persecution.  In Abrego Garcia's case, the IJ concluded that he was entitled to such protection because the Barrio 18 gang had been "targeting him and threatening him with death because of his family's pupusa business."  ECF No. 1-1 at 2.  DHS never appealed the grant of withholding of removal, and so the decision became final on November 9, 2019.[6]  *See* Hr'g Tr., Apr. 4, 2025, 24:15–16 (Mr. Reuveni: "The government did not appeal that decision, so it is final.").  Accordingly, as Defendants have repeatedly admitted, they were legally prohibited from deporting Abrego Garcia to El Salvador.  *See* Hr'g Tr., Apr. 4, 2025, 25:6–7 (Mr. Reuveni: "There's no dispute that the order could not be used to send Mr. Abrego Garcia to El Salvador.").

For the next six years, Abrego Garcia lived in Maryland with his wife and their three children.  ECF No. 1 ¶¶ 24–25.  He complied fully with all directives from ICE, including annual check-ins, and has never been charged with or convicted of any crime.  ECF No. 1-3, ECF No. 1 ¶ 45.

On March 12, 2025, while driving home from work with his young son in the car, Abrego Garcia was stopped by ICE agents.  *Id.* ¶¶ 48–49.  The officers had no warrant for his arrest and no lawful basis to take him into custody; they told him only that his "status had changed."  *Id.* ¶ 50.  He was first transported to an ICE facility in Baltimore, Maryland.  *Id.* ¶¶ 51–53.  Next, ICE agents shuttled him to detention facilities in Louisiana and La Villa, Texas.  *Id.* ¶¶ 54–57.  He was allowed a handful of calls to his wife.  He said that he was told he would see a judge soon.  *Id.*  But

---

[6] A decision by an IJ becomes final "upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken within that time."  8 C.F.R. § 1003.39.  The deadline for filing an appeal to the Board of Immigration Appeals is 30 days from the date of the decision.  *See* 8 C.F.R. § 1003.38(b).  Once final, a grant of withholding of removal prohibits removal to the country of feared persecution absent formal reopening and termination of that protection.  *See* 8 C.F.R. § 208.24.

that never happened.

Three days later, on March 15, 2025, without any notice, legal process, or hearing, ICE forcibly transported Abrego Garcia to the Terrorism Confinement Center ("CECOT") in El Salvador, a notorious supermax prison known for widespread human rights violations.  ECF No. 1 ¶ 59; ECF No. 11-3 at 2; ECF No. 10-2.  On that day, two planes carried over 100 aliens to CECOT purportedly pursuant to the Alien Enemies Act, ECF No. 11-3 at 2, the legality of which is the subject of separate litigation.  *See J.G.G. v. Trump,* No. 1:25-cv-766 (JEB), 2025 WL 890401 (D.D.C. Mar. 24, 2025).  A third plane included "aliens with Title 8 removal orders;" many of them were in ICE custody awaiting asylum and other protective hearings in the United States. ECF No. 11-3 at 2; *see J.G.G. v. Trump,* No. 1:25-cv-766 (JEB), ECF Nos. 67-5–67-20.

Once the planes arrived in El Salvador, the male detainees[7] were stripped and shackled. Their heads were shaved, and they were marched into CECOT to join nearly 40,000 other prisoners held in some of the most inhumane and squalid conditions known in any carceral system.  ECF No. 10-3.  Since then, no one has heard from Abrego Garcia.  ECF No. 1 ¶ 41.

To effectuate a mass relocation of those detained by the United States, the federal government struck an agreement with El Salvador whereby it would pay the Salvadoran government six-million dollars for placement of the detainees in "very good jails at a fair price that will also save our taxpayer dollars."  Marco Rubio (@SecRubio), X (Mar. 16, 2025, 7:59 AM),  https://x.com/SecRubio/status/1901241933302825470. El Salvador's President, Nayib Bukele, has publicly touted the agreement terms: "We are willing to take in only convicted criminals (including convicted U.S. citizens) into our mega-prison (CECOT) in exchange for a

---

[7] Female detainees were returned to the United States because the prison would not accept them.  *See, e.g., J.G.G. v. Trump*, No. 1:25-cv-766 (JEB), ECF No. 55-1.

fee."[8]    ECF No. 10-5; Nayib Bukele (@nayibbukele), X (Apr. 4, 2025, 10:23 AM), https://x.com/nayibbukele/status/1901245427216978290.  According to a memorandum issued by El Salvador's Ministry of Foreign Affairs, the agreement provides that the detainees will be held "for one (1) year, pending the United States' decision on [their] long term disposition."  *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7.

After Abrego Garcia was transferred to CECOT, Defendant, DHS Secretary, Kristi Noem, personally toured the facility alongside senior Salvadoran officials.  U.S. Dep't of Homeland Sec., *Inside the Action: Secretary Noem's Visit to El Salvador*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025).  From inside the prison walls, Secretary Noem declared that transferring individuals previously detained on U.S. soil to CECOT remains "one of the tools in *our* [the United States'] toolkit that we will use if you commit crimes against the American people."  U.S. Dep't of Homeland Sec., *How It's Going*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025) (emphasis added).

Although the legal basis for the mass removal of hundreds of individuals to El Salvador remains disturbingly unclear, Abrego Garcia's case is categorically different—there were no legal grounds whatsoever for his arrest, detention, or removal.  Nor does any evidence suggest that Abrego Garcia is being held in CECOT at the behest of Salvadoran authorities to answer for crimes in that country.  Rather, his detention appears wholly lawless.

---

[8] It is unclear what qualifies as a "convicted criminal" under the terms of the agreement, but Abrego Garcia has not been convicted of any crime.

Based on these events, Abrego Garcia, through counsel, and along with his wife, Jennifer Stefania Vasquez Sura, and their son, A.A.V., by and through his mother and next friend, [9] filed suit in this Court on March 24, 2025, against DHS Secretary Noem; Acting Director of U.S. Immigration and Customs Enforcement, Todd Lyons; Acting Executive Associate Director of ICE Enforcement and Removal Operations, Kenneth Genalo; ICE Baltimore Field Office Director, Nikita Baker; Attorney General, Pamela Bondi; and Secretary of State, Marco Rubio (collectively "Defendants").  Abrego Garcia specifically alleges that his removal to El Salvador violated the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(A)(Count I); the Due Process Clause of the Fifth Amendment (Count II); and the Administrative Procedure Act, 5 U.S.C. § 706(2) (Count III); and, pleaded in the alternative, qualifies him for habeas relief pursuant to 28 U.S.C. § 2241 (Count V).  ECF No. 1.  The matter is now before the Court on Plaintiffs' motion for preliminary injunction, ECF No. 6, following full briefing and a hearing held on April 4, 2025.  This Memorandum Opinion sets forth the Court's findings in support of the Order entered on April 4, 2025.

## II.    Jurisdictional Challenges

The Defendants' only meaningful challenge to the motion is that this Court lacks the power to hear this case.  They advance three arguments.  The Court considers each in turn.

## A.    The Court lacks Jurisdiction Because the "Core" of the Claims Sound in Habeas

Defendants first argue that because Abrego Garcia challenges his confinement in CECOT, the "core" of his claims sound only in habeas brought pursuant to 28 U.S.C. § 2241 *et seq*.  ECF No. 11 at 7, citing *DHS v. Thuraissigiam*, 591 U.S. 103, 117 (2020) ("habeas…is the appropriate

---

[9] Vasquez Sura and A.A.V's claims are not the subject of this decision, and so for clarity, the Court refers solely to Plaintiff Abrego Garcia.

remedy to ascertain…whether any person is rightfully in confinement or not."). And as such, suit is proper only against the immediate "custodian" (the Warden of CECOT) and in the jurisdiction where Abrego Garcia is confined (El Salvador). *Id.* at 9.

Defendants are wrong on several fronts. Abrego Garcia exclusively challenges his lawless return to El Salvador, not the fact of his confinement. ECF No. 1 at 16-20. This is the core of his claim, as Defendants concede, which is why his suit would remain equally strong had Defendants released Abrego Garcia to the streets of El Salvador instead of CECOT. Hr'g. Tr., Apr. 4, 2025, at 19. As Defendants did in *J.G.G. v. Trump*, Civil Action No. 25-766 (JEB), 2025 WL 890401, at *7–8 (D.D.C. Mar. 24, 2025), they fundamentally ignore the difference between challenging legality of *removal* as opposed to confinement. *Id.*[10] For purposes of this decision, however, Abrego Garcia simply does not challenge his confinement. The removal itself lies at the heart of the wrongs. Thus, the Court need not wade into the murky jurisdictional implications that flow from such a challenge.

But even if the Court considers the thorny question of "custody" as it pertains to Abrego Garcia's habeas claim (Count V), the Defendants are not out of the woods. They do indeed cling to the stunning proposition that they can forcibly remove any person—migrant and U.S. citizen alike —to prisons outside the United States, and then baldly assert they have no way to effectuate return because they are no longer the "custodian," and the Court thus lacks jurisdiction. As a practical matter, the facts say otherwise.

The facts are that the United States exerts control over each of the nearly 200 migrants sent to CECOT. The Defendants detained them, transported them by plane, and paid for their

---

[10] In this context, habeas claims need not be brought to the exclusion of all other claims. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 185–186 (D.D.C. 2015) (noting that "APA and habeas claims may coexist" where aliens challenge their detention in violation of removal procedures).

placement in the mega-jail until "the United States" decides "their long-term disposition."[11] Against this backdrop, Defendants have produced *no evidence* to suggest they cannot secure one such detainee, Abrego Garcia, for return to the United States. Equally important, to credit Defendants' argument would permit the unfettered relinquishment of any person regardless of immigration status or citizenship to foreign prisons "for pennies on the dollar."[12]

Nor do the Defendants cite any authority to support this eye-popping proposition. Sure, they point the Court to *Munaf v. Green*, 553 U.S. 674 (2008), but that decision has little bearing here. In *Munaf*, the Court reviewed whether plaintiffs, American citizens who voluntarily traveled to Iraq and were subsequently detained for violations of Iraqi law, could challenge their detention. The Court concluded that while the district court retained jurisdiction in the first instance, *id.* 686, the merits of the habeas challenge failed because "Iraq has the sovereign right to prosecute Omar and Munaf for *crimes committed on its soil.*" *Id.* at 695 (emphasis added).

Here, by contrast, Abrego Garcia is *not* being held for crimes committed in or against El Salvador, the United States, or anywhere else for that matter. His claims do not implicate any question of competing sovereign interests, and so, *Munaf* offers little guidance.[13] Thus, while the

---

[11] *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7.

[12] *Louis Casiano, U.S. Paid El Salvador to Take Venezuelan Tren de Aragua Members for 'Pennies on the Dollar,' White House Says*, FOX NEWS (Mar. 26, 2025), https://www.foxnews.com/politics/us-paid-el-salvador-take-venezuelan-tren-de-aragua-members-pennies-dollar-white-house-says.

[13] Defendants also urged this Court to follow *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009), wherein the United States Court of Appeals for the District of Columbia held that a claim could not sound in habeas where the plaintiff sought relief to avoid "torture" in the receiving country. The *Kiyemba* Court held that because a "district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee," the habeas claims fail on the merits. *Id.*, citing *Munaf*, 553 U.S. at 514. That is not this. Defendants have already determined that Abrego Garcia must not be returned to El Salvador because he had established under the INA that he faces persecution from Barrio18. ECF No. 1-1. Defendants remain bound to that decision just as much today as they were when they decided not to appeal that determination. Defendants' violation of the INA in detaining Abrego Garcia in El Salvador does not implicate United States' policy decisions as to El Salvador's possible propensity to violate the Convention Against Torture writ large. ECF No. 11 at 16 (this Court should defer to the Defendants' determination that Abrego Garcia will not likely be tortured or killed in El Salvador, this implicating Executive policy decisions). Accordingly, *Kiyemba* does not counsel a different outcome.

9

success of Abrego Garcia's preliminary injunction motion does not depend on the success of his habeas claim, Defendants also fail to convince this Court that the claim will not survive in the end. For purposes of this decision, suffice to say the Court retains jurisdiction because Abrego Garcia challenges his removal to El Salvador, not the fact of confinement.

### B.    Redressability

Defendants next make a narrow standing argument, contending that because the claims are not redressable, this Court lacks the power to hear the case.  ECF No. 11 at 10.  Federal courts are ones of limited jurisdiction, hearing only live "Cases" and "Controversies."  U.S. Const. art. III, § 2.  A party's standing to maintain an action "is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Davis v. Fed. Election Comm.*, 554 U.S. 724, 733 (2008) (citations omitted).  To satisfy Article III standing, the plaintiff must make plausible that he "(1)[] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The Defendants' redressability argument, simply put, is that their placement of Abrego Garcia in an El Salvadoran prison deprives them of any power to return him.  Thus, they say, even if Abrego Garcia succeeds on the merits, Defendants are powerless to get him back.  The facts demonstrate otherwise.

First, Defendants can and do return wrongfully removed migrants as a matter of course. This is why in *Lopez-Sorto v. Garland*, 103 F.4th 242, 248–53 (4th Cir. 2024), the Fourth Circuit concluded that the Defendants could redress wrongful removal to El Salvador by facilitating the

10

plaintiff's return per DHS' own directives. *Id.* at 253*; see also Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Aliens who are removed may continue to pursue their petitions for review, and those that prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal.").

Second, Defendants unilaterally placed hundreds of detainees behind the walls of CECOT without ceding control over the detainees' fates, as the detainees are in CECOT "*pending the United States' decision on their long-term disposition.*" *See* Matthew Lee & Regina Garcia Cano, *Trump Officials Secretly Deported Venezuelans and Salvadorans to a Notorious Prison in El Salvador*, ASSOCIATED PRESS (Mar. 15, 2025), https://apnews.com/article/trump-deportations-salvador-tren-aragua-64e72142a171ea57c869c3b35eeecce7. Unlike Abrego Garcia, for whom *no* reason exists to detain him, Defendants transported many individuals who had been detained in the United States while awaiting immigration proceedings.[14] Yet, despite Defendants' power to transfer those awaiting hearings to CECOT for a "good price," Defendants disclaim any ability to secure their return, including Abrego Garcia. ECF No. 11 at 11. Surely, Defendants do not mean to suggest that they have wholesale erased the substantive and procedural protections of the INA in one fell swoop by dropping those individuals in CECOT without recourse. Instead, the

---

[14] *See, e.g.,* 25-cv-766-JEB, ECF No. 55-1 (Declaration of S.Z.F.R., a female detainee formerly held at Webb County Detention Center in Laredo, Texas awaiting a merits hearing on her asylum claims was part of the mass transport to CECOT but ultimately returned to the United States because CECOT would not accept females); ECF 67-10 (Declaration of immigration attorney for Jose Hernandez Romero, who had been detained at Otay Mesa Detention Center pending his asylum hearing at time was transported to CECOT); ECF No. 67-11 (Declaration of immigration attorney for detainee, G.T.B., a native of Venezuela who had been detained at Aurora Contract Detention Facility awaiting deportation proceedings when transported to CECOT without warning. ICE ultimately returned her to the United States); ECF No. 67-11 (Declaration of immigration attorney for detainee, Jerce Reyes Barrios, who had been housed at Otay Mesa Detention Center awaiting hearing on protected status, prior to transport to CECOT); ECF No. 67-14 (Declaration of immigration attorney for detainee, E.V., who had been housed at Moshannon Valley Processing Center in Philipsburg, Pennsylvania awaiting hearing on final order of removal when transported to CECOT); ECF No. 67-16 (Declaration of immigration attorney for detainee J.A.B.V, who had been detained domestically prior to his removal hearing scheduled for April 7, 2025 was transported to CECOT); ECF No. 67-17 (Declaration of immigration attorney for detainee, L.G., who had been detained at Moshannon Valley Processing Center in Philipsburg, Pennsylvania, awaiting removal proceedings prior to transfer to CECOT).

record reflects that Defendants have "outsource[d] part of the [United States'] prison system."[15] *See also* U.S. Dep't of Homeland Sec., *How It's Going*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025) (quoting Defendant Noem: "This facility is one of the tools in our toolkit that we will use")."[16] Thus, just as in any other contract facility, Defendants can and do maintain the power to secure and transport their detainees, Abrego Garcia included.

In the end, Defendants' redressability argument rings hollow. As their counsel suggested at the hearing, this is not about Defendants' *inability* to return Abrego Garcia, but their lack of desire.

> THE COURT: Can we talk about, then, just very practically, why can't the United States get Mr. Abrego Garcia back?
>
> MR. REUVENI: Your Honor, I will say, for the Court's awareness, that when this case landed on my desk, the first thing I did was ask my clients that very question. I've not received, to date, an answer that I find satisfactory.

Hr'g Tr., Apr. 4, 2025, at 35–36. *See also id.* at 50 (counsel seeking 24 hours to persuade Defendants to secure Abrego Garcia's return). Flat refusal, however, does not negate redressability. The record reflects that the remedy is available. Abrego Garcia maintains standing to sue.

**C.    Section 1252(g) of the INA Does Not Strip the Court's Jurisdiction in this Case**

Lastly, Defendants argue that 8 U.S.C. § 1252(g) ("Section 1252(g)") deprives the Court of jurisdiction to review this matter. The statute reads:

---

[15] Nayib Bukele (@nayibbukele), X (Mar. 19, 2025, 8:12 PM), https://x.com/nayibbukele/status/1886606794614587573
[16] U.S. Dep't of Homeland Sec.*, How It's Going*, DHS, https://www.dhs.gov/medialibrary/assets/video/59108 (last visited Apr. 4, 2025) (quoting Defendant Noem: "This facility is one of the tools in our toolkit that we will use").

> Except as provided in this section and notwithstanding any other provision of law (statutory or non-statutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

Defendants concede that *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482 (1999), commands a narrow construction of Section 1252(g), limiting application solely to the Attorney General's exercise of lawful discretion to (1) commence proceedings; (2) adjudicate cases; or (3) execute removal orders. *Id.* ("It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings."). *See also Bowrin v. U.S. I.N.S.*, 194 F.3d 483, 488 (4th Cir. 1999) (noting that Section 1252(g) only stripped federal courts of jurisdiction to review the "Attorney General's decision to exercise her *discretion* to initiate or prosecute the specific stages in the deportation process."). As the *Reno* Court explained, "there was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's *discrete acts* . . . which represent the initiation or prosecution of various stages in the deportation process." *Id.* (emphasis added). Thus, this Court is deprived of jurisdiction only for the discretionary decisions made concerning the three stages of the deportation process. *See Bowrin*, *v. U.S. INS*, 194 F.3d 483, 488 (4th Cir. 1999); *U.S. v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1339–1341 (N.D. Ga. 2017); *Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92 (E.D.N.Y. 2018). *But see Silva v. United States*, 866 F.3d 938 (8th Cir. 2017).

13

Defendants press that Section 1252(g) precludes jurisdiction here because the claims concern Defendants' "execution of his removal order." ECF No. 11 at 13. The argument fails in both fact and law.

First, the Court cannot credit that Defendants removed Abrego Garcia pursuant to an "executed removal order" under the INA. Defendants have not produced *any* order of removal as to Abrego Garcia, executed or otherwise, or submitted any proof that they had removed him pursuant to one. Hr'g Tr. Apr. 4, 2025, at 20 (counsel admitting no order of removal is part of the record); *see also id*. at 22 (counsel confirming that "the removal order" from 2019 "cannot be executed" and is not part of the record). Nor have any other corollary documents surfaced, such as a "warrant for removal/deportation" customarily served on an alien as part of a lawful deportation or removal. *Id*.[17] From this, the Court cannot conclude that Abrego Garcia was spirited to CECOT on an "executed removal order" such that Section 1252(g) is implicated.

Second, even if there were an executed order of removal for Abrego Garcia, his claims do not seek review of any discretionary decisions. He is not asking this Court to review the wisdom of the Attorney General's lawful exercise of authority. Rather, he asks that the Court determine whether his return to El Salvador violated the INA. In this circumstance, the Fourth Circuit has spoken.

*Bowrin v. U.S. INS,* 194 F.3d 483 (4th Cir. 1999) made plain that review of agency decisions involving pure questions of law "do not fall into any of the three categories enumerated in § 1252(g)." *Bowrin*, 194 F.3d at 488. Section 1252(g), the *Bowrin* Court emphasized, "does not apply to all claims arising from deportation proceedings, because §

---

[17] *See* sample warrant for removal at https://www.ice.gov/sites/default/files/documents/Document/2017/I-205_SAMPLE.PDF

1252(g) stripped the federal courts of jurisdiction only to review challenges to the Attorney General's decision to *exercise her discretion* to initiate or prosecute these specific stages in the deportation process." *Id.* (citing *American-Arab Anti-Discrimination Committee*, 525 U.S. at 482) (emphasis added). *See also Hovsepian*, 359 F.3d at 1155 ("The district court may consider a purely legal question that does not challenge the Attorney General's discretionary authority, even if the answer to that legal question . . . forms the backdrop against which the Attorney General later will exercise discretionary authority."); *Siahaan v. Madrigal*, Civil No. PWG-20-02618, 2020 WL 5893638, at *5 (D. Md. Oct. 5, 2020) ("To insist, as the Respondents do, that this Court lacks jurisdiction because of § 1252(g) to determine the purely legal questions of whether his removal under these circumstances violates the statutory and constitutional provisions that his habeas petition has raised runs contrary to the consistent rulings of the Supreme Court for at least twenty years."); *Coyotl*, 261 F. Supp. 3d at 1339–41. Accordingly, and after exhaustive analysis, *Bowrin* concluded that "absent express congressional intent . . . to eliminate the general federal habeas corpus review pursuant to 28 U.S.C.A. § 2241, the remedy remains available to Bowrin and other aliens similarly situated." *Bowrin*, 194 F.3d at 489 (collecting cases).

Like *Bowrin*, Abrego Garcia presents to this Court a pure question of law: whether Defendants exceeded their authority in returning him to El Salvador, in violation of the 8 U.S.C. § 1231(b)(3)(A). Hr'g Tr., Apr. 4, 2025, at 24. In this Court's view, no plainer question of statutory interpretation could be presented. Thus, Section 1252(g) does not deprive the Court of jurisdiction over the claims.

In sum, the Court retains jurisdiction over this case.  And even though Defendants concede that if this Court retains jurisdiction, Abrego Garcia prevails on the merits of his preliminary injunction,[18] for the benefit of all, the Court briefly addresses why this concession makes sense.

### III.    Merits of Preliminary Injunctive Relief

A preliminary injunction is an extraordinary remedy that should be granted only upon "a clear showing that the plaintiff is entitled to relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (internal quotation marks omitted) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)).  Generally, injunctions are sought to "preserve the status quo so that a court can render a meaningful decision after a trial on the merits." *Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781, 788 (4th Cir. 1991) (quotation omitted); *see also United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 498 (4th Cir. 1999).  By contrast, injunctions which alter the status quo, known as "mandatory injunctions," are highly disfavored, *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980), and should be granted only when "necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind," *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003), *abrogation on other grounds recognized in Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 353–54 (4th Cir. 2011); *see also Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024).  Abrego Garcia requests relief designed to retore the status quo ante, or the "last uncontested status between the parties which preceded the controversy." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).  That is, to return him to where he was on March 12, 2025, before he was apprehended by ICE and spirited away to

---

[18]*See* Hr'g Tr., Apr. 4., 2025, at 25:10–14 (Mr. Reuveni: "if you're not buying our jurisdictional arguments, like, we're done here . . . . We have nothing to say on the merits.").

CECOT.

To receive the benefit of injunctive relief, Abrego Garcia must demonstrate by preponderant evidence four well-established factors: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that issuing the injunction is in the public interest. *See Winter*, 555 U.S. at 20. The Court considers each factor separately.

### A.    Likelihood of Success of the Merits

As to likelihood of success on the merits, Abrego Garcia need only demonstrate a likelihood of success on one cause of action. *See Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 613 (D. Md. 2019). Defendants concede success as to Count I, their violation of the INA. The Court agrees.

An alien "may seek statutory withholding under [8 U.S.C.] § 1231(b)(3)(A), which provides that 'the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'" *Johnson v. Guzman Chavez*, 594 U.S. 523, 530 (2021)). "If an alien is granted withholding-only relief, DHS may not remove the alien to the country designated in the removal order unless the order of withholding is terminated. 8 C.F.R. §§ 208.22, 1208.22. The withholding of removal is country-specific and more stringent than other forms of relief from deportation because once the noncitizen "establishes eligibility for withholding of removal, the grant is mandatory." *Amaya v. Rosen*, 986 F.3d 424, 427 (4th Cir. 2021), *as amended* (Apr. 12, 2021) (quoting *Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 353–54 (4th Cir. 2006)).

Accordingly, pursuant to Section 1231(b)(3)(A), once an alien is granted withholding of

removal, the Defendants "may not" remove the alien to the identified country.  It is undisputed that "Abrego Garcia, was removed to El Salvador despite a grant of withholding of removal to that country." ECF No. 11.  Even more disturbing, the Defendants concede that it cannot even produce the documents which reflect *any* authority, lawful or otherwise, to transfer him to El Salvador.  Thus, the record plainly reflects that Defendants' forced migration to El Salvador violates Section 1231(b)(3)(A).  He is guaranteed success on the merits of Count I.

Next as to Count II, the procedural due process claim, Abrego Garcia alleges that Defendants forced removal to El Salvador without *any process* constitutes a clear constitutional violation.  This the Defendants also concede.  But for completeness, the Court briefly addresses why the parties are correct.  To succeed on a Fifth Amendment due process claim, the plaintiff must show that he possesses "a constitutionally cognizable life, liberty, or property interest"; that he was deprived of that interest because of "some form of state action"; and "that the procedures employed were constitutionally inadequate." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013).

Abrego Garcia has demonstrated that he had a liberty interest by virtue of the INA in avoiding forcible removal to El Salvador.  "In order for a statute to create a vested liberty or property interest giving rise to procedural due process protection, it must confer more than a mere expectation (even one supported by consistent government practice) of a benefit." *Mallette v. Arlington County Employees' Supplemental Ret. Sys. II*, 91 F.3d 630, 635 (4th Cir.1996).  There must be entitlement to the benefit as directed by statute, and the statute must "'act to limit meaningfully the discretion of the decision-makers.'" *Id.* (quoting *Board of Pardons v. Allen*, 482 U.S. 369, 382 (1987) (O'Connor, J., dissenting))."  Here, the statutory scheme which conferred withholding of removal also entitled Abrego Garcia to not be returned to El Salvador absent

process.  Further, the statutes at issue eliminated the discretion altogether.  Thus, this element is easily met.

As to the third element, Defendants deprived Abrego Garcia of this right without *any procedural protections* due to him.  Indeed, nothing in the record suggests that Abrego Garcia received any process at all.  Accordingly, he is likely to succeed on the merits of Count II.

Last, and for similar reasons, Abrego Garcia is likely to succeed on the merits of the APA claim, Count III.  The APA mandates that "agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414(1971), *abrogated by Califano v. Sanders*, 430 U.S. 99; 5 U.S.C. § 706(2); *W. Virginia v. Thompson*, 475 F.3d 204, 209 (4th Cir. 2007).  An agency action is arbitrary and capricious when the agency disregards rules or regulations still in effect or departs from a prior policy without "articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *See Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018).  In short, an agency may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

The Defendants do not dispute that its expulsion of Abrego Garcia to El Salvador constitutes a final agency action.  Nor do they dispute that the decision was without any lawful authority whatsoever.  Nor have Defendants articulated any rationale for taking such action.  Their action was lawless, and thus in violation of the APA.

Abrego Garcia, as all who have touched this case recognize, is likely to succeed on the merits of these claims.  The first *Winter* factor is thus satisfied.

B.    **Irreparable Harm**

Regarding the second *Winter* factor, Abrego Garcia must show that he will be irreparably harmed in the absence of preliminary injunctive relief. *See Winter*, 555 U.S. at 20. This standard requires more than the mere "possibility" of irreparable harm; rather, the plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction." *Id.* at 21.

Obviously, "the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm." *J.G.G.,* 2025 WL 890401, at *16*, citing United States v. Iowa*, 126 F.4th 1334, 1352 (8th Cir. 2025) (torture); *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (physical abuse). Perhaps this is why Defendants anemically suggested that Abrego Garcia failed to show he would be "harmed" in CECOT, but then abandoned that contention at the preliminary injunction hearing. Certainly as to Abrego Garcia, the IJ found that returning him to El Salvador *at all* would likely subject him to persecution at the hands of Barrio 18, to include the risk of death. ECF No. 1-1 at 7.

More fundamentally, Defendants do not dispute that their placement of Abrego Garcia at CECOT invites this very harm. Defendants effectuated his detention in one of the most notoriously inhumane and dangerous prisons in the world. Defendants even embrace that reality as part of its well-orchestrated mission to use CECOT as a form of punishment and deterrence. ECF No. 10-5 at 4 (Defendant Noem announcing while standing in front of caged prisoners at CECOT "if an immigrant commits a crime, this is one of the consequences you could face . . . . You will be removed and you will be prosecuted.").

But particular to Abrego Garcia, the risk of harm shocks the conscience. Defendants have forcibly put him in a facility that intentionally mixes rival gang members without any regard for protecting the detainees from "harm at the hands of the gangs." ECF No. 10-3 at 15. Even worse,

Defendants have claimed—without any evidence—that Abrego Garcia is a member of MS-13 and then housed him among the chief rival gang, Barrio 18. Not to mention that Barrio 18 is the very gang whose years' long persecution of Abrego Garcia resulted in his withholding from removal to El Salvador. To be sure, Abrego Garcia will suffer irreparably were he not accorded his requested relief. He has satisfied the second *Winter* factor.

### C.    Balance of Equities and Public Interest

The Court considers the last two factors in tandem because "the balance of the equities and the public interest . . . 'merge when the Government is the opposing party.'" *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 242 (D. Md. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As to the balance of the equities, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S., at 24 (quoting *Amoco Prod. Co. v. Gambell, AK*, 480 U.S. 531, 542 (1987)). When considering the public interest, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The Court is mindful that it may not collapse this inquiry with the first *Winter* factor. *See USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025) (explaining that it is "circular reasoning" to argue that a government "program is against the public interest because it is unlawful" and that such argument "is nothing more than a restatement of their likelihood of success").

"Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken,* 416 U.S. at 436. Equally important, the public remains acutely interested in "seeing its governmental institutions follow the law. . . ." *Roe v. Dep't of Def.*, 947 F.3d at 230–31 (4th Cir. 2020) (internal quotation

21

marks and citation omitted).  The absence of injunctive relief places this interest in greatest jeopardy, as demonstrated by Abrego Garcia's experience over the past three weeks.

Defendants seized Abrego Garcia without any lawful authority; held him in three separate domestic detention centers without legal basis; failed to present him to any immigration judge or officer; and forcibly transported him to El Salvador in direct contravention of the INA.  Once there, U.S. officials secured his detention in a facility that, by design, deprives its detainees of adequate food, water, and shelter, fosters routine violence; and places him with his persecutors, Barrio 18. In short, the public interest and companion equities favor the requested injunctive relief.[19]

## IV.    Conclusion

Based on the foregoing, the Court retains jurisdiction to hear this case.  Abrego Garcia has also demonstrated that he is entitled to the injunctive relief sought.  The Court's April 4, 2025 Order thus remains in full force and effect.[20]

Date: April 6, 2025

/S/
_____
Paula Xinis
United States District Judge

---

[19] Defendants suggested in their response that the public retains an interest in not returning Abrego Garcia to the United States because "he is a danger to the community," ECF No. 11, only to abandon this position at the hearing. Again, with good reason.  No evidence before the Court connects Abrego Garcia to MS-13 or any other criminal organization.
[20] For these same reasons, the Court denies Defendants' Motion to Stay the Court's April 4, 2025 Order.  ECF No. 29.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Maryland**

**Notice of Electronic Filing**

The following transaction was entered on 4/6/2025 at 8:19 AM EDT and filed on 4/6/2025

| | |
|---|---|
| **Case Name:** | Abrego Garcia et al v. Noem et al |
| **Case Number:** | 8:25-cv-00951-PX |
| **Filer:** | |
| **Document Number:** | 32(No document attached) |

**Docket Text:**
PAPERLESS ORDER: for the reasons stated in [31] Memorandum Opinion, [29] Motion to Stay is denied. Signed by Judge Paula Xinis on 4/6/2025. (jf3s, Deputy Clerk)


**8:25-cv-00951-PX Notice has been electronically mailed to:**

Tarra DeShields Minnis     Tarra.DeShields@usdoj.gov, CaseView.ECF@usdoj.gov, tracy.lichtel@usdoj.gov

Erez Reuveni     erez.r.reuveni@usdoj.gov

Jonathan Gordon Cooper     jonathancooper@quinnemanuel.com, ecf-f8f66fa03bc4@ecf.pacerpro.com

Rina Mahesh Gandhi     rina@murrayosorio.com, cspeller@murrayosorio.com, egomez@murrayosorio.com, etonnesen@murrayosorio.com, jgoodman@murrayosorio.com, karina@murrayosorio.com, ssandoval@murrayosorio.com

Simon Y Sandoval-Moshenberg     ssandoval@murrayosorio.com, 8106988420@filings.docketbird.com, cspeller@murrayosorio.com, ecampos@murrayosorio.com, jclaure@murrayosorio.com, jsebastian@murrayosorio.com, jsolarte@murrayosorio.com, karina@murrayosorio.com, nleus@murrayosorio.com, pvalencia@murrayosorio.com, vperez@murrayosorio.com

Andrew J. Rossman     andrewrossman@quinnemanuel.com

**8:25-cv-00951-PX Notice will not be electronically delivered to:**